IN THE SUPERIOR COURT, STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF PLACER

--oOo--

**CERTIFIED TRANSCRIPT**

MARK F. BUCKMAN,

          Plaintiff,                No. SCV 0051637

     vs.

NATALIE B. PITRE, CARL T.
PITRE and Does 1 Through 10,
inclusive,

          Defendants.                /
--------------------------------------

DEPOSITION OF

NATALIE B. PITRE

VOLUME 1, PAGES 1 - 311

Monday, January 27, 2025

MARY BARDELLINI & ASSOCIATES
920 Blitz Lane
Auburn, CA 95603
530.823.2950

STENOGRAPHICALLY REPORTED BY: CHRISTINE BEDARD, CSR #10709



Mary Bardellini
& Associates

INTERACTIVE REALTIME REPORTING

**(530) 823-2950**

920 Blitz Lane • Auburn, California 95603
Roseville and Sacramento Locations Available

**EXHIBIT 3**

MR. BUCKMAN:  Q.  Did you draft emails for Mom and write them for her?    09:29:26 09:29:28

A.  I have.    09:29:30

Q.  Did you draft emails and -- under your mom's name and send them to Attorney Steve Reese?    09:29:31 09:29:37

A.  Yes.    09:29:39

Q.  And did you identify yourself as a sender of that email?    09:29:40 09:29:43

A.  No.    09:29:44

Q.  How many emails did you draft and send to Steve Reese under your mom's account?    09:29:44 09:29:46

A.  I don't know.    09:29:48

Q.  More than ten?    09:29:49

A.  I don't think so.    09:29:52

Q.  How many?    09:29:53

A.  Two or three.    09:29:58

Q.  And why would you draft and send emails from your Mom's account?    09:30:00 09:30:04

A.  Her instruction.    09:30:06

Q.  How did she instruct you?    09:30:07

MR. SCIACCA:  I'm going to object to the extent that it invades attorney-client privileged communication.    09:30:09 09:30:11

Don't answer the question.    09:30:14

MR. BUCKMAN:  She's talking to her mother.  I'm asking what your mother told you.    09:30:15 09:30:17

read back?    09:35:51

THE WITNESS:  Oh, yeah.  I'm sorry.  I'm reading the email.    09:35:52 09:35:54

MR. SCIACCA:  Are you able to read that back.    09:36:00

(Whereupon, the previous question was read by the court reporter.)    09:36:07 09:36:07

THE WITNESS:  Yes.  Perhaps.  I don't know.    09:36:08

MR. BUCKMAN:  Q.  And why -- did you ever tell Steve that you wrote this email?    09:36:11 09:36:14

MR. SCIACCA:  I'm going to object.  Calls for attorney-client privileged communication.    09:36:16 09:36:18

Don't answer that question.    09:36:20

MR. BUCKMAN:  Q.  Has Steve Reese ever been your attorney; ma'am?    09:36:21 09:36:23

A.  Not that I'm aware of.    09:36:29

Q.  Okay.  So did Steve -- did you ever tell Steve Reese that you wrote this email?    09:36:31 09:36:34

A.  Not that I'm aware of.    09:36:42

Q.  Did you ever tell Steve Reese that you had written other emails from your Mom's account to Steve?    09:36:44 09:36:46

A.  I don't think so.    09:36:53

Q.  Okay.  So you say Mom participated with you in writing this email?    09:36:54 09:37:06

A.  Yes.    09:37:07

Q.  Was that the whole email?    09:37:08

A. Well, like, we had a paper through Bank of Hawaii, but we never filed the paper anywhere.

Q. Are you trying to say you thought it was not valid or active?

A. I thought it was not.

MR. SCIACCA: Hang on. I'm going to object to the extent it calls for a legal contention question.

You can answer.

THE WITNESS: I thought it was not valid.

MR. BUCKMAN: Q. So did you take any steps to try to get that -- you signed a document that you became the trustee though; correct?

