IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PATRICIA W. BUCKMAN,                ) Civil No.:
Individually, and as               ) 1:24-cv-00129-MWJS-KJM
Trustee of the PATRICIA W.         )
BUCKMAN REVOCABLE TRUST;           )
PATRICIA W. BUCKMAN                )
REVOCABLE TRUST,                   )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )
                                   )
MARK F. BUCKMAN                    )
Individually, and as              )
TRUSTEE OF THE MARK F.            )
BUCKMAN TRUST; MARK F.           )
BUCKMAN TRUST; JENNIFER          )
BUCKMAN; JOHN DOES 1-10;         )
JANE DOES 1-10; DOE             )
CORPORATIONS 1-10; DOE          )
PARTNERSHIPS 1-10; and DOE )
GOVERNMENTAL AGENCIES           )
1-10,                           )
                                )
          Defendants.           )
_____ )

VIDEOTAPED DEPOSITION OF PATRICIA W. BUCKMAN

VOLUME III

Taken on behalf of the Defendants at the offices of

Ralph Rosenberg Court Reporters, 1001 Bishop Street,

Suite 2460, Honolulu, HI, commencing at 10:09 a.m. on

Wednesday, September 18, 2024, pursuant to Notice.

Reported by:
MELINDA HERMANSEN, RPR, CSR NO. 545
Certified Shorthand Reporter

Ralph Rosenberg Court Reporters, Inc.
(808) 524-2090

**EXHIBIT**

**13**

Q.   And if Mark worked on 16th Avenue for most days for the whole construction, which is way over six months, you think he shouldn't own any part of it even though that was your agreement; is that correct?

A.   I'm not clear.  I thought he got a certain sum through escrow, but I can't remember.

Q.   Do you think Mark should have received anything for the construction of 16th Avenue?

A.   I thought Mark was a loving and dutiful son who wanted to help me.

Q.   Does that preclude Mark owning 40 percent of 16th Avenue as well?

A.   Yes.

Q.   Why?

A.   I don't think he should ever have owned 40 percent of 16th Avenue.

Q.   Okay.  So last time we looked at a document that said that Mark got 40 percent of 16th Avenue that year in construction.

Do you remember that?

A.   No.

Q.   So I'm giving you what's Exhibit G from last time, if you want to look at that.  I'm sorry.  One second.  It's Exhibit C from last time.  (Handing.)

I'll let you look at that again.  This is

because you don't recall it from our last deposition.

Do you recall looking at that document the last time we were at your deposition?

A.   No.

Q.   Does it look familiar to you at all?

A.   No.

Q.   So it seems like to you, this is a brand-new document in your -- in your consciousness right now?

A.   Well, it has little inklings of -- might be, that I might have seen it, but I don't know.

Q.   If we look at the bottom of Exhibit C there, is that your signature?

A.   Yes.

Q.   Okay.  And is that your writing on the date, 3/25/03?

A.   Yes.

Q.   Okay.

A.   That was some time ago.

Q.   Uh-huh.  This is before you ever purchased Kaunaoa or 16th Avenue, correct?

A.   I don't remember.

Q.   Okay.  If we look at Exhibit C again, if you look at all of the handwriting there, let's look -- start at the top, "William Harper, Agent," is that your handwriting?

Q.   So do you think that means he shouldn't get any portion of 16th Avenue?  He should lose his interest in 16th Avenue because he has a career?

A.   I'm not clear.

Q.   Is that something you would think?

A.   I say I'm not clear.

Q.   I know, but I'm asking, is that -- does that ring a bell?  You mentioned something like that over time, Well, Mark is established.  He'll get some pensions from other people, so he shouldn't get anything.

Have you said things like that?

A.   I don't think I did.

Q.   Okay.  When we look at the line again, "$35,000 to Mark Buckman," and then it says, again, you read it, "He got" --

A.   Yes.

Q.   -- "40 percent of house which he earned in construction," what's your understanding of that?

A.   Exactly that.

Q.   So you believe that was true on that date?

A.   Yes, I do.

Q.   And what do you know that changed since that date, that Mark wouldn't be entitled to 40 percent of 16th Avenue?

A.    I have no idea.

Q.    Okay.  So this was 12 years after 16th Avenue was built, though, right?  It was built in 1991?

A.    I'm not sure of the dates.

Q.    Is that about correct, in your mind, though?

A.    I don't know.

Q.    Okay.  Let's talk again --

A.    I am 89 years old.

Q.    I know, Mom.  I'm -- I'm sorry we're at this. I think we'll get some illumination before too long, and I think you've been told things that Mark is trying to take advantage of Matt, but that's not going to turn out to be true, but we'll look into that a little bit later.  So we'll just hold on.  We're just walking through it step by step for now.  Okay?

