IN THE UNITED STATES DISTRICT COURT

DISTRICT OF HAWAII

PATRICIA W. BUCKMAN,        ) CIVIL NO. 24-00129 MWJS-KJM
Individually, and as       )
Trustee of the             )
PATRICIA W. BUCKMAN        )
REVOCABLE TRUST;           )
PATRICIA W. BUCKMAN        )
REVOCABLE TRUST,           )
                           )
            Plaintiffs,    )
                           )
       vs.                 )
                           )
MARK F. BUCKMAN,           )
Individually, and as       )
Trustee of the MARK F.     )
BUCKMAN TRUST; MARK F.     )
BUCKMAN TRUST;             )
JENNIFER BUCKMAN; JOHN     )
DOES 1-10; JANE DOES       )
1-10; DOE CORPORATIONS     )
1-10; DOE PARTNERSHIPS      )
1-10; and DOE              )
GOVERNMENTAL AGENCIES      )
1-10,                      )
                           )
            Defendants.    )
_____)


DEPOSITION OF JENNIFER BUCKMAN,

Taken on behalf of the Plaintiffs pursuant to

Notice, on Friday, April 25, 2025, commencing at

9:01 a.m., at the Law Office of Richard E. Wilson,

735 Bishop Street, Suite 306, Honolulu, Hawaii 96813.


Ali'i Court Reporting
956 Uwao Street
Honolulu, Hawaii  96825
(808) 394-Alii

**EXHIBIT**

**16**

A    The first amendment?

Q    Right.

A    Well, I don't remember seeing this, but I do know that when Pat signed the documents at Kinko's, she read the entire thing.

Q    What thing?

A    The entirety of the trust.

Q    So your brother had a copy of the first amendment --

A    No.  My husband.

Q    Your husband.  And gave it to your mother-in-law to read the entire 30 pages?

A    Yes.  That's why it took her a long time to read them all, but I sat next to her for almost all of the time.

Q    How long did it take for her to go through all that?

A    I want to say over an hour.  She read like this (indicating).  She's leaning over the page, and she does this thing with her index finger now which is kind of new to her where she crooks it.  She used to, you know, talk to you like this where she'd point her finger up, but now it's more crooked.  I think she's -- I think her arthritis is bothering her.  But she went like this (indicating).

Q    She'd underline each line?

A    She went through every bit of it.

Q    Are you aware of your mother-in-law ever going to Mark and saying, "Mark, you need to help me fix my trust"?

A    I was not aware of the conversations they had before that day.  I knew when we were at lunch at the Outrigger, we talked about the logistics in dropping him off so he could draft things, but I wasn't aware of what they were doing.

Q    And your mother-in-law never came to you and said, "Hey, you know, I know you're a lawyer," words to that effect, "but we need to fix my trust"?

A    No.  She has this mantra called "family only," and she -- I'm not in that circle.  She likes me, but I'm not in her "family only" circle.  That's the three of them and her.

Q    Did Mark ever tell you, "Hey, look, I talked to my mom and she wants me to fix her trust"?

        MS. ING:  Well, let me object because we're getting into spousal privilege.

        MR. WILSON:  Instruct her not to answer.

BY MR. WILSON:

Q    If you want to answer, answer it.  If you don't, you don't have to answer it.

talk to Steve Reese.

Q    And what did Steve Reese say, or you didn't talk to Steve Reese?

A    No.  We did.

Q    And what did Steve Reese say?  That she just signed it without looking at it?

A    No.  I'm not sure.  We'd have to go back and look at his statements.

Q    Do you recall -- getting back to your -- Exhibit 6 to your husband's deposition, was a copy of this given to your mother-in-law?

A    No.  She specifically asked us to keep it for her because she didn't want Natalie to have it.

Q    Okay.  Let's go to Exhibit 7 to your husband's deposition.  It's the warranty deed.  Do you see that?

A    Yes.

Q    Did you see this before it was provided to your mother-in-law on August 10th, 2023?

A    No.  I mean, before she signed it, yes, in that he handed her the documents, but I did not see it before that.

Q    And did she go line through line through this one too?

A    Yes.

A    Okay.  That's a big bunch of stuff.  So let me go through it.  It wasn't just Mark's story. See, I was there when Mark and Matt made their deal. So I know that that happened.  I was present when Pat signed the deed and the trust amendment.  So I know that it wasn't just documents thrown in front of her. When she had questions, when she was going through the trust amendments that he was getting her to sign and she came to a place in the trust where she had a question, she'd call him over and ask him about it.

