LOUISE K.Y. ING        2394
TIM PARTELOW           10218
DENTONS US LLP
1001 Bishop Street, Suite 1800
Honolulu, HI  96813
Telephone: (808) 524-1800
Email:   louise.ing@dentons.com
         tim.partelow@dentons.com

Attorneys for Defendants
MARK F. BUCKMAN, individually
and as Trustee of the MARK F. BUCKMAN TRUST,
and JENNIFER BUCKMAN

MARK F. BUCKMAN   SBN 7080
Law Offices of Mark F. Buckman
8359 Elk Grove Florin Rd., Suite 103-320
Sacramento, CA  95829
Email:  markfbuckman@sbcglobal.net

Attorney for Defendant
JENNIFER BUCKMAN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| PATRICIA W. BUCKMAN, PATRICIA W. BUCKMAN REVOCABLE TRUST,<br><br>          Plaintiffs,<br><br>   v.<br><br>MARK F. BUCKMAN, ET. AL.<br><br>          Defendants. | Civil No. 1:24-CV-00129-MWJS-KJM<br><br>DEFENDANTS' MOTION TO COMPEL DEPOSITION, PRODUCTION OF DOCUMENTS, AND TO HOLD MATTHEW BUCKMAN IN CONTEMPT OF COURT FOR FAILING TO OBEY THE COURT ORDERS DIRECTING HIM TO TESTIFY AT DEPOSITION; DECLARATION OF MARK F. BUCKMAN, EXHIBITS 1-7, CoS (ECF # 114, 122, 135, 147, 159)<br>Trial Date: November 3, 2025<br>Judge: Hon. Micah Smith |

**TABLE OF CONTENTS**

I.      INTRODUCTION ...........................................................................................1

II.     SUMMARY OF PERTINENT FACTS ........................................................1

        A.      Matt Is an Important Witness with Relevant Facts and Evidence ........1

        B.      Natalie's Pressure on Matt to "Cooperate" and Not Testify..................5

        C.      The Scheduling, Re-Scheduling, and Court Orders for Matt's
                Deposition ...........................................................................................6

        D.      Matt Was Able, But Not Willing, to Answer Questions at His June 20
                Deposition - And Walked Out When Defendants' Counsel Refused to
                Allow Kimi to Testify for Him ...........................................................8

        E.      Matt Appeared in Other Recent Court Proceedings............................9

        F.      Defendants Have Spent over $10,000 attempting to Take Matt's
                Deposition. ........................................................................................10

III.    ARGUMENT................................................................................................10

        A.      Matt, Like All Persons, Is Presumed Competent ...............................11

        B.      Matthew Did Not Object to His Deposition Notice, Nor Did He File a
                Motion for Protective Order or to Quash ...........................................11

        C.      Matt's Doctor's Letter Does Not Excuse Him From Testifying - and
                His Doctor Confirmed that a Deposition Does Not Present a Health
                Risk Such as Heart Attack or Stroke..................................................12

        D.      Orders Prohibiting a Deposition are Rarely Granted ..........................13

        E.      Matthew Should Be Compelled to Attend His Deposition And
                Produce All Responsive Documents...................................................15

        F.      Since Matt Has Missed or Walked Out on Three Court-Ordered
                Depositions, He Should be Held in Contempt for (1) Failing to Obey
                the Court's May 7 Order, Failing to Obey the Court's June 12 order,
                and for Unilaterally Terminating His Deposition Without Seeking a
                Protective Order ...............................................................................16

        G.      The Court Should Prohibit Anyone Other Than Matt and His Licensed
                Attorney from Being in Deposition room. .........................................17

IV.     CONCLUSION .............................................................................................18

i

## TABLE OF AUTHORITIES

**Cases**

*Dang v. Eslinger*, No. 6:14-cv-37-Orl-31TBS, 2014 U.S. Dist. LEXIS 99550 at *6
(M.D. Fla. July 22, 2014)........................................................................ 12, 13

*ECB USA, Inc. v. Savencia, S.A.*, No. 19-cv-731-GBW-CJB, 2024 U.S. Dist.
LEXIS 110119 (D. Del. June 21, 2024), at *3 ....................................................15

*Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 570 (7th
Cir. 2009) ...........................................................................................14

*Sauer v. Exelon Generation Co.*, 280 F.R.D. 404, 408 (N.D. Ill. 2012) .......... 13, 14

**Rules**

Fed. R. Evid. 601 ........................................................................... 11, 14
Fed. R. Evid. 602 ...............................................................................14
Fed. R. Evid. 603 ...............................................................................14
Fed. R. Civ. P. 30(a)(1)-(2)....................................................................11

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that as soon as the matter may be heard in the above-entitled court, in the courtroom of Magistrate Judge Kenneth J. Mansfield, at the United States Courthouse for the District of Hawaii, located at 300 Ala Moana Blvd, Honolulu, Hawaii 96850, with oral argument to be held on a date and time to be designated by the Court, Defendants Jennifer Buckman and Mark Buckman, individually and as Trustee of the Mark F. Buckman Trust, will move the court for orders against Matthew Buckman (i) compelling him to attend and testify at his deposition as soon as possible, on a date or dates to be selected by defense counsel, (ii) compelling him to provide all responsive documents without objection or claim of privilege, (iii) holding him in contempt of court under Federal Rule of Civil Procedure 45(g) for failing without adequate excuse to obey the Court's May 7, 2025 Order to testify and produce documents (ECF #135) as well as the Court's June 12, 2025 Order to appear for deposition (ECF #159), (iv) and prohibiting anyone other than Matt and his licensed attorney (if any) from attending the deposition on his behalf.

