Sheet 1   Page 1

IN THE SUPERIOR COURT, STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF PLACER

--oOo--

MARK F. BUCKMAN,

Plaintiff,        No. SCV 0051637

vs.

NATALIE B. PITRE, CARL T. PITRE and Does 1 Through 10, inclusive,

Defendants.        /

-----------------------------------

DEPOSITION OF

NATALIE B. PITRE

VOLUME 1, PAGES 1 - 311

Monday, January 27, 2025

MARY BARDELLINI & ASSOCIATES
920 Blitz Lane
Auburn, CA 95603
530.823.2950

MARY BARDELLINI & ASSOCIATES
920 Blitz Lane
Auburn, CA 95603
530.823.2950

STENOGRAPHICALLY REPORTED BY: CHRISTINE BEDARD, CSR #10709

1

---

Page 3

I N D E X

Page

EXAMINATION BY MR. BUCKMAN            5

---oOo---

E X H I B I T   I N D E X

| Exhibit No. | Description | Page |
|---|---|---|
| A | Email string. Subject: Re: Pat Buckman's Trust | 35 |
| B | Reliastar Security Connecticut Life Insurance Company | 101 |
| C | Signature Properties | 189 |
| D | Email to Steve Reese from Natalie Petri. Subject: Pat Buckman Trust | 245 |
| E | Rental Application | 252 |
| F | Email. Subject: Mark Buckman Mom's Lawyer HECL | 270 |
| G | Email. Subject: Re: Mom's Lawyer HECL | 281 |

---oOo---

3

---

Page 2

BE IT REMEMBERED that, pursuant to Notice and on Monday, January 27, 2025 at the hour of 9:00 AM thereof, at the HOLIDAY INN, 120 Grass Valley Highway, Second Floor Conference Room, Auburn, California, before me, CHRISTINE BEDARD, a Certified Shorthand Reporter in and for the County of Nevada, State of California, there personally appeared

NATALIE B. PITRE

called as a witness by the Plaintiff; who, being by me first duly sworn, was examined and testified as is hereinafter set forth.

--oOo--

APPEARANCES OF COUNSEL

FOR THE PLAINTIFF:

LAW OFFICES OF MARK F. BUCKMAN
BY: MARK F. BUCKMAN
8359 Elk Grove Florin Road, Suite 103-320
Sacramento, CA 95829
T: (916) 442-8300
Email: Markfbuckman@sbcglobal.net

FOR THE DEFENDANTS:

POWERS MILLER
BY: JOHN P. SCIACCA
3500 Douglas Boulevard, Suite 100
Roseville, CA 95661
T: (916) 924.7900
Email: Jps@powersmiller.com

ALSO PRESENT: Jennifer Buckman

---oOo---

2

---

Page 4

PROCEEDINGS,

THE VIDEOGRAPHER: Good morning. My name is        09:00:03
Nick Hunt. I will be recording this proceeding on behalf        09:00:05
of Sacramento Legal Video Center, LLC, located at 3550        09:00:07
Watt Avenue, Suite 140, in Sacramento, California.        09:00:13

The date is January 27th, 2025. Time on the        09:00:17
video monitor is 9 AM. Our location is 120 Grass Valley        09:00:23
Highway in Auburn, California. We are here in the matter        09:00:28
of Buckman vs. Pitre filed in the Superior Court of        09:00:33
California, County of Placer, case No. SV0051637.        09:00:39

This is the deposition of Natalie Pitre. The        09:00:49
court reporter is Mark Buckman. The court reporter --        09:00:51
excuse me. The noticing attorney is Mark Buckman. The        09:00:56
court reporter is Christine Bedard of Mary Bardellini        09:00:59
& Associates.        09:01:03

This is a single track recording. Overlapping        09:01:05
voices cannot be separated. Private discussions on the        09:01:09
record will also be recorded.        09:01:12

Will counsel please identify yourselves and        09:01:13
firms and those you represent.        09:01:15

MR. BUCKMAN: Good morning. Mark Buckman,        09:01:17
Plaintiff and pro per here.        09:01:18

MR. SCIACCA: John Sciacca for Defendant        09:01:22
Natalie Pitre.        09:01:24

4

**EXHIBIT 19**

MR. SCIACCA: Object. It's argumentative.

