IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| PATRICIA W. BUCKMAN, PATRICIA W. BUCKMAN REVOCABLE TRUST, | Civil No. 1:24-CV-00129-MWJS-KJM |
| Plaintiffs, | DECLARATION OF MARK F. BUCKMAN, EXHIBITS 1-10 |
| v. | Trial Date: Vacated |
| MARK F. BUCKMAN, ET. AL. | Judge: Hon. Micah W. J. Smith |
| Defendants. | |

**DECLARATION OF MARK F. BUCKMAN**

I, Mark F. Buckman, declare as follows:

1. I am an attorney licensed to practice law before this Court and I am co-counsel of record in this matter. I am also a Defendant and Counterclaimant in this matter. I am over the age of 18, and I have personal knowledge of the facts recited in this Declaration. If called as a witness in these proceedings, I could and would testify competently to these facts. I make this declaration in support of Jennifer Buckman's and Mark Buckman's Motion to Enforce Settlement Agreement.

2. I've attached the following exhibits, which I authenticate in separate paragraphs below:

1

## EXHIBITS

Exhibit 1:    Binding Term Sheet signed July 17, 2025

Exhibit 2:    Natalie Pitre Texts to Mark Buckman, November 7 and 10

Exhibit 3:    Movant's Draft of Settlement Agreement w/ Exhibits A, B, & C

Exhibit 4:    Patricia's January 9, 2025 Will

Exhibit 5:    Patricia's January 9, 2025 Third Amendment to Trust

Exhibit 6:    Patricia's 2023 Codicil to Will and 2023 Trust Amendment

Exhibit 7:    Natalie Pitre text 2023 Matt wants to move in, "I won't Have It"

Exhibit 8:    Mom & Natalie March 2024 Eviction Lawsuit Against Matt

Exhibit 9:    Plaintiff's Counsel's October 21, 2025 Settlement Agreement

Exhibit 10:  Natalie Pitre Emails February 2026

3.    Jennifer and I believed we had totally resolved this case at the MSC. We want to bring this matter to conclusion so we and the whole family can put it in the past. Jennifer and I attended the settlement conference on July 17, 2025. At that time, dispositive motions were pending, we had served a Rule 11 Sanctions Motion on Richard Wilson, and plaintiff had finally admitted that I invested in our original house on 16th avenue, something her agents had steadfastly denied to that point. My mother Patricia also appeared at the Settlement Conference with the Magistrate Judge on July 17, 2025. Jennifer and I were represented by attorney Louise Ing and Plaintiffs were represented by Richard Wilson. My sister, Natalie Pitre, and

her husband, Carl Pitre, who are <u>not</u> parties to this case, also appeared at the Settlement Conference.

4.      Although not a party, Natalie has been involved in Mom's Case from its inception:  she hired attorney Richard Wilson for herself and Mom (Mr. Wilson acknowledged Natalie was his main contact in this case), Natalie attended every session of Mom's deposition (conducted over multiple, one hour sessions), she attended multiple third-party depositions, and she attended the first MSC.  Natalie and Mr. Wilson have taken the position that Natalie was serving as Mom's "litigation assistant" in this case, and Mr. Wilson has represented to the Court that Natalie was his primary point of client contact.  (I have believed since the beginning, and continue to believe, that Natalie actually is the person behind this case and that Mom never wanted to sue me and wasn't making those claims.  However, it's unproductive to further discuss that issue at present except to note that Jennifer's Rule 11 Sanctions Motion demonstrates that we uncovered evidence to support our belief.)

5.      None of the other parties to the Pitre Case – Matt Buckman, Kimberly Buckman, Manoa Buckman, or Tamara Buchwald – appeared at the Settlement Conference for this case because they are non-parties and no Settlement Conference was noticed for the Pitre Case.   There has been no Rule 16 conference

in that case, no discovery undertaken, and Matt, Kimberly, and Manoa were in default at the time of the MSC in this case - Manoa for the second time.