A. It was some document that I wrote up to try to protect her from getting scammed.

Q. You had a document where Mom resigned as trustee, and you took over as trustee; correct?

A. Yes.

Q. Do you believe that document gave you the power to act as a trustee of the trust?

A. No.

Q. Did you use that document in exercise any of the powers of the trustee under Mom's trust?

A. No, I don't know.

Q. Why did you fill that paper out there?

A. Why what?

Q.   Okay.   So AI existed back in 2020 when you did this?    09:50:57 09:51:01

A.   Well, you just go online and you say, "How do you resign as a trustee?"  And they just give you, you know, some, like, boilerplate thing like legal aid type of Google thing.    09:51:01 09:51:04 09:51:09 09:51:16

Q.   Did you tell anybody in the family that you were taking over?    09:51:16 09:51:18

A.   I told Matt.    09:51:20

Q.   Did you tell anybody else?    09:51:21

A.   I don't think so.    09:51:26

Q.   Why wouldn't you tell Mark?    09:51:27

A.   I don't know.  I told Mark about this trust change.    09:51:32 09:51:35

Q.   I'm asking about you being the acting trustee of Mom's trust.  There's documents that say you're the acting trustee; correct?    09:51:36 09:51:40 09:51:42

A.   There is a paper with Bank of Hawaii.    09:51:45

Q.   And did you take over Mom's finances?    09:51:48

A.   No.    09:51:50

Q.   At any time were you in charge of Mom's finances?    09:51:52

A.   No.    09:51:54

Q.   At any time were you in charge of Mom's banking?    09:51:56

A.   No.    09:51:58

Q.   At any time were you in charge of mom's bills;    09:51:59

51

paying of any type of bills?                    09:52:02

A. Yes.                    09:52:04

Q. What were those?                    09:52:05

A. Electric, water, Internet, just -- utility bill.                    09:52:07

Q. How about the mortgage?                    09:52:15

A. The mortgage is set up through -- was set up through the bill pay as well.                    09:52:18 09:52:21

Q. We're asking if you're responsible for that.                    09:52:22

A. I don't understand that.                    09:52:26

Q. Are you --                    09:52:27

A. Am I responsible for Mom's mortgage?                    09:52:27

Q. Did you take over responsibility for paying Mom's mortgage?                    09:52:29 09:52:32

A. Since when?                    09:52:34

Q. At any time.                    09:52:35

A. You mean from my own pocket?                    09:52:37

Q. Were you responsible for taking over Mom's bill-paying, including her mortgage?                    09:52:42 09:52:45

MR. SCIACCA:  Do you need clarification?                    09:52:50

THE WITNESS:  Yeah.  I do.  I need clarification.                    09:52:51

MR. BUCKMAN:  Q.  Not from your pocket.                    09:52:53

A. Okay.  So did I orchestrate for Mom's mortgage to be paid with Mom's money?  Is that the question?                    09:52:55 09:53:02

Q. Sure.                    09:53:07

A. Yes.                    09:53:07

Q. And why did you -- would you say you were in charge of that for Mom? 09:53:13 09:53:16

A. Carolyn and me. 09:53:20

Q. Who did most of the work? You or Carolyn? 09:53:21

A. I don't -- I really don't know. 09:53:25

Q. If Carolyn said it was her -- 09:53:29

A. I know it at least -- yeah. At least half of it or more. I don't know. Like, she's Mom's assistant at that time. 09:53:31 09:53:35 09:53:41

Q. And what did she assist Mom with? 09:53:42

A. Setting up bill-pay. 09:53:45

MR. SCIACCA: Objection. Calls for speculation. 09:53:46

You can answer. 09:53:48

MR. BUCKMAN: Q. You live next door to your mother; right? 09:53:48 09:53:50

A. Yes. 09:53:50

Q. You're in and out of her house every day; correct? 09:53:51

A. Yes. 09:53:53

Q. You interact with Carolyn whenever Carolyn's there; correct? 09:53:54 09:53:56

A. Yes. That was all like that before you evicted us. 09:53:57 09:54:00

Q. So what was Carolyn's role? How was she assisting Mom? 09:54:00 09:54:04

A. She talked to her. She helped with her taxes. 09:54:05

A.  Because after the trust changed and I told you about the change in the trust, then you showed up, about -- I don't know -- a week or a month later with Emma to distract us and went and talked to Mom.

Q.  Okay.  So do you know anything about Mark having interest in 16th Avenue?

A.  No.

Q.  Have you ever heard that from Mark?

A.  Mark has claimed --

Q.  Have you ever heard that from Mark?  Yes or no, ma'am?

A.  -- in Mom's deposition that he has an interest --

Q.  Ma'am, please let's try --

THE REPORTER:  Hold on.  You can't talk over each other.

MR. BUCKMAN:  Q.  But you don't get to just -- you get to answer the questions, and another time you get to volunteer stuff if you want.