A.    Fine.

Q.    So you said that Mark gets 40 percent of 16th Avenue.  Is there any doubt in your mind when it says "40 percent of house which he earned in construction," that house refers to 16th Avenue?

A.    What line is that?

Q.    It starts with 35,000 to Mark Buckman.

A.    I see it.  Uh-huh.

Q.    Did you own any other house at that time?

A.    I don't think so.

pretty clear, that Mark gets 40 percent of 16th Avenue?

A.    I don't know.

Q.    If Mark --

A.    It says 35,000 to Mark Buckman.  This is a while ago.

Q.    Okay.  And along the while ago line, you said "but things change."

What would change such that Mark would no longer be entitled to 40 percent of 16th Avenue?

A.    I have no idea.

Q.    Has anything changed in your mind that would say that Mark should get no part of 16th Avenue?  Let me rephrase that.

Has anything changed such that Mark should not get 40 percent of 16th Avenue?

A.    I don't know, but I never intended to be unfair to Mark, but I also intended to be fair to all my other children.

Q.    If Mark put money into 16th Avenue and Mark built 16th Avenue and Mark financed 16th Avenue, isn't it fair that Mark get his share that you agreed?

A.    It seems so.

MR. WILSON:  And that also misstates the testimony and the facts, but go ahead, Pat.

Q.   Okay.   Did you -- did you see a similar document like this in your previous deposition?

A.   Not to my memory.

Q.   Okay.   So this document is brand new to you today?

A.   Yes.

Q.   Okay.   But you signed it?   You recognize your signature?

A.   Of course I do.

Q.   And do you recognize that as Mark's signature as well?

A.   Yes.

Q.   Okay.   Would you sign a document if it was incorrect?

A.   If it were incorrect, but not to my knowledge that it was incorrect, I would never sign it.

Q.   Okay.   So if you saw it was incorrect, you would not sign it?

A.   Correct.

Q.   Okay.   And when you read it, is there anything incorrect here in Exhibit H?

A.   (Reviews document.)   I'm not sure of your question.

Q.   I'm asking you to look at that document that you signed and tell me if anything there is incorrect,

factually inaccurate.

A.   Seems to be correct.

Q.   Okay.  So as you read it today, and you did take your time to read it, you can't see anything in there that's incorrect, factually inaccurate.

Is that true?

A.   Yes.

Q.   Okay.  And do you recall signing this document?  I know you said you've seen it today for the first time, but do you ever recall signing this document?  Because it is your signature there.

A.   That is my signature, but I do not remember signing it.

Q.   Do you remember possibly where you were when you signed it?

A.   Well, if I don't know that I signed it, I don't know where I signed it.

Q.   Forgive me.  I have to ask you kind of stupid questions because I'm acting as a lawyer here, but sometimes we have to be a little bit too careful.

So do you know if anybody else might have been there when you signed it or reviewed it?

A.   No.

Q.   Okay.

MR. WILSON:  I'm going to give you a minute or

two.  We're past the hour, but go ahead.

THE WITNESS:  Pardon?

MR. WILSON:  No, no.  We're going to shut it down.  I'm going to give Mark an opportunity to ask you a couple more questions and then we're going to shut it down.  Okay?

THE WITNESS:  That's fine.

MR. WILSON:  Okay.

BY MR. BUCKMAN:

Q.  Okay.  So when we -- we look at this, it's referring to a promissory note that you're also signing, on the bottom paragraph, right?  It says, "Pat is signing."

Can you read that last paragraph for me out loud?

A.  [As read] "Pat is signing the promissory note so that Mark receives 40 percent equity share of the property, 16th Avenue, so Pat does not have to pay this money during her lifetime, unless she moves out of 310 Kaunaoa."

Q.  Okay.  So it seems like you can read and understand this document pretty -- pretty comfortably?

A.  Yeah, I think so.

Q.  Okay.  And so there's -- we also looked at another promissory note that you had signed in that

C E R T I F I C A T E


I, MELINDA HERMANSEN, do hereby certify:

That on Wednesday, September 18, 2024, at 10:09 a.m., appeared before me PATRICIA W. BUCKMAN, the witness whose deposition is contained herein; that prior to being examined she was by me duly sworn or affirmed pursuant to Act 110 of the 2010 Session of the Hawaii State Legislature;

That the deposition was taken down by me in machine shorthand and was thereafter reduced to typewriting; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

That pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to this transcript:

    _   Was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

    X   Was **not** made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

    _   Was waived.


I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

Dated this 1st day of October, 2024, in Honolulu, Hawaii.


_Melinda Hermansen_
_____
Melinda Hermansen, RPR, CSR NO. 545