Q    What was the question if you know, do you remember?

A    I don't remember.  I wasn't paying attention to that.  Although, I do remember --

Can I look at this exhibit again?

Q    Sure.

A    It's the bit about the personal property.

Q    I remember you mentioned about that.

A    Yeah, so --

Q    She was concerned --

A    Hold on.  Let me read it, please.

Okay.  Yes.  So Mark had drafted a -- when we went to Kaiser, Pat and I went to Kaiser, Mark had drafted a change that also would have changed Article V, section 5.01(a), Personal Property

Distribution, and he had proposed to eliminate the part where it said, "The personal and household effects of the grantor shall be distributed at the sole discretion of Natalie P. Pitre with the remaining assets of the trust."  And so when Pat was reading through this at Kinko's and she got to this part, she said, "No.  I don't agree to this.  I don't want this."

And so Mark said, "Okay.  No problem, mom.  We can change that.  We'll like -- we won't have you change that part."

So then he reprinted it without the part that she objected to.  When he reprinted it without the part that she objected to, he gave her the wrong copies the second time.  So it still hadn't changed.  So she read through it again.

Q    When you say "through it," you mean the --

A    The entirety of the trust document.  She was -- it was very important to her to read through the entirety of the trust document because for whatever reason, she felt like that hadn't happened with the amendment that she'd done with Steve Reese.  So when she read through it and she got to this part, she said, "Jen, Jen" -- she was catching my attention

like this, Rich, waving her hand and said, "Jen."

And I said, "I'm right here.  You don't have to yell."

And she said, "This isn't how I wanted it.  This is not how I wanted it."

And I said, "Okay.  What's wrong with it?"

She said, "This still says that it would all be with the trustee and Natalie wouldn't -- wouldn't be distributing the household effects."  And she said, "Natalie will be very mad.  She'll be very mad.  I don't want that.  I don't want to have to deal with that.  I don't want Natalie to be very, very mad."  And so she called Mark over.  She said, "What do I do?"

And I said, "Well, call Mark and tell him he gave you the wrong document.  It's not a big deal."

So he came over.  He looked at it.  He said, "You're right, Mom.  I am so sorry.  I got that one wrong when I reprinted it.  Let me print it again."  And he went and had to go put the credit card back in the machine 'cause it's Kinko's.  So it took him a few minutes.

Q     Okay.

A    And then he went and printed it again so that it remained that Natalie Pitre would distribute the household effects because she was afraid -- Pat said she was afraid of getting yelled at by Natalie if she changed that bit.

Q    So she -- Natalie wouldn't be mad that Mark was putting a mortgage on the house that she was supposed to get, but she'd be mad if the mom changed the trust where she wouldn't get the personal property; correct?

A    We weren't dealing with the mortgage at all that day.  You're confusing dates.

Q    Well, when it came to changing the mortgage, did your mother-in-law say, "Wait a minute. Natalie's going to be mad about that"?

A    She wanted to talk -- my understanding is she wanted to talk to Natalie about that, but I was not there when the mortgage was prepared or signed.

Q    When you were saying what was changed, that was the day that you were there.  That would have been October 10th; correct?

A    No, it was not October 10th.

Q    I'm sorry.  August 10th?

A    Correct.

Q    The only documents that were signed on

August 10th -- let's get this right, was the second amendment --

A    Correct.

Q    -- right?  And there's -- is there anything in the second amendment -- so was the first draft of the second amendment, it had something to the effect that the personal representative -- I mean the personal property was going to be given --

Who was going to get the personal property?

A    The first draft of the second amendment eliminated the last sentence of Article V, section 5.01(a).

Q    And I'm just showing you, this is the second amendment.  So was it above 1.02 Trustee that changed the trusteeship?

A    No.

Q    It was afterwards?

A    Correct.  At least that's my recollection.  I mean, you're talking about a document that I saw for like 30 seconds two years ago.

Q    And the only other document that was signed on August 10th was the deed; right?

A    Correct.  She didn't have any questions

about the deed.  She did have questions about the trust as she was going through it and trying to make sure that everything was how she wanted it, and then she'd call Mark over.  Mark was sitting with the mobile notary because it was taking her a long time to read all through this.  So Mark was sitting on the other end of Kinko's with the mobile notary, and she'd call Mark over when she had questions and he'd explain, you know, what was going on.