This Motion is based upon Rules 37 and 45 of the Federal Rules of Civil Procedure, the facts and pleadings in this case, Mark Buckman's declaration, the

iii

arguments of counsel, and such other evidence as may be properly before the

Court.

Dated:  Honolulu, Hawai`i, June 30, 2025.

/s/ Louise K.Y. Ing
LOUISE K.Y. ING
TIMOTHY C. PARTELOW
Attorneys for Defendants
MARK F. BUCKMAN, individually
and as Trustee of the MARK F.
BUCKMAN TRUST, and
JENNIFER BUCKMAN

/s/ Mark F. Buckman
MARK F. BUCKMAN

Attorney for Defendant
JENNIFER BUCKMAN

## I.     INTRODUCTION

Defendants Jennifer Buckman and Mark Buckman (Mark)[1], individually and as Trustee of the Mark F. Buckman Trust, move to compel the deposition of Matthew Buckman (Matthew) and production of documents because, although he showed up for his June 20 deposition and was sworn to testify, he abruptly ended the deposition after less than 10 minutes after Kimberly Buckman (Kimi) interjected into the deposition and Matt demanded that Kimi be allowed to testify on his behalf.  Declaration of Mark Buckman ("MFB Decl."), ¶ 3.

## II.     SUMMARY OF PERTINENT FACTS

### A.     Matt Is an Important Witness with Relevant Facts and Evidence

Matt is identified as a witness on both Plaintiffs' and Defendants' initial disclosures.  (ECF #17, para 3; ECF #18, page 2.)  Matt has information relevant to this action, as set forth in Mark's previous declarations filed March 30, 2024 (ECF #114-1, para 15, 16) and June 18, 2025 (ECF #166-1, Decl., ¶ 4-20).  Indeed, even Kimi's hearsay declaration (ECF #163) – which is not competent evidence – seems to confirm that Matt has relevant information. However, this information is not admissible through Kimi's hearsay testimony.

---

[1]   Given the number of parties with the same last name in this case, Defendants follow the established procedure of identifying the parties by first name for clarity; no disrespect to any witness identified in this manner is intended.

1

Matt's testimony is important because, although Plaintiff Patricia Buckman (Patricia or Pat) held record title to the Back House,[2] Defendants believe, and contend, Matt had an equitable interest in it since 2003, when he put down part of the down payment to purchase it. Matt was the beneficiary of the Back House under Pat's trusts since 2006, when the first trust was signed, until 2022, when it was changed under suspect circumstances. MFB Decl. ¶ 4.

Matt knows that, in 2018, Mark talked with Pat and Matt to put the Back House into a spend-thrift trust for Matt, due to his financial irresponsibility. Mark wrote to Pat's then-estate attorney to ask him to draft that change. On March 1, 2018, Pat wrote Mark, "Thank you Mark for taking the lead in this; I have a hard time getting to it . . . ." At that point, it looked like things were moving forward and Matt's interest in the Back House would be protected. MFB Decl. ¶ 5.

Just four days later, Pat wrote to Mark about the Back House, stating,

> "Sounds as if you think I would take Matt's house from him???
> NEVER NEVER NEVER!
> And I don't want to spend a lot of money to accomplish that
> spendthrift trust.  And I need the tax write off.
> Why don't you talk to Matt and see if he is worried?"

MFB Decl. ¶ 6, Exh. 1 (emphasis in original)

---

[2]  The Back House is the main property in dispute in this case.

2

Unfortunately for Matt and the entire Buckman family, he agreed to let the status quo continue and the Back House was not put into a spendthrift trust in 2018.

Natalie moved into the Back House in 2019 and agreed to pay Pat rent. Natalie took over Pat's trust as her successor trustee in 2020.[3] MFB Decl. ¶ 7.

However, in 2022, Pat's trust was changed after Natalie emailed instructions for that change to Pat's estate attorney using Pat's email account, without identifying that the email was actually being sent by Natalie. The resulting 2022 changes completely wrote Matt out of Pat's trust, including any interest in or benefit from the Back House. MFB Decl. ¶ 8.

Matt knows that Mark came to Hawaii in 2023 at Natalie's invitation to "check out" the problems in the family. In July 2023, Matt told Mark he had "f'ed up" by not insisting that the Back House be put in the spendthrift trust for his benefit, that Natalie was not paying rent (which was supposed to indirectly benefit Matt during Pat's lifetime while he was living with Pat in the Front House), and that he thought Natalie was trying to steal the Back House and he would get no benefit from it.  MFB Decl. ¶ 9.

---

[3] Mark had discussed Matt's ownership interest in the Back House with Natalie prior to her moving in, because she wanted to buy it from Pat on very favorable terms.  Mark memorialized Natalie's report of her conversation with Pat in an email on MFB Decl. ¶ 25, Exhibit 7.