MR. BUCKMAN: Q. Saying you're paying cash rent.

MR. SCIACCA: Asked and answered.

You don't need to answer that question. You've already answered.

MR. BUCKMAN: Q. Did Matt and Manoa say that they didn't think you were paying rent?

A. No.

Q. Okay. At the same time, did you also have some violations from the Real Estate Commission?

A. Yes.

Q. Yes. You've testified you're supposed to be the property manager for the back house; right? Under the trust amendment you would be the property manager?

A. Yes.

Q. And you got in trouble -- right -- in July of 2022 -- '23 for violating your duties as a real estate broker in renting a house; correct?

A. Yes.

Q. And that was because you did various things and not advertising it right, and not returning the security deposit to the tenant; right?

A. Yes.

Q. And you lost the judgment, and you didn't pay the guy the judgment; correct?

241

A. Yes.

Q. And another client, you -- you and your husband Carl used their house as a beach house; correct?

A. No.

Q. And this has been publicly reported; right, ma'am? Your discipline.

A. It's -- the discipline has been recorded, but that's not what happened.

Q. And the allegations were you were using the client's house for your own benefit; correct, ma'am?

A. That was the allegation.

Q. And then you got fined $12,000 by the Real Estate Commission in Hawaii; right, ma'am?

A. Yes.

Q. And the allegations were you breached your fiduciary duties to your clients; correct, ma'am?

A. Yes.

Q. And the clients in that case -- which came to light in July 2023 -- where they were elderly and had dementia, and you took advantage of that; correct, ma'am?

A. No.

Q. That's the allegation; correct, ma'am?

A. No.

Q. Are you aware that that was the allegations made and publicly reported against you?

242

A. No.

Q. Have you -- did you have a discussion with your mom about your two RICO cases in July 2023?

A. Yes.

Q. Did she try to get you to follow the law and not be so aggressive towards your clients?

A. Mom and I had a discussion.

Q. And tell me about that.

A. We just had a discussion.

Q. Was she very concerned about how you had been operating your business?

A. She was concerned I would say.

Q. Did that come to light -- you have a conversation with Mom right about July 20, 2023, at the same time you were renting a condo in Marina Palms in Mom and Manoa's name?

A. Can you say that again.

Q. In July 2023, you also rented a condo in Marina Palms in your mother's and Manoa's name; correct?

A. Yes.

Q. And you signed their names to that lease with DocuSign; correct?

A. Yes.

Q. And you did that from your own computer or your own electronic device; correct?

243

A. I don't know.

Q. Did Mom sign that document herself?

A. I had her consent to sign it.

Q. Did you have Manoa's consent to sign that lease?

A. No.

Q. And why would you sign his name to a lease, a legal document, without his consent?

A. I don't have an answer for you.

Q. As a real estate broker, do you think you're allowed to sign people's names without their consent?

A. No.

Q. Did you also fill out an application in your mom's name in handwriting and provide it to the landlord?

MR. SCIACCA: I'm going to object now on the grounds of fifth amendment. Instruct you not to answer the question.

THE WITNESS: I refuse to answer.

MR. BUCKMAN: Q. Well, you did fill out a handwritten rental application, right, ma'am?

MR. SCIACCA: Same objection. Instruct you not to answer. Asserting the fifth.

MR. BUCKMAN: Q. You've previously discussed with Mark that you had filled out that application yourself though; correct, ma'am?