6.    Mom and I met individually with Judge Mansfield, and then together with him, and discussed the issues in this case.  Mom and I reached agreement on all disputed issues in this case.  At the Judge's request, I hand-wrote up a Term Sheet after the productive discussion.  Mom and her attorney reviewed and approved this Term Sheet.  The settling parties (Mom, me, Jennifer, Natalie, and Carl) then made additions based on further discussions, including discussions with Natalie and Carl in which they asked for, and received, monetary payments for themselves (as reflected in the Term Sheet).   A true and correct copy of the fully-signed binding Term Sheet is attached hereto as **<u>Exhibit 1</u>**.  (I redacted the names of Natalie and Carl's minor daughters from the second page.)

7.    The Term Sheet resolved the disputes among Mom, me, and Jennifer that had been raised in this case, as follows:

(1)    Mom's note and mortgage on the Front House would remain as-is, except for my reducing Mom's payoff obligation by $78,563.00;

(2)    Mom's deed to Me for the Back House would remain as-is.  I would provide my brother Matt a conditional option to occupy the house during his lifetime provided Matt signed a rental agreement and paid the carrying costs of the house (otherwise Matt had to move out or be evicted and thereafter I would

provide him / his new landlord a housing payment for life). I also agreed that, after Matt's death, I would provide Matt's son Manoa $200,000.00 from the sale of the Back House to be used for real estate for Manoa;

(3)     Mom's Life Insurance beneficiaries would stay as-is, with my holding $40,000 for Matt to be disbursed in my discretion[1]; and

(4)     I agreed to continue advancing Mom further funds by directly paying for her physical therapist and other bills during her lifetime, up to an additional $20,000.00.

Although only defendants in the Pitre Case, Natalie and Carl sought and obtained benefits for themselves in the Term Sheet:

(a)     I agreed "to pay Natalie $1,500 / month for the duration of Pat's life as long as Pat is living with Natalie"; and

(b)     I agreed to pay Natalie and Carl's daughters "$10,000 each for college costs from [the sale of] the Back House."

Finally, the Term Sheet provided for "Full releases of everyone - Patricia, Mark, Jeni, Natalie, and Carl."

8.     As there had been acrimony and distrust in this case and Jeni and I had concerns over possible non-performance of the Term Sheet, the Judge wrote above

---

[1]   I received the life insurance proceeds and am holding them pursuant to my agreement with my Mom, consistent with the Term Sheet.

5

the signature lines before presenting the document for everyone to sign: "The undersigned have full authority to enter into this settlement and do with the intent to fully and finally resolve any and all disputes among them from the beginning of time until today, July 17, 2025." The Term Sheet does not include any contingency stating it would only be effective if a more detailed agreement was signed; rather, Jennifer and I believed the Term Sheet was enforceable as-is and the judge told us he would enforce it as written.

9.      Right after leaving the settlement conference, Jennifer and I ran into my Mom, who was accompanied by Carl Pitre. My Mom approached us, gave me a hug, and said she was glad we resolved the case. I also hugged my Mom and told her I was glad we had resolved the case. Carl was noticeably mad, rushed my Mom, treated her rudely by yelling at her to hurry up, and rushed her into the elevator with him and continued to berate her for settling this Case contrary to his wishes. (Natalie and Carl kept Mom isolated from me and other family members for years since late 2023 by not allowing visits or calls, changing Mom's phone number, blocking my phone number from my Mom's phone, screening her email, and then in 2025 stopped her from being able to text by replacing her phone with a non-texting model. Most of these facts come directly from Natalie and Carl's sworn testimony.) This occurred on the second floor of the court house, and when my Mom and Carl emerged from the elevator on the first floor, we heard Carl

6

loudly berating my Mom for settling the case, berating her for being happy, and generally raining on her parade and her relief at having the case resolved. I was sickened and shocked at Carl's mistreatment of my Mom - especially in such a public place. I was concerned for my Mom's safety and physical and mental health, as she lived at Carl & Natalie's house. I have lost a lot of respect for Carl through this sad saga.