I'm going to ask you a simple question:  Do you know about Mark's interest in 16th Avenue?

A.  No.

Q.  Had you ever heard of that from Mark prior to your mother's deposition?

A.  No.

Q.  Have you ever heard of that from Mom prior to her

10:16:20
10:16:23
10:16:25
10:16:29
10:16:32
10:16:35
10:16:36
10:16:39
10:16:42
10:16:44
10:16:45
10:16:46
10:16:49
10:16:53
10:16:55
10:16:56
10:16:58
10:17:01
10:17:02
10:17:05
10:17:08
10:17:10
10:17:12
10:17:14
10:17:14

A.  You just log online.    01:20:20

Q.  Okay.  And did you give Mom copies of those statements at any time in 2022?    01:20:21 01:20:26

A.  Copies of the statements that I myself never saw or received?    01:20:29 01:20:32

MR. SCIACCA:  Just answer the question.    01:20:33

THE WITNESS:  No.    01:20:34

MR. BUCKMAN:  Q.  You didn't see or receive any statements from the EASE account in 2022; is that correct?    01:20:34 01:20:36 01:20:38

A.  Not that I'm aware of.    01:20:39

Q.  Okay.  And before Mark arrived -- you said Mark arrived in, like, August of 2023; right?    01:20:40 01:20:43

A.  Mm-hmm.    01:20:47

Q.  In Hawaii.  Before that time, had you given Mom any BankoH EASE statement that showed her money in there and bill paying?    01:20:47 01:20:52 01:20:56

A.  No, but I've showed online.    01:20:59

Q.  Did you ever give Carolyn any of the EASE statements at any time before Mark arrived in August 2023?    01:21:02 01:21:05 01:21:07

A.  No, but she also looked online.    01:21:08

Q.  And did they see that you had bounced mortgage payments?    01:21:11 01:21:14

A.  Yes.    01:21:15

163

Q.   Okay.   Did you get any other pay from Mom for Yacht Harbor Towers?                                              01:23:59
01:24:03

A.   No.                                                     01:24:04

Q.   Then why did you take $9,999 out?                        01:24:05

A.   Because we did two renovations.                          01:24:09

Q.   So you have another renovation?                          01:24:11

A.   We did two renovations.                                  01:24:13

Q.   And so you got 4,999 on the second one?                  01:24:15

A.   5,000 each time.                                         01:24:20

Q.   So why did you only take out 4,999 the second time?   On the same day -- November 25, 2022 -- you withdrew 5,000 in cash from the BankoH EASE; correct?
01:24:21
01:24:25
01:24:30

A.   I don't know the day.                                   01:24:35

Q.   But it's about the correct timing; right?              01:24:36

A.   I will -- I will defer to you.                          01:24:39

Q.   But it's $5,000 cash you took out of the bank of Mom's account?                                              01:24:41
01:24:44

A.   Yes.                                                    01:24:45

Q.   And on the same day, then you withdrew another $4,999 of Mom's cash out of her bank account; correct?      01:24:45
01:24:48

A.   Yes.                                                    01:24:54

Q.   And why did you do it in that amount?   It seems like you're trying to avoid, like, bank reporting requirements.                                             01:24:55
01:24:57
01:25:00

A.   Yeah.   The bank said if you're under 5,000, then     01:25:01

167

you don't have to do the bank reporting requirements.    01:25:04

Q.  And why were you trying to avoid the reporting?    01:25:06
Because you have tax problems; right, ma'am?    01:25:09

A.  No.    01:25:12

Q.  You owe taxes for nine years at that point in    01:25:12
time; right?    01:25:15

MR. SCIACCA:  I'm going to object.    01:25:16

MR. BUCKMAN:  Q.  You have publicly-recorded liens    01:25:20
showing you owe taxes for nine years; right, ma'am?  We    01:25:22
just talked about that money getting taken out of your    01:25:26
mom's account; right?    01:25:28

MR. SCIACCA:  He's asking if you have    01:25:33
publicly-recorded tax liens.    01:25:34

THE WITNESS:  I do have a -- but it's not now.  I    01:25:36
took care of it.    01:25:39

MR. BUCKMAN:  Q.  Did it disappear out of the    01:25:40
public record, ma'am?    01:25:41

A.  Oh, no.    01:25:43

Q.  Okay.    01:25:45

A.  But it's taken care of.    01:25:45

Q.  And that was from nine years of you not paying    01:25:47
taxes and Carl not paying taxes; correct?    01:25:50

A.  It was a transit-accommodation tax from the Airbnb    01:25:52
that I ran.    01:25:56

Q.  Ma'am, nine years of not paying taxes.  You and    01:25:57

168

MR. SCIACCA:  Ask the question.