MS. ING:  Which exhibit?

THE DEPONENT:  Well, this is -- yeah, so this is Exhibit 3 to J. Buckman now.  Okay.

BY MR. WILSON:

Q    You know what, Ms. Buckman, I have a lot more questions for you, but we'll save that for trial.  I have no further questions.  The only caveat is if there's a tremendous amount of documents that are produced that were requested earlier that come in later, we'll address it with the magistrate.  Other than that, you want to have the opportunity to review and look at your deposition; correct?

A    Yes.

Q    And you'll do that through your counsel?

A    Yes.

Q    Other than that --

to be your mother-in-law's intent, were those plans consistent with what you understood to be your mother-in-law's intent?

A    No.  Matt's house was always intended to be Matt's house, not for Natalie to occupy and for her own benefit.

Q    Okay.  Now, you also just testified about your mother-in-law's review of that second amendment to trust and changes she requested.  Now, she did not -- you had said she had no questions about the deed; right?

A    That's correct.  She --

Q    Okay.

A    -- was -- she was an active broker here for over 40 years and had run her own property management real estate company for a lot of years, and she is fully capable of reading the deed and understanding what she's doing.

Q    All right.  And you testified about the change that she had requested in the trust document. And you saw her review every page of that second amendment to trust?

A    Yes, along with the first amendment to trust.  She was reading them together because that was important to her to make sure that they all fit

together.

Q    Thank you.

A    She had her crooked index finger going through it.  And she got really cold 'cause the air conditioning in Kinko's was set at like 66.  So as you guys have noticed from my deposition, I always have an air conditioning sweater.  So I lent her my sweater and I was freezing.

Q    That's all you remember?

Okay.  Another question asked of you is why you did not think Tammy Buchwald was an appropriate trustee.  Do you recall that line of questioning?

A    Yes.

Q    And why not?

A    Because Tamara lives in Washington D.C. and she comes Hawaii from time to time, but she's not boots on the ground and she had not investigated. When Matt called her and said he was worried about the 2022 trust which he told us he had done, she didn't investigate and just told him, "Don't worry about it.  It will be fine.  It will be fine."  And so from my perspective, if you're going to be the trustee, you have a duty to investigate and figure out what's going on.

Kinko's, did you see Mark ever say something to the effect of telling his mother she had to sign or similar words?

A    No.   When she asked him the question about the personal property, he said, "No, you know, I'll reprint it.   You can have -- you know, you can -- hang on.   I'll reprint it."   And then when he handed it back to her after having made the correction, he said, "Look, Mom, you can sign this or don't sign this.   It's up to you."

Q    And did she say anything in response or do anything in response?

A    She said, "No, no, no, I want to get this taken care of.  I want to make sure I have Matt taken care of.  That's very important to me."

Q    Did Mark try to rush her in her review of the documents before she signed?

A    No.  He went and sat and talked to the notary while we sat maybe like as long as this table is.  I'm terrible estimating distances.

THE WITNESS:  How long is this table, Rich?

MR. WILSON:  Oh, I would say --

THE DEPONENT:  Seven feet?

MR. WILSON:  -- seven feet maybe.

C E R T I F I C A T E


STATE OF HAWAII                    )
                                  )  ss.
CITY AND COUNTY OF HONOLULU )


           I, LAURA SAVO, a Court Reporter in and for the State of Hawaii, do hereby certify:

           That on Friday, April 25, 2025, at 9:01 a.m., appeared before me JENNIFER BUCKMAN, the deponent whose testimony is contained herein; that prior to being examined, the deponent was by me duly sworn or affirmed; that the proceedings were taken in machine shorthand by me and was thereafter reduced to typewriting under my supervision; that the foregoing represents, to the best of my ability, a correct transcript of the proceedings had at that time;

           That pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to the transcript:

           _X_   Was made by the deponent or a party
                 (and/or their attorney) prior to the
                 completion of the deposition.
           ___   Was not made by the deponent or a party
                 (and/or their attorney) prior to the
                 completion of the deposition.
           ___   Was waived.

           I further certify that I am not of counsel or attorney for any of the parties to this case, nor in any way interested in the outcome hereof, and that I am not related to any of the parties hereto.

           Dated this 10th day of May, 2025, in Honolulu, Hawaii.



                            _____
                            LAURA SAVO, RPR, CSR NO. 347
                            STATE OF HAWAII