After talking with Matt and investigating the situation, Mark discovered that Natalie had not been paying Pat rent on the Back House, and that Natalie had backdated and forged a rental agreement on the Back House, both of which Natalie originally denied (even at deposition). In July 2023, after Natalie forged Pat's name on a rental application for a condo as she was trying to move Matt and his son Manoa to move them out the Front House where they were living with Pat, Matt texted Pat as follows:

> "DID YOU KNOW ABOUT THIS?
>
> WHY IS NATALIE KICKING MANOA AND ME OUT?
>
> HOW COME SHE CAN LIVE IN MY HOUSE WITH MY THINGS AND NOT EVEN PAY RENT THAT ANYONE KNOWS OF?
>
> SHE HAS RUINED YOUR BUISNESS AND IS TEring our family apart to stale these houses! This is awful."[4]

MFB Decl. ¶ 10, Exh. 2.

To obtain the benefit out of the Back House for his lifetime, in August 2023 Matt entered into the "Brother's Agreement" with Mark concerning the Back House. Based in large part on the Brother's Agreement, Mark and Plaintiff then entered into an agreement regarding the Back House. MFB Decl. ¶ 11. The transactions and events related to the transfer of the Back House are the main issues raised in the SAC, as well as being raised in Mark's Counterclaim.

---

[4] Months later, Natalie recanted her earlier deposition testimony and admitted to lying previously, to not paying Pat rent, and to backdating the rental agreement, as well as signing Pat's name electronically to same. MFB Decl. ¶ 12.

4

For obvious reasons, Defendants would like to talk to Matt about these relevant issues.

### B.    Natalie's Pressure on Matt to "Cooperate" and Not Testify

Circumstantial evidence obtained during discovery suggests to Defendants that Matt has been avoiding his deposition because he has been pressured by Natalie Pitre to "cooperate" with her by testifying favorably for her claims in this case. On March 9, 2024, when Natalie was evicting Matt from the Front House, she texted Matt, stating in part:

> Move into your own house, the back house.  That Persian guy is paying you $1000 a month.  You can use that money however you wish – you could pay the property taxes you could pay the utilities.  There are many things you could do with that money.  It's your choice.  **If you cooperate, you will inherit the back house.  Nothing is written in stone, Matt.  You take care of mom by cooperating and vacating and she will take care of you.**

MFB Decl., ¶ 13, Exh. 3, emphasis added.

Defendants have also obtained evidence revealing that Matt was not happy with Natalie's pressure, and he filed an application for a Temporary Restraining Order against her based on her actions to evict him from the Front House, get charge of his medical records, and take actions for him under a power of attorney signed while he was previously hospitalized. In that application, Matt declared under penalty of perjury that:

> I feel like Nat is trying to mess things up for me and wants me out of the picture so she can manipulate my situation to where she gets both of my

5

mother's house[s].  **Nat told me when I got home from the hospital on 2/28/24 that if I do not cooperate then I will not get the back house.**

MFB Decl., ¶ 14, Exh. 4, emphasis added.

### C.    The Scheduling, Re-Scheduling, and Court Orders for Matt's Deposition

Defendants originally scheduled Matt's deposition for February 2025. Matt's deposition was re-scheduled to March pursuant to his request. MFB Decl. ¶ 15.

On the rescheduled date, Matt failed to appear. MFB Decl., ¶ 15. When Matt refused to re-schedule or discuss his deposition, Defendants sought an OSC regarding Matt's deposition, which the court issued. ECF #114 & #122, respectively.

Following a hearing, the Court ordered Matt to produce documents and appear for his deposition on May 19.  ECF #135. Based on that order, Defendants hired a court reporter and a videographer, Mark traveled to Honolulu, and Ms. Ing spent time preparing for Matt's deposition. However, in disobedience to the Court Order, Matt again failed to produce documents or appear for his deposition. MFB Decl., ¶ 16

Defendants filed a status report with court noting that Matt did not appear for his deposition and did not produce any documents, except for two forwarded emails. ECF #147, page 4. The Court then issued a second Order requiring Matt to

6

appear for his deposition, or provide a physician's explanation as to why he could not be deposed, by June 20, 2025. ECF #159.

In response to this Order, Matt filed a "Clarification and Response to Defendants' Status Report on Compliance With Subpoenas" etc. along with a declaration from Kimberly Buckman (Kimi). ECF #162, #163.

As the Clarification and Response acknowledged, Matt did not "provide a physician's explanation as to why he cannot be deposed." Instead, it declared Matt's doctors "have not been asked to provide statements at this time." ECF #162, p. 3. Along with this "Clarification and Response," Matt submitted a random assortment of his medical notes, with a verification of their authenticity provided from his primary care physician. *Id*. The medical notes do not state that Matt cannot be deposed. *Id*. Thus, the medical notes provided with the Clarification and Response did not meet the requirements of the Court's June 12, 2025 Order. *See* ECF #159.

Defendants filed an opposition to Matt's Clarification and an objection to the hearsay Declaration of Kimberly Buckman stating, among other things, that the deposition should go forward. ECF #166, #167. The court did not issue any orders based on the Clarification and Response or the Opposition and Objection thereto.

Matt's deposition was scheduled to start at 9:00 a.m. on June 20. Defendants had again hired a court reporter and a videographer. Defense counsel again prepared for the deposition. Matt did not appear until after 10:00 a.m., when he

7

provided a note from his doctor. The note did not state that Matt could not testify; indeed, Matt agreed to testify and was sworn in to do so. Kimi also attended Matt's deposition. MFB Decl., ¶ 17.