MR. SCIACCA: I'm going to object. Again,

244

asserting the fifth.  Instruct you not to answer.   02:48:03

MR. BUCKMAN:  Can I ask her something that might   02:48:21
help you not push on it?   02:48:22

MR. SCIACCA:  Sure.   02:48:24

MS. BUCKMAN:  Let's go off the record.   02:48:26

MR. SCIACCA:  I'm going to use the restroom.   02:48:28

THE WITNESS:  Me too.   02:48:30

THE VIDEOGRAPHER:  Off the record at 2:48 PM.   02:48:31

(Recess taken.)   02:48:55

(Exhibit D was marked   02:48:55
for identification.)   02:59:34

THE VIDEOGRAPHER:  All right.  We are back on the   02:59:40
record at 2:59 PM.   02:59:42

MR. BUCKMAN:  Okay.  We've had a little break.   02:59:44
I've given you an exhibit that's been marked Exhibit D.   02:59:47
It's an email from Patricia W. Buckman to Steve Reese,   02:59:50
with a cc to Natalie Pitre entitled "Pat Buckman Trust."   02:59:53

Q.  Have you seen this document before?   03:00:00

A.  Yes.   03:00:04

Q.  And did you draft this Exhibit D?   03:00:05

A.  Yes, with Mom.   03:00:10

Q.  Okay.  And do you remember actually drafting it?   03:00:12

A.  No.   03:00:15

Q.  Okay.  And what parts of it did you draft?  Which   03:00:17
parts of it did Mom draft?   03:00:20

A.  I don't remember.   03:00:22

Q.  Okay.  And why, again, are you sending it under   03:00:22
Mom's email account here?  This is a year later after the   03:00:27
trust has been amended.  Why are you still sending these   03:00:30
emails without, you know, telling Steve it's you actually   03:00:33
drafting with Mom?   03:00:36

A.  I don't know.  Looks like I should have put "Pat   03:00:39
and Natalie."   03:00:41

Q.  And didn't -- well, I mean that's a good idea;   03:00:42
right?  That's what you learn to do in your real estate   03:00:45
dealings; right, ma'am?  When you sign on behalf of   03:00:48
somebody, you have to tell the recipients that you're   03:00:54
signing on behalf of somebody; correct?   03:00:58

A.  I don't sign on behalf of anybody.   03:01:01

Q.  Well, you've had power of attorney for your   03:01:03
mother; right?   03:01:05

A.  Yes.   03:01:09

Q.  And you have to fill out your name and say,   03:01:10
"Signing under power of attorney;" right?   03:01:12

A.  I didn't know that.   03:01:15

Q.  Okay.  So we'll go on.   03:01:15
Exhibit D.  You -- you took part in drafting   03:01:18
this; correct?   03:01:24

A.  Yes.   03:01:25

Q.  And why are you cc'ing yourself there if you're   03:01:27

part of the drafting of it?   03:01:30

A.  I don't know.   03:01:32

Q.  I mean, there's no need to, is there?   03:01:33

A.  I really don't know.  Maybe I want a copy.   03:01:36

MR. SCIACCA:  Well, don't speculate.   03:01:39

THE WITNESS:  Okay.   03:01:39

MR. SCIACCA:  Just testify to what you know.   03:01:40

THE WITNESS:  Okay.  I don't remember.   03:01:41

MR. BUCKMAN:  Q.  And you're saying -- is this   03:01:42
drafting on Mom's computer or her phone or what?   03:01:44

A.  I don't know.  I mean, I'm assuming that it's --   03:01:47

MR. SCIACCA:  Don't assume.   03:01:50

MR. BUCKMAN:  Q.  Do you have any idea?   03:01:52

A.  I believe it's her phone.   03:01:54

Q.  Okay.  So you would get her phone and start   03:01:55
drafting; correct?   03:01:57

A.  Mom and I would be together --   03:01:58

Q.  Would she be awake?   03:02:01

A.  Yes.   03:02:02

Q.  Okay.  And she would be -- you would be talking   03:02:03
about this actual email?   03:02:06

A.  Yes.   03:02:08

Q.  It's not just that you're in the same room and you   03:02:08
happen to be drafting it?   03:02:10

A.  No.   03:02:12

Q.  Okay.  And did she ask you that -- to send it to   03:02:13
her attorney without disclosing that you're taking part?   03:02:16