10. I've performed all my obligations under the Term Sheet to date. Those generally are (A) paying Natalie $1,500 per month to assist with my Mom's living expenses, (B) continuing to pay my Mom's physical therapist / general helper, (C) trying to have Matt sign a rental agreement and pay rent on the Back House, and (D) drafting and circulating a more formal set of documents to memorialize the settlement agreement we reached at the MSC, and (E) delaying collection of my Mom's promissory note on the Front House for 3 months after her passing to allow Natalie and Carl more time to obtain a refinance to pay off my loan.

A. The Term Sheet provides that "Mark agrees to pay Natalie $1,500/month for the duration of Pat's life as long as Pat is living with Natalie." To fulfill that obligation, I made $6,678.00 of payments to Natalie, as follows:

| Time Period | Amount / Date |
|---|---|
| July 17 - August 31 | Paid $2,178 on August 31 |
| September 1-30 | Paid $1,500 on September 16 |
| October 1-31 | Paid $1,500 on September 29 |
| November 1-30 | Paid $1,500 on October 28 |
| **Total** | **$6,678.00** |

B.    I continued to pay my Mom's physical therapist / general helper through the date of her passing, including paying him agreed upon bonuses, including a Christmas bonus, the total amount being over $4,000.00. (I had been paying some of my Mom's bills since 2023 pursuant to an agreement with my Mom and Natalie, and provided the updated accounting of same - a bit over $30,000.00 - to Mr. Wilson and also provided it to Judge Mansfield at the MSC.)

C.    I tried to have Matt sign a rental agreement and pay rent on the Back House by contacting him regarding the rental agreement on August 5, August 8, and August 12, 2025. I visited him in person, called, texted, and emailed, including after August 12. However, Matt refused to sign any agreement, refused and failed to pay me any monthly carrying costs, and instead Matt, his son Manoa, and his ex-wife Kimi filed documents challenging the Term Sheet. Consistent with the Term Sheet, I intend to move forward to have Matt, Kimi, Manoa, and any other occupants evicted from the Back House. <u>I will provide Matt's new landlord with rental payments on Matt's behalf for life, as specified in the Term Sheet</u>. (I previously discussed and agree with my Mom evicting Matt, Manoa, and Kimi from the Back House, and me paying Matt's rent directly to his landlord, not Matt, which is the underpinning for some of the Term Sheet.)

8

11.    For context, less than two months after filing this case, Natalie, as Mom's

agent, filed an eviction case against Matt when he refused to move out of the Front

House.  This eviction case was filed March 13, 2024 against Matt in State District

Court, Case No 1DRC-24-0002568.  I am informed and believe that to resolve that

case, Natalie on her own initiative had Matt move into the Back House.  A true and

correct copy of the complaint is attached as Exhibit 8.

D.    I drafted and circulated a more formal set of documents to

memorialize the settlement agreement (as set forth below).

12.    Prior to my Mom's passing, our draft settlement documents covered the

major points in more detail.  Indeed, the last comments sent over by Mr. Wilson on

October 21, 2025, less than 2 weeks before Mom's death, contained Mom's and my

agreement on all material terms (language from Mr. Wilson's draft):

A.    **Front House Promissory Note and Mortgage Valid &
Enforceable**.  Patricia hereby represents, warrants, and confirms that
she voluntarily signed the Promissory Note, ARNM, and Mortgage,
and they are valid, effective, and legally binding according to their
terms.

B.    **Back House Deed Valid & Transferred 100% Fee
Simple Title**.  Patricia hereby represents, warrants, and confirms that
she voluntarily signed the Back House Deed and it is valid, effective,
and legally binding according to its terms.

C.    **Promissory Note Reduction**.  Mark has agreed to reduce
the amount required to pay off the Promissory Note after Patricia's
passing.  The discount shall be an amount equal to one-third (1/3) of
the original   principal balance of $235,695.00, such that the total

discount to be deducted from the pay-off amount will be Seventy-Eight Thousand, Five Hundred Sixty-Three Dollars ($78,563.00)

      **i.**      **Extended Payoff**. Mark agrees to extend the Maturity Date of the Promissory Note by up to three (3) months after Patricia's passing so Natalie and Carl have extra time to pay off the Promissory Note.