MR. BUCKMAN:  Q.  Okay.  Under the trust, Manoa was supposed to get -- the trust that got changed in 2022; correct?  You understand that's what we're talking about?

A.  I believe so.

Q.  And Manoa would get -- indirectly -- rent from the back house; correct?

MR. SCIACCA:  I'm just going to object on the grounds that it violence a third party's right to financial privacy.

You can testify as to your understanding.

THE WITNESS:  I don't know.

MR. BUCKMAN:  Q.  Say again.  You don't know what the change in the 2022 trust did for Manoa on the back house?

A.  No.  You said that Manoa was going to get rent.

Q.  Let's ask this.  What was the effect of the 2022 trust change regarding the back house?

MR. SCIACCA:  I'm going to object on the grounds that it potentially violates a third party's right to financial privacy.  Calls for a legal contention and a legal conclusion.

You can answer based on your knowledge.

THE WITNESS:  The back house is going to Manoa

212

rather than Matt.                                              02:08:58

MR. BUCKMAN:  Q.  And when you say, "The back     02:08:59
house is going to Manoa," what do you mean by that?           02:09:01

A.  Manoa was going to inherit the back house rather      02:09:04
than Matt.                                                    02:09:07

Q.  Does that mean he would get title to it?          02:09:07

MR. SCIACCA:  I'm going to object.  Calls for      02:09:10
speculation.  Calls for a legal conclusion.  Calls for a     02:09:11
legal contention.                                             02:09:17

Testify to what you know.                          02:09:18

THE WITNESS:  I don't know.  I never thought it    02:09:19
that far.                                                     02:09:21

MR. BUCKMAN:  Q.  As between you and your mom in   02:09:21
2022, who had a better understanding of how the estate       02:09:23
documents worked?                                             02:09:27

MR. SCIACCA:  Object.  Calls for speculation.      02:09:28

THE WITNESS:  I have no idea.                       02:09:31

MR. BUCKMAN:  Q.  Well, you sat for hours with     02:09:31
your mom drafting a change to the 2022 trust; right?          02:09:33
That multi-page exhibit we looked at earlier; right?          02:09:37

A.  I don't know how long I sat with her to do that.  02:09:47

Q.  And Mom didn't send it on her own.  You had to go  02:09:51
look through the trust and look through it and find the       02:09:54
trust section numbers and all that; correct?                  02:09:57

A.  She and I worked on the document together.        02:09:59

213

STATE OF CALIFORNIA    ]

COUNTY OF NEVADA    ]

I, the undersigned, a Certified Shorthand Reporter in the State of California, hereby certify that the witness (if applicable) in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said proceeding was taken at the time and place therein stated; that the testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete, and true record of the said testimony; and that the witness(if applicable) was informed of his/her opportunity to read and, if necessary, correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceedings and caption named, or in any way interested in the outcome of the cause named in said caption.

Dated this 13th day of February, 2025

_____
CHRISTINE BEDARD, CSR NO. 10709

**MARY BARDELLINI & ASSOCIATES**
920 Blitz Lane
Auburn, CA 95603
530.823.2950


Date:  February 13, 2025

Natalie B. Petri
c/o John Sciacca
Powers Miller
3500 Douglas Boulevard, Suite 100
Roseville, CA 95661

Case:   Buckman vs. Petri
Deposition of NATALIE B. PITRE, Volume I
Deposition taken:  January 27, 2025

Dear NATALIE B. PITRE,

          Please be advised the original transcript of your deposition is ready for your review.

          You may either call my office to make arrangements with me to read and sign the original transcript, or you may contact your attorney or the attorney who arranged for you to be present at your deposition.  If they have ordered a copy of the transcript, you may review their copy and make corrections by indicating on a separate sheet of paper the page and line number and the word or words you wish to correct.  Please then sign your correction sheet at the bottom and return it to the above address.

          As this is a civil action, you have 35 days from the date of this letter to read, correct, if necessary and sign your transcript.  It will then be sealed and sent to the examining attorney pursuant to the applicable law.

                    Sincerely,


                    Christine Bedard
            Certified Shorthand Reporter #10709

cc:  All Counsel