### D.    Matt Was Able, But Not Willing, to Answer Questions at His June 20 Deposition - And Walked Out When Defendants' Counsel Refused to Allow Kimi to Testify for Him

Matt agreed to sit for his deposition, but quickly tried to establish his own rules: he would testify for no more than an hour, and he would testify only if Kimi could speak at the deposition for him. While the transcript is attached as Exhibit 5, the following testimony shows Matt's position:

Q.    And we will be able to take breaks.  This isn't an endurance contest, and we're not in a rush either. So you can take your time or go slow, or if you need to take a break, we'll do that.  Okay?
A.    **So we're only going to be here for like an hour; right?**
Q.    I think we're going to go as far as we can today and see how it goes.
A.    **It's only going to be an hour. No more than that.**[5]
6:21 - 7:6

Q.    Okay. What have you done to prepare for your deposition?
A.    **Kimi[6], help me with that.**  I really don't know.
8:15-18

Q.    So your understanding is Rich Wilson represents Natalie in this lawsuit?
A.    Yeah.
Q.    Okay. And has Natalie told you that Rich Wilson represents her in this lawsuit?
A.    Probably. I'm not -- I don't really know.

---

[5]  Mark was not sent, and had not seen, Matt's email in which he stated he would answer questions for an hour.

[6] Spelling corrected to Kimi throughout.

Q.    Do you know if Mom has an attorney in this lawsuit?
A.    You gotta talk to Natalie.
Q.    Okay. 'Cause Natalie is in charge of this lawsuit?
A.    Probably.
Q.    That's your understanding though?
A.    Yeah.
MS. KIMBERLY BUCKMAN: Mark.
9:21-10:11


A.    Yes. But why did Kimi stop you and not even say -- she was about to say
      something to her and you say no. Why?
Q.    Because only attorneys can represent people in court here. So she's not a
      participant in this.
A.    **She is.**
MS. KIMBERLY BUCKMAN: I wasn't --
Q.    She's not a participant in the deposition.
A.    She -- she -- she helps completely. So she does, so I'm sorry.
Q.    Okay.
A.    **You need to talk to Kimi. So you better get with that now or I'm going
to be out of here or stop.**
Q.    But she cannot --
A.    **I'm going to leave if you don't tell – you don't talk to Kimi. Just so
      you know, I'm going to go.**
Q.    Okay. We don't want you to do that.
A.    **I'm going to go. Are you going to talk to her? I'm going to go.**
MS. KIMBERLY BUCKMAN: All I was going to say to you --
MR. MARK BUCKMAN: You're not his lawyer.
MS. ING: Can we just go off the record.
MR. MARK BUCKMAN: I want the record --
THE WITNESS: **Okay. I'm done.**
11:16-12:21


### E.    Matt Appeared in Other Recent Court Proceedings

Since this case began, Matt Buckman has initiated proceedings against his

sister Natalie Pitre and has appeared and given statements in state court

proceedings related to the possession and occupancy of the Back House. At that

9

hearing, both Matt and Kimi urged the state court to stay that case pending the outcome of this one. Having convinced the state court to grant the stay so that this case could proceed, Matt now seeks to avoid providing testimony and documents in this case – even as Matt continues to occupy the disputed Back House without paying any of the costs associated with it – those costs are being paid by Mark. MFB Decl., ¶ 19.

### F. Defendants Have Spent over $10,000 attempting to Take Matt's Deposition.

Matt has now missed 3 court-ordered depositions. Each time, defense counsel prepared for the depositions, and each time Mark traveled to Honolulu for the deposition. For the second and third deposition dates, Defendants hired court reporters and videographers. Jennifer has incurred thousands of dollars of attorneys' fees, and both Defendants have incurred thousands more to have Ms. Ing prepare for Matt's deposition, to report to the court on production of documents and Matt's failure to appear, and work on this motion. MFB Decl. ¶ 20.

## III. ARGUMENT

As discussed below, even persons who have been adjudicated incompetent, as well as those who merely have aphasia or have suffered strokes, and witnesses with a host of other medical and cognitive issues have all been compelled to testify, even when they would have preferred not to do so. The same should be true with Matt providing testimony in this case.

### A.    Matt, Like All Persons, Is Presumed Competent

A party may take the deposition of "any person, including a party" pursuant to the procedures outlined in the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 30(a)(1)-(2).  Moreover, "Every person is competent to be a witness unless these rules provide otherwise." FRE 601.

Notably, Matt himself has not stated that he cannot testify. [7] And his actions demonstrate the opposite: he has appeared in court and appeared twice at Denton's offices. Most tellingly, Matt agreed to sit for an hour of deposition on June 20 – before abruptly leaving, but not due to any health issue.

### B.    Matthew Did Not Object to His Deposition Notice, Nor Did He File a Motion for Protective Order or to Quash

Matt has not filed a motion for any relief from this court such as a motion to quash or a motion for protective order. In filing such a document, the burden is placed on the moving party to demonstrate good cause for not being deposed, which is a very high burden.

Considering a case where a deponent sought a protective order based in part on his aphasia, the court denied the request and noted that "Protective orders prohibiting depositions are rarely granted. [citation] A party must show extraordinary circumstances before a court will issue such an order. [citation]. ("[I]t is exceedingly difficult to demonstrate an appropriate basis for an order

---

[7]  Defense counsel still has not received nor seen the ECF #168 documents.

barring the taking of a deposition.") *Dang v. Eslinger*, No. 6:14-cv-37-Orl-31TBS, 2014 U.S. Dist. LEXIS 99550 at *6 (M.D. Fla. July 22, 2014).