A.  We didn't discuss that part.  I don't think we --   03:02:19
I didn't think about that.   03:02:22

Q.  Do you see how the recipient, Mom's estate   03:02:23
attorney, could be misled as to who's sending the email?   03:02:26

MR. SCIACCA:  I'm just going to object.  Calls for   03:02:29
speculation.   03:02:31

You can answer.   03:02:31

THE WITNESS:  I could see how it would be   03:02:35
misleading.   03:02:36

MR. BUCKMAN:  Q.  Do you -- did you ever tell   03:02:36
Steve Reese that you drafted all or part of this email?   03:02:39

A.  I don't know.   03:02:49

Q.  Did you ever inform anybody that you drafted all   03:02:49
or part of this email?   03:02:52

A.  Who would I inform?   03:02:55

Q.  Have you ever denied drafting this email to Mark?   03:02:57
Let me get an answer.   03:03:01

Did you inform anybody that you drafted all or   03:03:03
part of this email?   03:03:05

A.  I don't think so.   03:03:07

Q.  Okay.  Did you previously tell Mark that you   03:03:07
denied drafting this email to Steve Reese?   03:03:11

A.  I don't know.   03:03:16

Sheet 64   Page 253

Q. Okay. In the full first page -- if you can look at it -- and is that all your handwriting?

A. Yes.

Q. And the second page, is that all your handwriting?

A. Yes.

Q. Is that you signing "Patricia Buckman" on the bottom there?

A. Yes.

Q. Okay. And so you filled this out as part of the application for Marina Palms; correct?

A. Yes.

Q. And did your mom want Matt to move out of her house at this time?

A. At this time she was open to it.

Q. Open to it?

A. Mm-hmm.

Q. Was she agreeable to it?

A. Well, she -- yes, she was agreeable. She went and looked at it.

Q. Was Matt agreeable?

A. No.

Q. Did your mom ever tell you she intended to move to Marina Palms?

A. No.

Q. I mean, because this application says as if

253

Page 254

Patricia Buckman is wanting to rent a place to live on the marina; right? It says, "Wants to live on marina in Hawaii Kai." Did Mom ever want to live on the marina in Hawaii Kai when this application was filled out?

A. That wasn't Mom who maybe wanted to live on the marina. I don't know. This wasn't for Mom. This was not for Mom.

Q. And you submitted this application to the landlord on Marina Palms?

A. Yes.

Q. And you drafted up this -- this agreement. Did you have Mom's help in this?

A. This agreement?

Q. This rental application, Exhibit E.

A. I had her consent, but I didn't need to ask her for, like, "How do I fill this out?" If that's what you mean.

Q. That's because you're a real estate broker.

A. No, that's because I can read.

Q. Okay. So where did you get, like, some figures? Like, how much money she had in the bank? Where did you get that from?

A. I don't know.

Q. Well, it says on the second page there's, like, $66,000 in the bank. Where would you get that

254

Page 255

information?

A. From, like, the line of credit.

Q. But it says it's the bank account -- the checking account -- so it's not a line of credit.

A. I don't know. I was --

Q. You see the account number there?

A. I was thinking it was the line of credit.

Q. You see it ends in 7726? That's actually Mom's bank account; right?

A. Well, I was referring to the line of credit.

Q. Okay. But, actually, you wrote the checking account. So that number is wrong when you wrote it; right?

A. It looks like it's wrong.

Q. And you submitted this to another real estate broker; right?

A. I did.

Q. And you submitted that to the real estate broker so he would rent a place in Marina Palms to your mom and Manoa; correct?