      **ii.**      **Natalie and Carl Agree to Promissory Note and Mortgage**. Natalie and Carl acknowledge and agree with the terms set forth above regarding the Promissory Note and Mortgage. Natalie and Carl specifically agree that the Promissory Note, ARNM, and Mortgage are valid and legally binding obligations enforceable pursuant to their terms and that the Promissory Note is secured by the Mortgage, which is a valid encumbrance on the Front House. Further, Natalie and Carl represent and warrant that they will not challenge or dispute the Promissory Note, ARNM, or Mortgage in any way whatsoever and expressly and irrevocably waive any and all rights, claims, or defenses to challenge, contest, dispute, or hinder the enforcement of the Promissory Note, ARNM, or Mortgage for any reason whatsoever.

13. Despite the agreement on these key points, the parties were unable to agree to Mr. Wilson's draft because he included additional terms that do not reflect the terms of the Settlement as documented in the Term Sheet, basing his contentions on the EO entered in the Pitre Case that appears to be a clerical error. He also included terms - likely because he made his edits on an outdated draft - that continued to provide Matt the option to occupy the Back House, when that option had already expired due to Matt's refusal to sign a rental agreement or pay rent.

14. Although I have discussed the incorrect EO in the Pitre Case with the Magistrate Judge in settlement discussions, and noted that it was factually incorrect

in an update to the court in August, Mr. Wilson persists in claiming it is somehow binding in this case. The EO is factually inaccurate and appears to be the result of a clerical error. Although I will be filing a motion to address the Pitre Case EO, I certainly **never** agreed to "a binding settlement term sheet resolving all remaining claims and parties" against Matt, Kimberly, Manoa, or Tamara. Moreover, where the EO states that it "STAYS all pending motions and pretrial deadlines" the fact is, there were no pre-trial deadlines in that case, because there had been no scheduling conference or scheduling order. Mr. Wilson's claim that non-clients are the beneficiaries of clerical mistake is representative of the sorts of challenges I have experienced in dealing with him in this case and related matters; indeed, the first time I met Mr. Wilson, he was "thrown out of court" in the middle of a hearing by the state court judge due to his ethical conflict of interest in trying to represent both Mom and Natalie although they were on different sides of that matter. The state court judge also questioned Mr. Wilson how his conduct did not knowingly facilitate the violation of a court order by his client Natalie.

15. Natalie and Carl's attorney Tom Bush used Mr. Wilson's draft to make additional comments in late October (perhaps just a mistake). These were the first comments he made. Mr. Bush's comments included asks on Natalie's and Carl's behalf that far exceeded anything agreed in the Binding Term Sheet, such as (1) a 6-month extension of the maturity date of Mom's promissory note on the Front

House -- the Term Sheet did not call for an extension, but my first draft still contained a 3-month extension because that is what Mom and I agreed [see para. 23 below], (2) the striking of any interest from Mom's promissory note, whereas the Term Sheet did not call for any reduction on the interest and Mom and I had already agreed on a reduced, 5% interest rate set forth in the Note itself; (3) that Jennifer and I reach a settlement with all defendants in the related case (Matt, Kimi, Manoa, and Tamara) - apparently for no consideration - which counsel claimed was a "material condition of the agreement", even though the Binding Term Sheet did not call for such dismissals. This proposed new term directly contradicts the Binding Term Sheet, which states explicitly, "Matt & Manoa beneficiaries, but not signatories" and provides that Matt, et al. would be evicted if they refused to sign a rental agreement and pay rent for the Back House for 60 days (as they have), and (4) a provision stating that Jennifer and I agree that Mom's 2025 Trust Restatement and Estate documents are valid and binding–even though these documents were not disclosed to Defendants in discovery and Mr. Wilson and Natalie did not produce these documents to Defendants until weeks after the settlement agreement had been reached and the Binding Term Sheet had been signed - despite an outstanding court order compelling the documents identification and production.