Indeed, what Matt wants to happen is simply not allowed: Matt would like to have another person, Kimi, testify for him based on what he has told her combined with her own conjecture or imaginings. Kimi was <u>not</u> present when Mark and Matt spoke on the phone, met in person, and made the Brother's Agreement. Indeed, Kimi has already testified that she lacks personal knowledge of the Brother's Agreement, though that hasn't stopped her from expressing speculation and unfounded opinions about the subject. MFB Decl., ¶ 21.

There is no basis to allow Kimi to testify on behalf of Matt. Accordingly, the Court should order Matt to attend his deposition and give his own testimony.

> **C.    Matt's Doctor's Letter Does Not Excuse Him From Testifying - and His Doctor Confirmed that a Deposition Does Not Present a Health Risk Such as Heart Attack or Stroke**

Matt belatedly provided a doctor's letter on June 20.  Counsel's discussion with Dr. Miyamoto on June 30 clarified that his concern was for Matt's aphasia, and not due to any immediate health concern from testifying. When asked if Matt had a risk for heart attack or stroke from testifying, Dr. Miyamoto confirmed that a deposition would not be life-threatening to Matt.  He mentioned that being deposed could cause emotional distress, but that could be true of almost every deponent. MFB Decl., ¶ 22.

In either case, what a deponent says is for the fact-finder to weigh, not a doctor to veto in advance. *Sauer v. Exelon Generation Co.*, 280 F.R.D. 404, 408 (N.D. Ill. 2012).

### D.      Orders Prohibiting a Deposition are Rarely Granted

There is a strong policy in favor of allowing parties to take depositions of deponents with relevant information.  In determining whether to grant a protective order, courts must balance "the movant's proffer of harm against the adversary's 'significant interest' in preparing for trial." *Dang v. Eslinger*, No. 6:14-cv-37-Orl-31TBS, 2014 U.S. Dist. LEXIS 99550, at *6 (M.D. Fla. July 22, 2014).

Dang involved a factually similar scenario, in which the plaintiff "claim[ed] that he suffered chronic, permanent, and irreversible damage to his cognitive and communicative functions, dementia, <u>expressive aphasia</u>, loss of vision, loss of hearing, and seizure disorder." *Dang*, at *3-*4. The plaintiff's primary ground for requesting a protective order is that he "is not competent to testify in a deposition" due to cognitive and communication deficits. This request was denied. The mere fact that a party may not be mentally competent to testify is not a sufficient reason to prohibit the other party from taking his deposition." *Id*., *6-*7 (citing *Sauer v. Exelon Generation Co*., 280 F.R.D. 404, 408 (N.D. Ill. 2012).

Here, Matt's aphasia does not prohibit him from being able to communicate or testify, even if he does sometimes have trouble finding the right words. The

13

transcript itself shows that Matt can testify, and the jury can weigh his testimony, just as it can weigh the testimony of all witnesses. MFB Decl., Exh. 5 (Matt's Deposition Transcript).

In *Sauer*, a young woman had been adjudicated incapacitated, and it was claimed that she "cannot give competent testimony regarding the facts and circumstances that gave rise to this action." As stated by the court:

> Plaintiffs argue that the Court should preclude Sarah Sauer's deposition because she has "difficulty in remembering, communicating and understanding."
>
> Under the Federal Rules of Evidence, all persons are presumed competent to testify. Fed. R. Evid. 601 ("Every person is competent to be a witness unless these rules provide otherwise."); *see Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 570 (7th Cir. 2009) (Rule 601 "creates a broad presumption of competency") . . . . In fact, the Rules require only that the witness has personal knowledge, Fed. R. Evid. 602, and understands the duty to testify truthfully, Fed. R. Evid. 603. Further, "[n]o mental or moral qualifications for testifying as a witness are specified. . . . A witness wholly without capacity is difficult to imagine. The question is one particularly suited to the jury as one of weight and credibility . . . ." Fed. R. Evid. 601 advisory committee's note."

*Sauer v. Exelon Generation Co.*, 280 F.R.D. 404, 408 (N.D. Ill. 2012).

Here, Matt has not been adjudicated incompetent.  He does not have a guardian and has not requested one.

Another case involved a third-party deponent who was approximately 65 (Matt is 62) and suffered a stroke in 2020.  That third-party "moved to quash Plaintiff s' subpoena because [he] suffers from speech aphasia as a result of the

14

stroke." *ECB USA, Inc. v. Savencia, S.A.*, No. 19-cv-731-GBW-CJB, 2024 U.S. Dist. LEXIS 110119 (D. Del. June 21, 2024), at *3. "The impact of this is that [he]: (1) sometimes has 'moments of hesitancy [or] word-finding deficits'; (2) has difficulty with higher-level cognitive function; (3) sometimes gets distracted or lost in thought; (4) is sometimes unaware that he produces incorrect words or sentences; and (5) gets fatigued easily." *Id*.

The Judge declined to quash the subpoena and ordered reasonable accommodations, including that (1) "the witness should be deposed in person for no more than two and a third hours per day, over a three-day period of the parties' choosing (that is, for a total of seven hours, broken up over three days)," and (2) "If the witness needs to take breaks or pauses during those days of testimony in light of his condition, the parties should permit that." *ECB USA, Inc. v. Savencia, S.A.*, No. 19-cv-731-GBW-CJB, 2024 U.S. Dist. LEXIS 110119, at *3-4 (D. Del. June 21, 2024).