A. Yes.

Q. But your mom was never going to move there?

A. No.

Q. And why did you submit it in your mom's name?

A. So that -- can you ask that again.

255

Page 256

Q. Why did you submit this application in your mom's name when she never intended to live there? Let's go backwards --

A. It would be for Matt and Manoa.

Q. Right. Matt and Manoa. But most times in real estate, people submit applications on properties they want to rent, not applications from other people that don't want to rent it; right? Is that your standard practice normally?

A. Yes.

Q. Okay. So this is unusual; correct?

A. Yes.

Q. Okay. So why did you submit it this way?

A. Because Matt wouldn't be able to qualify.

Q. Why not?

A. Because he's had an eviction, and he doesn't have any money.

Q. Uh-huh. And so when you write down here that Mom has a 2019 Lexus, her car was actually -- what -- a decade older than that; correct?

A. I don't know.

Q. Okay. And you write down here that Mom's phone number is (808) 927-9199. Do you see that?

MR. SCIACCA: I'm just going to object. Misstates what's in the document. It looks like it reads, is it,

256

Sheet 65   Page 257

9101.

MR. BUCKMAN: 9199?

MR. SCIACCA: Where are you seeing that? I'm sorry.

MR. BUCKMAN: I'm sorry. Here, John. Up here. Apologies. First page.

MR. SCIACCA: First page?

MR. BUCKMAN: First page. Yeah. Below the secure security number.

Q. Do you see that, ma'am?

A. Where it says, "Current landlord's phone number"?

MR. SCIACCA: No. "Current home phone number."

THE WITNESS: Oh, yes. Uh-huh.

MR. SCIACCA: Q. And it says 927-9199. And is that your mom's phone number?

A. No.

Q. Whose is that?

A. No. It's not a home phone number at all. It's my mobile number.

Q. Why did you write your mobile number there instead of Mom's? Did Mom tell you to do that?

A. We wanted her to contact me.

Q. Who is "her"?

A. The rental application lady.

Q. So when she -- did the rental lady contact you?

257

Page 258

A. Yes.

Q. And did you tell her you were Patricia Buckman?

A. No.

Q. Who did you tell her you were?

A. Natalie.

Q. And you -- why did you say it was Natalie answering and not Patricia?

A. Because I answer my phone "Natalie."

Q. And then were you Mom's agent on this transaction? Is that you being her real estate agent then?

A. No.

Q. Okay. But why are you doing it then? Why is not Mom doing it?

A. I think I wanted it more than Mom.

Q. Okay. But, again, even though you want it, why are you doing it in her name and not your name?

A. Because I don't want to be on the lease for Matt.

Q. Did you ever tell the real estate agent on the other side of the transaction that it was actually going to be for Matt and not Mom?

A. No.

Q. Why not?

A. For the same reason that I didn't put Matt's name on the application. He's not -- I don't think he'd pass a credit check.

258

Page 259

Q. And it seems like you must have really wanted Matt and Manoa out at this time; is that correct? How would you describe it?

A. That's how I would describe it.

Q. Mm-hmm. And these are the guys that you're supposed to be the property manager for in the back house; right?

A. Well, I'm -- my understanding is that I'm managing the property to make money so Matt is supported.

Q. Okay. So the guys -- Matt and Manoa -- you're supposed to be --

A. No. It doesn't say for Matt and Manoa, does it? It says the house in the benefit for them.

Q. Okay.

A. And in my mind, if they're receiving money to live, then they're receiving the benefit.

Q. Do you think it might concern them if you're forging Manoa's name on a lease if you're supposed to be the property manager for the benefit of Manoa? Or he might get a little nervous about that.

MR. SCIACCA: I'm going to object. Calls for speculation.

You can answer.

MR. BUCKMAN: Q. Did you ever discuss this? You signing Manoa's name on this?

259

Page 260

A. No.

Q. On the lease that resulted from this application?

A. No.

Q. And a lease did result from this application; right?

A. Yes.

Q. Okay. And so on the bottom you said that -- bottom of the first page, that you -- this Natalie Pitre -- was Mom's supervisor; right?