16.   On November 4, 2025, Natalie informed me our Mom had passed.   On

November 7, she texted me the following:

> Hi Mark,
> Now that Mom has died, we need to settle a few outstanding matters.
> I'd like to schedule a short call tomorrow with you and Tamara, mom's
> successor trustee, to discuss the status of the settlement agreement—
> specifically whether you plan to sign it as written by Tom Bush or if
> we need to consider next steps.
> What time tomorrow works best for you?

> On November 10, I texted Natalie "It's better to communicate thru your
> lawyers."

> Natalie responded on November 10:

> Hi Mark,
> I saw your note suggesting communication through counsel. That's
> fine, and **I'll loop Rich in. I'm still confirming, on the record, that
> the three-page handwritten agreement signed by all parties in the
> judge's chambers remains binding**. Your 27-page version does not
> reflect those agreed terms, and your failure to finalize as ordered by
> the court is a violation of that order.

> In addition, the ongoing criminal and violent activity at the property
> you hold title to continues to endanger neighbors and create serious
> liability for you as the titled owner. I've begun documenting incidents
> and police reports.

> If I don't hear from you or your attorney by **Wednesday at noon**, **I'll
> move forward with counsel to have the court enforce the signed
> settlement** or, if necessary, set the matter for trial."

> True and correct copies of these texts are attached hereto as <u>Exhibit 2</u>.

17.   As noted above, in late October Mr. Wilson had provided his comments on

an outdated draft of the documents (August 28 instead of September 30), and Mr.

13

Bush commented on Mr. Wilson's draft. To facilitate resolution of the differences between the operative document and the draft provided by Messrs. Wilson and Bush, I incorporated the changes proposed by Mr. Wilson or Mr. Bush, to the extent Defendants were willing to accept them, and created a new version of the operative draft documents. I transmitted this revised draft to Mr. Wilson and Mr. Bush on November 12, 2025.

18.    To date, neither Mr. Wilson nor Mr. Bush has provided comments, although Mr. Bush did state last week that he would get to it "in a few days." This impasse appears to be due to the fact that Natalie refuses to sign any settlement documents unless they include the new, objectionable terms put forth by Messrs. Wilson and Bush. In emails Natalie sent me in February 2026, Natalie's position has steadfastly been, "**If you wish to move this matter forward, sign and return the Settlement Agreement previously provided. Until that is completed, there is nothing further to discuss**." True and correct copies of these emails are collectively attached hereto as Exhibit 10.

It should be noted that I have repeated, well over 10 times, written inquiries to  Messrs. Wilson and/or Bush (including forwarding them Natalie's emails) and asked whether they represent Natalie or Tamara Buchwald, and they have steadfastly refused to reply - except that Mr. Bush recently confirmed he continues to represent Natalie and Carl in the Pitre Case.

19.    For the last 3 months, both Mr. Wilson and Mr. Bush have refused to provide comments and they have both ignored my repeated requests to meet and confer pursuant to LR 7.8 prior to the filing of this motion.  Thus, the parties have reached impasse and it appears they will be unable to prepare a more formal document memorializing the terms of our settlement agreement. However, the Term Sheet remains binding and enforceable.

20.    I delayed collection of the Mom's promissory note for more than 3 months after her passing.  I provide context for my and Mom's agreement regarding this delay and the promissory note.  In addition to the written Promissory Note and agreement regarding note and mortgage, my Mom requested, and I agreed, to loan her up to an additional $50,000.00 for her personal expenses as well as wait up to 3 months for Natalie and Carl to payoff the loan after her passing.  This was set forth in Paragraph 8 of my Amended Counterclaim filed August 27, 2024, page 33-34, ECF 71, "PWB requested, and MFB agreed, to two additional terms regarding the promissory note and mortgage on the Front House.  First, MFB agreed to loan PWB up to another $50,000 for her personal needs (but not for subsidizing Natalie, Carl, Matt, or anyone else).  Second, MFB agreed to allow Natalie and Carl three months to obtain a loan on their 15th Avenue property to pay off MFB's promissory note and mortgage on the Front House, as PWB believed that they would likely need more than 30 days to obtain a loan to pay off MFB's note after PWB's passing.