Defense counsel is willing to provide similar reasonable accommodations to Matt, as detailed in the next section.

### E.   Matthew Should Be Compelled to Attend His Deposition And Produce All Responsive Documents

The Court should order Matt to attend his deposition on a date to be set by defense counsel and produce all responsive documents requested in the Subpoena.

Here, Defendants are willing to break up Matt's deposition into two days with no more than 3.5 hours of testimony each day. A workable format would be an hour of testimony, followed by ~15 minute break, then another hour of testimony, then an hour break for lunch.  Then another hour and a half in the afternoon, followed by the same procedure the following day until the deposition is completed. MFB Decl., ¶ 23.

Defendants are also willing to work with Matt if an additional break is needed, as long as it does not stretch the deposition beyond 2 days.  Id.

With these reasonable accommodations, the Court should order Matt to attend his deposition and answer all questions.

**F.    Since Matt Has Missed or Walked Out on Three Court-Ordered Depositions, He Should be Held in Contempt for (1) Failing to Obey the Court's May 7 Order, Failing to Obey the Court's June 12 order, and for Unilaterally Terminating His Deposition Without Seeking a Protective Order**

Matt has not obeyed repeated Court Orders. He has shown little respect for defense counsel's time, the reporter's time, the videographer's time, nor for the ~$10,000 of costs his conduct has imposed on Defendants.

Matt's failure to appear for his deposition on May 19 was in violation of the Court's Order. He also failed to produce documents.

Matt also did not provide counsel or the Court with any explanation by any physician as to why he could not be deposed before the start of the May 19

16

deposition. Matthew acknowledged not seeking a doctor's note regarding his deposition.

In either case, not only did Matt not have a valid excuse to not attend his deposition, he failed to notify counsel beforehand and did not contact counsel until after the reporter and videographer had been dismissed after an hour.

In order to have Matt fulfill his obligations to testify, the Court should hold him in contempt of court and impose appropriate consequences until he produces documents and finishes his deposition.

### G. The Court Should Prohibit Anyone Other Than Matt and His Licensed Attorney from Being in Deposition room.

Both Matt and Kimi want to have Kimi at the Matt's deposition. However, Kimi is not a lawyer or a doctor. While she should be allowed to visit with Matt during breaks in the deposition (taken every hour or more frequently, if necessary), she should be barred from being in the deposition room as it is disruptive.

The record shows that Kimi is attempting to be what amounts to an unlicensed legal advisor to Matt, such as when she asked to be recognized as his "pro se facilitator" by stating that, "I assist him in navigating court matters, including helping him understand questions, reviewing documents, and preparing responses." ECF #169, ¶ 4. For example, Kimi emailed Mark on February 20, 2025, stating, "I'm writing on behalf of Manoa Buckman, Matt Buckman, and myself. We cannot afford an attorney so I will be acting as the spokesperson for

17

the three of us. . . . Please direct future correspondence to me as they will not be responding to you." MFB Decl., ¶ 24. Defendants object to Kimi testifying on Matt's behalf. This does not provide them with an opportunity to obtain Matt's testimony, as opposed to Kimi's. Defendants therefore ask the Court to prohibit Matt from bringing anyone other than a licensed attorney to his deposition.

## IV.    CONCLUSION

Based on the foregoing, Defendants respectfully request that the Court grant their motion so they can obtain testimony from Matt Buckman.

Dated:  Honolulu, Hawai`i, June 30, 2025.

    /s/ Louise K.Y. Ing
LOUISE K.Y. ING
TIMOTHY C. PARTELOW
Attorneys for Defendants
MARK F. BUCKMAN, individually
and as Trustee of the MARK F.
BUCKMAN TRUST, and
JENNIFER BUCKMAN

    /s/ Mark F. Buckman
MARK F. BUCKMAN

Attorney for Defendant
JENNIFER BUCKMAN

18

PATRICIA W. BUCKMAN,
PATRICIA W. BUCKMAN
REVOCABLE TRUST,

                    Plaintiffs,

        v.

MARK F. BUCKMAN, ET. AL.

                    Defendants.

Civil No. 1:24-CV-00129-MWJS-KJM

**DECLARATION OF MARK F. BUCKMAN IN SUPPORT OF DEFENDANTS' OF MOTION TO COMPEL DEPOSITION, DOCUMENTS, AND SANCTIONS AGAINST MATTHEW BUCKMAN, INCLUDING HOLDING MATTHEW BUCKMAN IN CONTEMPT OF COURT FOR FAILING TO OBEY THE COURT ORDERS DIRECTING HIM TO TESTIFY AT DEPOSITION**

Trial Date: November 3, 2025

Judge: Hon. Micah Smith

### DECLARATION OF MARK F. BUCKMAN

I, Mark F. Buckman, declare as follows:

1.      I am an attorney licensed to practice law before this Court and I am co-counsel of record for Defendant Jennifer Buckman in this matter. I am also a Defendant in this matter. I am over the age of 18, and I have personal knowledge of the facts recited in this Declaration. If called as a witness in these proceedings, I could and would testify competently to these facts.

2.      Matt appeared in person at court. He appeared in person at state District Court. He appeared, albeit 2 hours late, at Denton's office in May. He also

19

appeared on June 20.  I also visited him at the Back House twice in June 18-22, and he was hanging out outside and came out to greet me, then walked away.  He is physically able to attend his deposition.