A. Yes.

Q. And that Mom made six grand a month from real estate?

A. It's on the second page?

Q. First page, bottom-right corner.

MR. SCIACCA: Right here.

THE WITNESS: Yes.

MR. BUCKMAN: Q. But that wasn't true; was it?

A. No.

Q. What -- what was the amount that she does make at that time from real estate?

A. About five grand.

Q. Isn't it closer to two grand a month for her rental income?

A. It's about two, and then she gets three for Social Security.

260

**D E C L A R A T I O N**

I, Natalie B. Petri, do hereby declare under penalty of perjury that I have read the foregoing transcript of my deposition; that I have made such corrections as noted herein in ink, initialed by me, or attached hereto; that my testimony as contained herein as corrected is true and correct.

EXECUTED this_____day of_____

_____,at_____,_____.
(Year)        (City)            (State)

-----------------------------
NATALIE B. PETRI

309

---

**DEPONENT'S CORRECTION SHEET**

To add testimony, indicate "Add" and print the exact words you wish to add.  To delete testimony, indicate "Delete" and print the exact words you wish to delete.

Deposition of:   Natalie B. Petri, Volume 1

Deposition Date:  January 27, 2025

I, Natalie B. Petri, have the following changes to my deposition transcript:

PAGE    LINE     CHANGE (Add/Delete)

___/____/_____

___/____/_____

___/____/_____

___/____/_____

___/____/_____

___/____/_____

___/____/_____

___/____/_____

___/____/_____

___/____/_____

___/____/_____

___/___/_____

___/___/_____

___/___/_____

310

---

STATE OF CALIFORNIA ]

COUNTY OF NEVADA    ]

I, the undersigned, a Certified Shorthand Reporter in the State of California, hereby certify that the witness (if applicable) in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said proceeding was taken at the time and place therein stated; that the testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete, and true record of the said testimony; and that the witness(if applicable) was informed of his/her opportunity to read and, if necessary, correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceedings and caption named, or in any way interested in the outcome of the cause named in said caption.

Dated this 13th day of February, 2025

-----------------------------
CHRISTINE BEDARD, CSR NO. 10709

311

---

**MARY BARDELLINI & ASSOCIATES**
920 Blitz Lane
Auburn, CA 95603
530.823.2950

Date:  February 13, 2025

Natalie B. Petri
c/o John Sciacca
Powers Miller
3500 Douglas Boulevard, Suite 100
Roseville, CA 95661

Case:   Buckman vs. Petri
Deposition of NATALIE B. PITRE, Volume I
Deposition taken:  January 27, 2025

Dear NATALIE B. PITRE,

Please be advised the original transcript of your deposition is ready for your review.

You may either call my office to make arrangements with me to read and sign the original transcript, or you may contact your attorney or the attorney who arranged for you to be present at your deposition.  If they have ordered a copy of the transcript, you may review their copy and make corrections by indicating on a separate sheet of paper the page and line number and the word or words you wish to correct.  Please then sign your correction sheet at the bottom and return it to the above address.

As this is a civil action, you have 35 days from the date of this letter to read, correct, if necessary and sign your transcript.  It will then be sealed and sent to the examining attorney pursuant to the applicable law.

Sincerely,

Christine Bedard
Certified Shorthand Reporter #10709

cc:  All Counsel

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PATRICIA W. BUCKMAN,    : CIVIL NO.

PATRICIA W. BUCKMAN     : 1:24-CV-00129-

REVOCABLE TRUST,        : MWJS-KJM

        Plaintiffs,      :

        Vs.              :

MARK F. BUCKMAN,        :

MARK F. BUCKMAN TRUST, :

JENNIFER BUCKMAN, JOHN :

DOES 1-10; JANE DOES    :

1-10; DOE CORPORATIONS  :

1-10; DOE PARTNERSHIPS   :

1-10; DOE GOVERNMENTAL :

AGENCIES 1-10,          :

        Defendants.      :

_____:

      Deposition of NATALIE PITRE taken by the Defendants at the Law Offices of Dentons US LLP, 1001 Bishop Street, Suite 1800, Honolulu, Hawaii 96813 on May 23, 2025, commencing at approximately 9:00 a.m. HST pursuant to Notice.