PWB requested this, and MFB agreed, because she wanted Natalie and Carl to have the opportunity to pay off MFB's promissory note if they wanted to live in the Front House after PWB passed."

By the time we attended the MSC, my Mom had admitted the following RFAs: "Admit that the "Promissory Note" to Mark Buckman that you signed on September 24, 2023 is fully enforceable pursuant to its terms.  (MFB00022-00023)" (RFA 12) and "Admit that, before you signed the "Promissory Note" to Mark Buckman on September 24, 2023, you asked Mark to agree to loan you up to an additional $50,000.00 for your personal needs. (MFB00022-00023)"  (RFA 14.)

21.    For background, my Mom and I had discussed numerous times in 2023 that Matt is financially irresponsible, extremely difficult to deal with, and has been evicted numerous times from places in Waianae, Waimanalo, Hawaii Kai, and Kapahulu.  Natalie also agrees that Matt is financially irresponsible and has been evicted.  Attached as Exhibit 10 is a true and correct copy of a text Natalie sent me in June 2023.

22.    For context, although my Mom had also included my wife Jennifer in her complaint, almost every time I've spoken with Mom, in deposition or otherwise, she would either not know that "she" had sued Jennifer, or had no reason for suing Jennifer.  Jennifer's Rule 11 Motion, served back in July and to be filed concurrently with our motion to enforce settlement, demonstrates that it was

16

actually Mom's attorney Richard Wilson, along with Natalie Pitre and Tamara Buchwald, that made up the SAC's claims against Jennifer without Mom's input; i.e., they are based on speculation of Rich, Natalie, and Tamara, even though those claims were brought in my Mom's name.  The emails between Rich, Natalie, and Tamara do not include my Mom, and do not mention any of them talking to my Mom about the claims against Jennifer. While found it surprising that an email group that included two attorneys was openly discussing how to create allegations for a complaint to be filed in Federal Court, this certainly does provide good circumstantial evidence to support an inference that Mr. Wilson, Natalie, and Tamara also simply made up the outrageous and untrue allegations about me in Plaintiff's Complaints.

23.    Although I waited the 3 months after my Mom's passing to first inquire about collecting on my Mom's promissory note, Natalie, Tammy, Rich, and Tom have all ignored or rebuffed my efforts to collect on this without a further court case.  I have written them several times, true and correct copies of those emails are attached as Exhibit "10."  To date, Natalie and Carl have not made any payment on the Note, even though Natalie has acknowledged to me, in written texts, that the Term Sheet is binding and enforceable.

24.    I have emailed and tried numerous times to get Natalie, Tamara, Rich, and Tom to inform me (i) who is or intends to be my Mom's PR under her 2025 Will,

(i) who is the successor Trustee under my Mom's 2025 Trust, (iii) what parties Rich or Tom represent and in which capacities. This is, obviously, confusing because Natalie's November 10, 2025 text to me indicated that Tamara is the "successor trustee," but Tamara has yet to appear in this action to file a Substitution of Party under Federal Rules of Civil Procedure section 25, and we understand that Tamara has had at least two lengthy telephone conversations with the Magistrate Judge in which she has stated that she did not intend to participate in any role in Patricia's estate or trust. Similarly, I have asked Natalie, Tamara, Rich, and Tom to inform me of the progress of moving forward with probate, but the best I've received is Rich stating that those issues will be addressed later and Natalie saying she won't respond until I sign her preferred version of the settlement agreement (with whom, she won't say). I am concerned that Natalie (with Mr. Wilson's agreement and assistance) is trying to drive up costs for me by delaying this process while she benefits by delaying this matter, and hurting us. Attached are true and correct copies of some of those emails as **Exhibit 10**.

I declare under penalty of perjury under the laws of the United States that the facts recited above are true and correct.

Executed February 27, 2026 in Elk Grove, California.

 /s/ Mark F. Buckman
MARK F. BUCKMAN

18