3.    Although Matt showed up for his June 20 deposition (an hour late) and was sworn to testify, he abruptly ended the deposition after less than 10 minutes after Kimberly Buckman (Kimi) interjected into the deposition and Matt demanded that Kimi be allowed to testify on his behalf.

4.    I understand from talking with my mom and Matt through the years that Matt had an off-record interest in the Back House (the main property in contention in this case) since providing part of the down payment when it was acquired in 2003.  My mother, Plaintiff Patricia Buckman, has always spoken of the Back House as "Matt's house," and it is my understanding that she held it as a constructive trustee for Matt, because of him being financially irresponsible.  Matt was the beneficiary of the Back House under Pat's trusts since 2006, when the first trust was signed, until 2022, when it was changed under suspect circumstances.

5.    In early 2018, I talked with Pat and Matt to put the Back House into a spend-thrift trust for Matt, due to his financial irresponsibility. I wrote to Pat's then-estate attorney to ask him to draft that change. On March 1, 2018, my mom wrote me, "Thank you Mark for taking the lead in this; I have a hard  time getting to it . . . ."

6.    On March 5, 2018, my mom emailed me about the Back House, stating, "Sounds as if you think I would take Matt's house from him???

20

NEVER NEVER NEVER!
And I don't want to spend a lot of money to accomplish that spendthrift trust. And I need the tax write off.
Why don't you talk to Matt and see if he is worried?"
A true and correct copy of this email is attached as Exhibit 1.

7.     Unfortunately for Matt and the entire Buckman family, he agreed to let the status quo continue and the Back House was not put into a spendthrift trust in 2018. Natalie moved into the Back House in 2019 and agreed to pay Pat rent. Natalie took over Pat's trust as her successor trustee in September 2020.

8.     In 2022, Pat's trust was changed after Natalie emailed instructions for that change to Pat's estate attorney using Pat's email account, without identifying that the email was actually being sent by Natalie. The resulting 2022 changes completely wrote Matt out of Pat's trust, including any interest in or benefit from the Back House.

9.     Matt knows that I came to Hawaii in 2023 at Natalie's invitation to "check out" the problems in the family. In July 2023, Matt told me he had "f'ed up" by not insisting that the Back House be put in the spendthrift trust for his benefit, that Natalie was not paying rent (which was supposed to indirectly benefit Matt during Pat's lifetime while he was living with Pat in the Front House), and that he thought Natalie was trying to steal the Back House and that he and Manoa would get no benefit from it.

10.    After talking with Matt and investigating the situation, I discovered that

Natalie had not been paying Pat rent on the Back House, and that Natalie had

backdated and forged a rental agreement on the Back House, both of which Natalie

originally denied (even at deposition).  In July 2023, after Natalie forged Pat's

name on a rental application for a condo as she was trying to move Matt and his

son Manoa to move them out the Front House where they were living with Pat,

Matt texted Pat as follows:

> "DID YOU KNOW ABOUT THIS?
> WHY IS NATALIE KICKING MANOA AND ME OUT?
> HOW COME SHE CAN LIVE IN MY HOUSE WITH MY THINGS AND
> NOT EVEN PAY RENT THAT ANYONE KNOWS OF?
> SHE HAS RUINED YOUR BUISNESS AND IS TEring our family apart to
> stale these houses! This is awful."[8]

> A true and correct copy of this text is attached hereto as Exhibit 2.

11.    To obtain the benefit out of the Back House for his lifetime, in August 2023

Matt entered into the "Brother's Agreement" with me concerning the Back House.

Based in large part on the Brother's Agreement, my mom and I then entered into an

agreement regarding the Back House. Matt and I were the only two people

involved in the negotiations, although my wife Jennifer was present on the day

when we finalized the agreement and signed documents. We called Manoa that day

and obtained his consent.  Matt never asked Kimi to be involved in the negotiations

---

[8] Months later, Natalie recanted her earlier deposition testimony and admitted to
lying previously, to not paying Pat rent, and to backdating the rental agreement, as
well as signing Pat's name electronically to same.  MFB Decl.  ¶ x

and she took no part in them. Indeed, I do not believe Matt told Kimi about our agreement for several months. When Kimi first discussed it with me, she only had very limited knowledge and told me that Matt had not told her details.

12.    In May-June 2025, Natalie recanted her earlier deposition testimony and admitted to lying previously, to not paying Pat rent, and to backdating the rental agreement, as well as signing Pat's name electronically to same.

13.    Circumstantial evidence obtained during discovery suggests to me that Matt has been avoiding his deposition because he has been pressured by Natalie Pitre to "cooperate" by providing false testimony in this case. On March 9, 2024, when Natalie was evicting Matt from the Front House, she texted Matt, stating in part:

> Move into your own house, the back house. That Persian guy is paying you $1000 a month. You can use that money however you wish – you could pay the property taxes you could pay the utilities. There are many things you could do with that money. It's your choice. **If you cooperate, you will inherit the back house. Nothing is written in stone, Matt. You take care of mom by cooperating and vacating and she will take care of you**.

Emphasis added. A true and correct copy of this text, which Natalie produced in discovery as document N 000242-243, is attached as Exhibit 3.