REPORTED BY:   Kathryn Plizga, RPR, CSR No. 497

RALPH ROSENBERG COURT REPORTERS, INC.

Q.   Would you consider the allegation that you hadn't paid Mom rent slander?

A.   No.

Q.   Would you consider the allegation that you had signed the lease for Marina Palms without Manoa's consent slander?

A.   No.

Q.   Would you consider the allegation that you had signed the Marina Palms lease without Mom's consent slander?

A.   Yes.

Q.   Would you consider the allegation that you had filled out the Marina Palms name and signed Mom's signature yourself to be slander?

A.   That part I am not following.  Can you --

Q.   I accused you --

A.   So here's this.

Q.   You're looking at Exhibit 1?

A.   You're talking about this?

Q.   Yes.  You signed that exhibit, correct, the second page?

A.   Yes, with Mom's permission.

Q.   But look at the whole exhibit, both pages. Is everything written there in handwriting your handwriting?

A.   Yes.

Q.   And is the signature there, even though it says Patricia W. Buckman, is that you writing that?

A.   Yes.

Q.   Would you consider it slander if I had told the family that you had forged Mom's name on that application?

MR. BUSH:  Objection.

A.   Yes, because it wasn't forged.

Q.   Did you ever have Mom's written agreement to fill out an application in her name?

A.   No.  But she went with me to the place, looked at it and gave her approval.

Q.   Okay.  If you look at that application it says that the renter would be Mom, right?

A.   Uh-huh.

Q.   Was Mom ever going to be the renter of that condo?

A.   No.

Q.   And if you look at the application it says that the reason for moving is that Mom wanted to live on the marina in Hawaii Kai?

A.   Well, Mom didn't.  She already did.

Q.   So that was false when you wrote that there, correct?

RALPH ROSENBERG COURT REPORTERS, INC.

A.   Yes.

Q.   And you submitted this application to another licensed real estate broker?

A.   Yes.

Q.   And when you listed Mom's current monthly payment as zero, the truth was it was actually $2400 a month, correct?

A.   Is the $2400 the mortgage?

Q.   Correct.

A.   Yeah.

Q.   So you listed zero, correct?

A.   I see a zero there, uh-huh.

Q.   And the truth was it was closer to $2400, correct?

A.   She does have or had a mortgage payment, does have a mortgage payment.

Q.   You see there it says employment supervisor, Natalie Pitre?

A.   Where is that?

Q.   I think it's towards the bottom of the first page.

A.   Okay, yes.

Q.   And is that true?  Were you her employment supervisor?

MR. BUSH:  Objection, misstates the

document.  It just says supervisor, it doesn't say employment supervisor.

Q.   Were you Mom's supervisor at work?

A.   Yeah, I think maybe I considered myself to be a supervisor of her, trying to keep her safe.

Q.   Keep her safe or keep her doing the right things in real estate?

A.   Both.

Q.   And you listed her monthly gross pay as $6,000 when the truth was the rental management commissions were closer to $2,000, correct?

A.   Yes.  But with her social security, that's another $3,000.

Q.   But that's not monthly gross pay, is it?

A.   Isn't social security included in that?

Q.   Do you believe it's monthly gross pay?

A.   Yeah.  It's paid every month.

Q.   And the current bank balance you put as $66 thousand, do you see that?  I believe it's on the next page.

A.   Yes.

Q.   And the truth was her balance was closer to $2,000, correct, on that day?

A.   Well, there was only one account here. When you consider her other accounts, she had easily

RALPH ROSENBERG COURT REPORTERS, INC.

$66 thousand.