14.    Matt filed an application for a Temporary Restraining Order against Natalie based on her actions to evict him from the Front House, get charge of his medical

23

records, and take actions for him under a power of attorney signed while he was hospitalized. In that application, Matt declared under penalty of perjury:

> "I feel like Nat is trying to mess things up for me and wants me out of the picture so she can manipulate my situation to where she gets both of my mother's house[s]. **Nat told me when I got home from the hospital on 2/28/24 that if I do not cooperate then I will not get the back house.**" Emphasis added. A true and correct copy of the relevant page of Matt's application for the Temporary Restraining Order filed March 12, 2024, Case 24-0503, is attached as Exhibit 4.

15.    Defendants have been attempting to obtain Matt's deposition testimony since February.  The first deposition date was re-scheduled pursuant to Matt's request. On the rescheduled date, Matt failed to appear.  Thereafter, Defendants sought an OSC regarding Matt's deposition, which the court issued.

16.    Defendants hired a court reporter and a videographer, I traveled to Honolulu, and Ms. Ing spent time preparing for Matt's deposition. However, in disobedience to the Court Order, Matt again failed to produce documents or appear for his deposition on May 19

17.    Matt's deposition was scheduled to start at 9:00 a.m. on June 20. Defendants had again hired a court reporter and a videographer. Defense counsel again prepared for the deposition. Matt did not appear until after 10:00 a.m., when he

24

provided a note from his doctor. The note did not state that Matt could not testify; indeed, Matt agreed to testify and was sworn in to do so.  Kimi also attended Matt's deposition.

18.   A true and correct copy of Matt's deposition transcript from June 20 is attached hereto as Exhibit 5.

19.   Since this case began, Matt has initiated proceedings against Natalie Pitre and has appeared and given statements in state court proceedings related to the possession and occupancy of the Back House.  At that hearing, both Matt and Kimi urged the state court to stay that case pending the outcome of this one. Matt continues to occupy the disputed Back House without paying any of the costs associated with it like taxes and insurance, instead, I am paying those costs and have done so since 2023.

20.   Matt has now missed 3 court-ordered depositions.  Each time, defense counsel prepared for the depositions, and each time I traveled to Honolulu for the deposition. For the second and third deposition dates, Defendants hired court reporters and videographers. Jennifer has incurred thousands of dollars of attorneys' fees, and both Defendants have incurred thousands more to have Ms. Ing prepare for Matt's deposition, to report to the court on production of documents and Matt's failure to appear, and work on this and related court filings.  These sums exceed $10,000.

21.    Matt seems to want Kimi to testify for him - and Kimi has attempted to be Matt's legal advocate.  Kimi was <u>not</u> present when Matt and I spoke on the phone, met in person, and made the Brother's Agreement. Indeed, Kimi testified that she lacks personal knowledge of the Brother's Agreement, though that hasn't stopped her from expressing speculation and unfounded opinions about the subject - which at times she will acknowledge is just speculation.

22.    Matt belatedly provided a doctor's letter on June 20, a true and correct copy of which is attached as Exhibit 6.  I spoke with Dr. Miyamoto on June 30 and he clarified that his concern was for Matt's aphasia and communication ability, and not due to any immediate health concern from testifying. When asked if Matt had a risk for heart attack or stroke from testifying, Dr. Miyamoto confirmed that a deposition would not be life-threatening to Matt.  He mentioned that being deposed could cause emotional distress, but that could be  true of almost every deponent. Based on my interactions with Matt, including on June 20 and the next day or so, he can communicate and provide testimony and I think that is borne out by the transcript.

23.    Ms. Ing and I were willing and remain willing to break up Matt's deposition into two days with no more than 3.5 hours of testimony each day.  A workable format would be  an hour of testimony, followed by ~15 minute break, then another hour of testimony, then an hour break for lunch.  Then another hour and a

26

half in the afternoon, followed by the same procedure the following day until the deposition is completed.  We are also open to other reasonable arrangements and provide Matt additional breaks if needed, as long as it does not stretch the deposition beyond 2 days (being that we've already consumed several days and $10,000 trying to get his deposition).

24.    Kimi emailed me on February 20,  2025, stating in pertinent part, "I'm writing on behalf of Manoa Buckman, Matt Buckman, and myself. We cannot afford an attorney so I will be acting as the spokesperson for the three of us. . . . Please direct future correspondence to me as they will not be responding to you." Kimi has also advanced legal arguments on Matt's behalf, threatened to file a Rule 11 Motion for Matt, and gave me a quasi-legal argument as to why she and Matt were refusing to sit for their depositions in March.  She also interjected in Matt's deposition, made a speech, and wanted to coach him on answers, so I think it best that she not attend to avoid future issues from a non-party.

I declare under penalty of perjury under the laws of the United States that the facts recited above are true and correct.

Executed this 30th day of June in Elk Grove, California.

/s/ Mark F. Buckman
MARK F. BUCKMAN

27

## CERTIFICATE OF SERVICE

I, Brian Buckman, hereby certify that, on the dates and by the methods of service noted below, a true and correct copy of the foregoing was served on the following at their last known addresses:

**SERVED ELECTRONICALLY THROUGH CM / ECF:**

**SERVED BY PRIORITY U.S. MAIL:**

Matthew Buckman
3010A Kaunaoa Street
Honolulu, HI 96815

**SERVED BY HAND DELIVERY:**

Dated:        Elk Grove, California, July 1, 2025


          /s/ Brian Buckman
          Brian Buckman