Q.   But the account that's listed there is her main checking account that had about $2,000, correct, but you put $66,000?

A.   I don't know how much she had, but I know that with her -- all together she had at least $66 thousand dollars.

Q.   And where is this $66 thousand?  Where do you think it is?

A.   It's in her bank.

Q.   Was it an equity line or was it actually a checking or savings account?

A.   An equity line.

Q.   So it's not a current bank balance, is it?

A.   It's an available balance.

Q.   But the form says current bank balance, correct?

MR. BUSH:  Objection.  This does not say this, it says current balance.

MR. BUCKMAN:  Current balance.

MR. BUSH:  Well, just read it correctly.  It doesn't specify bank balance.

Q.   It says the current balance is $66 thousand. Was that Mom's current balance at that time?

A.   With her available funds, yes.

RALPH ROSENBERG COURT REPORTERS, INC.

Q. And how much did she owe on the equity line at that time?

A. I don't recall.

Q. Did you check on her balance when you filled this form out?

A. No, but I knew how much she had kind of. I don't recall when -- I mean -- she still has.

Q. And you listed Mom's phone number on the first page there. What is Mom's phone number?

A. Where?

Q. Can you read the phone number?

A. This says 808-927-9199.

Q. Is that Mom's phone number?

A. No.

Q. Whose is it?

A. That's my phone number.

Q. Then for the emergency contact, you listed 808-927-9101. It's says daughter, correct? That's what it says?

A. I see that listed here.

Q. But actually that's Carl's phone number, not yours, right?

A. That's correct.

Q. So you had misstated a bunch of the information on the form; would you say that's a fair

RALPH ROSENBERG COURT REPORTERS, INC.

statement?

A. I did misstate some information on the form.

Q. Was that done to make Mom appear to be a stronger candidate for the rental?

A. I wanted to be sure that we got that, yeah.

Q. So you were trying to make it appear that she was very strong as a candidate for the place, correct?

A. Yes.

Q. And you were hoping the other broker would look at this and think Mom was a good candidate to rent this condo, correct?

A. Clearly.

Q. And so you say your mom approved of you signing this application?

A. Yes.

Q. Did she know about these factual misstatements that we've talked about?

A. I told her I padded it.

Q. Can you tell me a little bit more about that? You padded it, what does that mean?

A. Well, that we would have to include, you know, the money that she has and the equity line and stuff.

Q. Did you tell her why you put in the

RALPH ROSENBERG COURT REPORTERS, INC.

incorrect phone numbers?

A.   No, it didn't come up.

Q.   Did you tell her that it listed her as a tenant instead of Matt?

A.   Well, Matt couldn't qualify.

Q.   But did you tell Mom that this application was in her name?

A.   Yes.

Q.   So are you saying that Mom agreed to everything you wrote in this application?

A.   She was fine with it, yes.

Q.   And so you two were working together on applying to get this condo, you and Mom?

A.   We went to look at it together and we filled out the application together.  She paid her check for the security deposit.

Q.   And did Mom actually read this application when you signed it or before you signed it?

A.   I told her what I was doing but she didn't read the application.

Q.   If Mom read that application at that time period, do you think she would have the ability to understand it?

A.   I'm not sure.  I'm having a hard time understanding it.

RALPH ROSENBERG COURT REPORTERS, INC.

STATE OF HAWAII        )

COUNTY OF HONOLULU )    SS.

I, KATHRYN PLIZGA, RPR, Hawaii CSR, Notary Public, State of Hawaii, hereby certify:

That on May 23, 2025 at approximately 9:00 a.m. appeared before me NATALIE PITRE, the witness whose deposition is contained herein; that prior to being examined, the witness was by me duly sworn;

That pursuant to Rule 30 (e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to the transcript was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

That the foregoing represents, to the best of my ability, a full, true and correct transcript of said deposition.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

_____

KATHRYN PLIZGA, RPR, Hawaii CSR 497

RALPH ROSENBERG COURT REPORTERS, INC.