## SETTLEMENT AGREEMENT

This Settlement Agreement and Mutual General Release ("**Agreement**") is entered into as of February 24, 2026 by and between Mark F. Buckman, individually and as Trustee of the Mark F. Buckman Trust dated August 9, 2022 ("**Mark**" which includes his trust) and Jennifer Buckman ("**Jeni**"), on the one hand, and [Tamara Buchwald or Natalie Pitre], not individually, but as Successor Trustee of the Patricia W. Buckman Revocable Trust dated July 25, 2019, as amended, and as Personal Representative under Patricia W. Buckman's Will (collectively, "**PWB Estate & Trust**") and Natalie Pitre ("**Natalie**") and Carl Pitre ("**Carl**"), on the other hand (collectively the "**Parties**").   In consideration for the promises made by the Parties and recited herein, the Parties agree as follows:

### I.      Recitals

a.      *Whereas*, in 1991, Mark purchased the real property located at 714 16th Avenue, Honolulu, Hawaii.

b.      *Whereas*, in 2003, Patricia Buckman ("**Patricia**" or "**Mom**") purchased the real property that is now known as a two-unit condominium, identified as (i) 3010 Kaunaoa Street, Honolulu, Hawaii 96815, also known as Unit Diamond of the Cottages at Diamond Head, Tax Map Key No. (1) 3 1 024 043 CPR 0001 ("**3010 Kaunaoa**" or the "**Front House**") and (ii) 3010A Kaunaoa Street, Honolulu, Hawaii 96815, also known as Unit Ewa of the Cottages at Diamond Head, Tax Map Key No. (1) 3 1 024 043 CPR 0002 ("**3010A Kaunaoa**" or the "**Back House**").

c.      *Whereas*, Patricia signed and notarized that certain "Warranty Deed" on August 10, 2023, which conveyed 100% fee simple ownership of the Back House from Patricia to Mark's Trust, and which was recorded in the State of Hawaii Bureau of Conveyances on August 11, 2023 as Document No. A-86230897 ("**Back House Deed**"), a true and correct copy of which is attached hereto as **Exhibit "A";**

f.      Whereas, on or about September 24, 2023, Patricia signed and notarized that certain Promissory Note (dated September 18, 2023) to Mark in the principal amount of Two Hundred Thirty-Five Thousand Six Hundred Ninety-Five Dollars ($235,695.00) ("**Promissory Note**"). Patricia also signed that certain Agreement Regarding Note and Mortgage on or about September 24, 2023 ("**ARNM**").  Patricia signed and notarized that certain Mortgage on September 24, 2023, to Mark, which secured the Promissory Note and encumbered the Front House, and which was recorded in the State of Hawaii Bureau of Conveyances on September 25, 2023 as Document No. A-86680413 ("**Mortgage**").  True and correct copies of the Promissory Note, ARNM, and Mortgage are attached hereto as **Exhibit "B";**

g.      *Whereas*, certain disputes arose between the Parties regarding the validity of the aforementioned documents, transfers, and encumbrances;

h.      *Whereas*, on January 19, 2024, Patricia filed an action against Mark and Jeni in

*Settlement Agreement, Case 1:24-cv-00129-MWJS-KJM, Page 1 of 9 (February 24, 2026)*

## EXHIBIT 3

circuit court, Civil No. 24-0000095 ("**Suit I**");

i.    *Whereas*, on March 18, 2024, Jeni removed Suit I to federal court, Civil No. 1:24-cv-00129-MWJS-KJM;

j.    *Whereas*, on March 27, 2024, Mark answered the complaint and filed a Counterclaim in Suit I;

k.    *Whereas*, on January 8, 2025, Mark filed an action against Natalie, Carl, Duke Manoa Buckman ("**Manoa**"), Matthew Buckman ("**Matt**"), Kimberly Buckman ("**Kimi**"), and Tamara Buchwald ("**Tamara**"), Civil Case No. CV 25-00010 MWJS-KJM ("**Suit II**");

l.    *Whereas*, on July 17, 2025, a Mandatory Settlement Conference was noticed for and held in Suit I ("**MSC**").  Patricia participated and was represented by attorney Richard Wilson, Mark and Jeni participated and were represented by Mark and Louise Ing.  Natalie and Carl also attended and participated in the MSC, although they were not parties to Suit I.  At the conclusion of the MSC, Patricia, Mark, Jeni, Natalie, and Carl all signed a binding, hand-written agreement ("**Term Sheet**") to totally resolve Suit I and Mark's claims against Natalie and Carl in Suit II; a true and correct copy of the Term Sheet is attached hereto as **Exhibit C**.  As used herein, the term "Agreement" shall also mean and include the Term Sheet;

m.    *Whereas*, up until her passing on November 2, 2025, Patricia was the trustee of the Patricia W. Buckman Revocable Trust dated July 25, 2019, as amended (the "**Trust**"), and, as used herein, Patricia or Mom includes actions Patricia took for herself and on behalf of the Trust.

m.    *Whereas*, Patricia, PWB Estate & Trust, Mark, Jeni, Natalie and Carl agreed that it is in their best interests to resolve all disputes among them arising from or related to Suit I, Suit II, and all other matters at issue, as set forth below;

*NOW THEREFORE*, in consideration of the foregoing premises and the mutual promises, covenants, and releases set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the Parties hereto, and intending to be legally bound hereby, they agree as follows:

## II.    <u>DETAILED TERMS</u>

A.    <u>**Front House Promissory Note and Mortgage Valid & Enforceable**</u>.  PWB Estate & Trust hereby represents, warrants, and confirms that Patricia voluntarily signed the Promissory Note, ARNM, and Mortgage, and they are valid, effective, and legally binding according to their terms.

B.    <u>**Back House Deed Valid & Transferred 100% Fee Simple Title**</u>.  PWB Estate & Trust hereby represents, warrants, and confirms that Patricia voluntarily signed the Back House Deed and it is valid, effective, and legally binding according to its terms.

C.    **Promissory Note Reduction**. Mark has agreed to reduce the amount required to pay off the Promissory Note.  The discount shall be an amount equal to one-third (1/3) of the original principal balance of $235,695.00, such that the total discount to be deducted from the pay-off amount will be Seventy-Eight Thousand, Five Hundred Sixty-Three Dollars ($78,563.00).

i.    **Extended Payoff**.  Mark agrees to extend the Maturity Date of the Promissory Note by up to three (3) months after Patricia's passing so Natalie and Carl have extra time to pay off the Promissory Note.

ii.    **Additional Loan**.  Mark and Patricia agreed that Mark would loan Patricia up to Fifty Thousand Dollars ($50,000) for her expenses, to be advanced by Mark by paying Patricia's bills ("**Additional Loan**").  The Additional Loan will be added to the principal amount of the Promissory Note and thus secured by the Mortgage.  As of July 17, 2025, the amount due was as reflected on the spreadsheet provided at the MSC.  At the MSC, Mark and Patricia further agreed that Mark would loan Patricia up to an additional $20,000.  The total amount of the Additional Loan Mark advanced is approximately $38,000 as of November 11, 2025.

iii.    **Natalie and Carl Agree to Promissory Note and Mortgage**.  Natalie and Carl acknowledge and agree with the terms set forth above regarding the Promissory Note and Mortgage.  Natalie and Carl specifically agree that the Promissory Note, ARNM, and Mortgage are valid and legally binding obligations enforceable pursuant to their terms and that the Promissory Note is secured by the Mortgage, which is a valid encumbrance on the Front House.  Further, Natalie and Carl represent and warrant that they will not challenge or dispute the Promissory Note, ARNM, or Mortgage in any way whatsoever and expressly and irrevocably waive any and all rights, claims, or defenses to challenge, contest, dispute, or hinder the enforcement of the Promissory Note, ARNM, or Mortgage for any reason whatsoever.

D.    **Mark to Provide Matt with a Housing Payment.** In exchange for receiving 100% free and clear title to the Back House and other good and valuable consideration, Mark agreed with Patricia (as shown on the Term Sheet) that: Mark would provide Matt with the opportunity to occupy the Back House for life, but Matt had to sign a rental agreement and pay certain monthly carrying costs.  The Term Sheet also provided that "if Matt doesn't pay monthly costs, then he has to move out - evicted if not out within two (2) months."  Following the MSC and the execution of the Term Sheet, Mark contacted Matt regarding the rental agreement on August 5, August 8, and August 12, 2025, but Matt refused to sign any agreement, refused and failed to pay Mark any monthly carrying costs, and instead Matt, Manoa (and Kimi) filed documents in Suit 1 challenging the Term Sheet, including on August 29 and September 5, 2025 (ECF 189 and 191, respectively).  Consistent with the Term Sheet, Mark will move forward to have Matt, Kimi, Manoa, and any other occupants evicted from the Back House.  PWB Estate & Trust represents and warrants that it will cooperate with Mark so that Mark can obtain possession of the Back House as well as terminate any of Matt's, Manoa's, or Kimi's claims to the Back House, such as by, without limitation, cooperating in having Matt, Kimi, Manoa, and any other occupants evicted from the Back House in Suit II.

Upon regaining possession and repairing and cleaning the Back House, Mark shall rent out the Back House to a third-party, pay the property expenses, then provide the net monthly rental income ("**NRI**") from the Back House to Matt's landlord directly or otherwise use his discretion to ensure the NRI is applied to Matt's housing costs for the rest of Matt's life.

ii.    **Matt's Personal Rights to NRI**.  Matt's right to receive the NRI is personal to Matt and is non-transferable, non-assignable, and may not be sold, willed, transferred to a trust, gifted, mortgaged, pledged, levied upon, subject to claims of his creditors, or otherwise conveyed, whether by act of Matt or operation of law.  All Matt's rights to the NRI ends upon his death.

E.    **Manoa $200,000.00 Residual Fund, No Other Rights.**  Upon Mark's sale of the Back House, Mark shall give Manoa $200,000.00 from the proceeds of the sale, as follows: $10,000.00 in cash, and $190,000.00 in the form of real estate, such as being used as a down payment on real estate for Manoa ("**Residual Fund**").  Any damage to the Back House occurring during Matt's and/or Manoa's occupancy or costs relating thereto shall be deducted from the Residual Fund; provided, however, the deduction will be limited to 70% of such expenses.  For example, if the Back House suffered damage of $10,000, then $7,000 would be deducted from the Residual Fund before payment to Manoa.  Manoa has no right to occupy, inherit, own, receive rental income from, or receive any interest in or benefit from the Front House or the Back House (other than the Residual Fund), whether from Patricia, PWB Estate & Trust, Mark, Jeni, Matt, their respective trusts, or anyone else.

F.    **If the Back House is Sold or Transferred by Mark.** Mark has the right and discretion to sell the Back House. If the Back House is sold, Mark remains obligated to, and shall, pay Matt the NRI for the remainder of Matt's life. Nothing herein will prevent or restrict the sale, transfer, foreclosure, or other disposition of the Back House by Mark.  To facilitate such a sale, Mark shall have the right to immediately evict Matt, if he is still occupying the Back House. However, Matt would continue to receive an amount equivalent to NRI for his lifetime, as provided herein.

G.    **Mark's Duties to Matt and Manoa Are Contractual.**   Mark is not a trustee or fiduciary for Matt or Manoa and thus does not owe them any fiduciary duties.  Thus, Mark only has contractual duties and has broad discretion, to be exercised in good faith, to carry out his obligations herein to achieve the overall intent of this Agreement to provide housing help to Matt and Manoa.

H.    **Dismissals of Litigation**.   Within seven (7) days of this Agreement being fully executed, PWB Estate & Trust, Mark, and Jeni shall submit a stipulation to dismiss Suit I (Civil No. CV: 24-00129 (MWJS-KJM)) with prejudice.  PWB Estate & Trust shall concurrently record a release of Lis Pendens, to be drafted and recorded by Mr. Wilson in a form acceptable to a title company to enable Mark to obtain title insurance for the Back House Deed and insuring his 100% fee simple interest. Mark shall dismiss Natalie and Carl from Suit II, with prejudice. Mark engaged in good faith and used reasonable efforts to negotiate a settlement of Suit II with Tamara, Matt, Manoa, and Kimi, but those efforts were unsuccessful.  Suit II will therefore be continued as against

Tamara, Matt, Manoa, and Kimi so that Mark can obtain possession of the Back House as well as terminate any other of Matt's, Manoa's, or Kimi's claims to the Back House as well as any claims against Mark and otherwise obtain relief based on the allegations and issues in Suit II.

**I.      Release of Claims**.  PWB Estate & Trust, Mark, Jeni, Natalie, and Carl hereby, on their own behalf and on behalf of any and all of their successors and assigns, fully release and forever discharge each other from all claims of any nature whatsoever which they now have or assert to have, or which they at any time heretofore had, or asserted to have against each other arising out of or in any way related to any acts, circumstances, facts, transactions, omissions, or other subject matters, based on facts occurring prior to the date of execution of the Term Sheet on July 17, 2025. The term "claims" includes any claim or cause of action, regardless of the forum in which it may be brought, and includes, but is not limited to, any alleged breach of express or implied contract, intentional or negligent infliction of emotional distress, fraud, misrepresentation, defamation, interference with contract or other interests, or any other claims or causes for damages of any nature, including without limitation, actual, compensatory, punitive, and liquidated damages, penalties, and attorneys' fees, costs, and expenses.  PWB Estate & Trust, Mark, Jeni, Natalie, and Carl represent and warrant that they have not assigned or transferred all or any part of the claims or property rights which each is releasing. Except for Natalie and Carl, this Agreement does not resolve, affect, amend, or release any claims asserted by or against any party to Suit II, Civil Case No. CV 25-00010 MWJS KJM.  PWB Estate & Trust is specifically releasing any and all claims on behalf of the Trust and Patricia's Estate.

**i.      Carve Out for Conduct Undermining the Benefits of This Agreement.**
Notwithstanding any provision of this Agreement to the contrary, the Parties expressly do not release, waive, discharge, or relinquish any claims against any other Party to the extent such claims arise out of, relate to, or are based upon:

a.      Any act or omission by any other Party that has the purpose or effect of undermining, impairing, interfering with, frustrating, or diminishing the releasing Party's rights, benefits, consideration, or expected value under this Agreement, including, but not limited to, any claims for fraud, misrepresentation, concealment, or other tortious conduct that affects or threatens the releasing Party's ability to obtain the full benefits of this Agreement;

b.      Any intentional, negligent, reckless, bad-faith, or improper interference with the performance, implementation, enforcement, or realization of the terms of this Agreement, including conduct constituting a breach of the implied covenant of good faith and fair dealing;

c.      Any conduct after July 17, 2025 that delays, obstructs, prevents, or otherwise adversely affects the releasing Party's ability to receive the full value or benefit of the settlement.

Nothing herein shall limit the releasing Party's right to pursue damages, equitable relief, or enforcement remedies relating to such conduct.

**J.      Costs and Fees**.  Each of the Parties to this Agreement shall be responsible for his or her own attorneys' fees and costs incurred in all matters described herein.  Mark and Jeni shall pay their attorneys fees and costs through the equity in the Back House.

**K.      Authority and Non-Assignment.**  Each Party represents and warrants to the others

*Settlement Agreement, Case 1:24-cv-00129-MWJS-KJM, Page 5 of 9 (February 24, 2026)*

that they have full authority and legal capacity to enter into this Agreement and to perform the obligations herein, including releasing the claims and ratifying the documents described in this Agreement. Each Party further warrants that none of the claims released herein has previously been assigned or transferred to any other person or entity, by operation of law or otherwise. PWB Estate & Trust and Natalie represents and warrants that neither it, nor Natalie, nor Patricia has given, sold, or provided any part of the Back House to anyone, including Matt, Kimi, and/or Manoa, whether by a written document, or otherwise.

**L.    Successors and Assigns.** This Agreement is and shall be binding upon, and shall inure to the benefit of, the successors and assigns of the Parties hereto, and each of them, specifically including any successor Trustee of Patricia's Trust or administrator of Patricia's Estate; provided, however, nothing in this Agreement limits, diminishes, or releases Tamara of any personal liability.

**M.    Governing Law.** This Agreement shall be construed and enforced in accordance with Hawaii law.

**N.    No Waiver**. The failure of any Party to this Agreement to insist on strict adherence to one or more of the terms stated herein, on one or more occasions, shall not be construed as a waiver, nor shall it operate to limit, impair, preclude, cancel or otherwise affect a Party's rights or remedies.

**O.    Interpretation / Advice of Counsel**. All Parties acknowledge and agree that this Agreement was jointly negotiated and drafted by them, and they each had the opportunity to propose, review, and revise its terms. Patricia and PWB Estate & Trust have been represented by attorney Richard Wilson, Natalie and Carl have been represented by attorney Thomas Bush, Mark has been represented by attorney Louise Ing, and Jeni has been represented by Mark and Ms. Ing. Therefore, each term or provision hereof shall be given a neutral and fair interpretation in all respects, and any ambiguity, dispute, or question of interpretation shall not be construed in favor of or against any Party on account of authorship. Each Party further represents and warrants that, in executing this Agreement, they have relied solely on their own independent judgment, belief, and knowledge, as well as the advice and recommendations of counsel of their own choosing, regarding the nature, extent, duration, and consequences of their rights, obligations, and claims. Each Party states that they have not, in any respect, been induced or influenced to execute this Agreement by any statement, representation, promise, or assurance of any kind regarding any matter, whether made by another Party, counsel for another Party, or any other representative, unless expressly and specifically set forth in this Agreement. Each Party understands and agrees that this Agreement fully, finally, and exclusively expresses their entire understanding and agreement as to the subject matter hereof.

**P.    Severability**. If a court of competent jurisdiction holds any provision of this Agreement to be illegal, unenforceable, or invalid in whole or in part for any reason, the validity and enforceability of the remaining provisions, or portions thereof, will not be affected, unless the essential purpose of this Agreement would be defeated by striking the illegal, unenforceable, or invalid provision.

**Q.**     **Reasonable Cooperation**.  The Parties shall at their own cost and expense execute and deliver such further documents and instruments and shall take such other actions as may be required or appropriate to evidence or carry out the intent and purposes of this Agreement.

**R.**     **No Benefit to Kimi Buckman or Tamara Buchwald**.  Nothing in this Agreement is intended to benefit Kimberly Buckman or Tamara Buchwald in any way whatsoever.

**S.**     **Good Faith Settlement**.  This settlement is based upon a good faith determination of the Parties to resolve a disputed claim.  The Parties resolved this matter in compliance with both state and federal law.  Together with the Term Sheet signed on July 17, 2025, this Agreement contains the entire agreement between the Parties on the matters covered herein.  The Parties acknowledge that each has read the terms of the Agreement, that each fully understands its provisions, that each executes this Agreement voluntarily, and that the Parties' signatures constitute acceptance of the terms and conditions of this Agreement.

**T.**     **Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute but one instrument.

**U.**     **Enforceability**.  The Parties agree that this Agreement is admissible for the purposes of proving up and or enforcing the terms of the Agreement.  The Parties further agree that this Agreement may be pleaded as a full and complete defense to, and may be used as the basis for any injunction against, any action, suit, or other proceeding which may be instituted, prosecuted or attempted in breach of this Agreement.

**V.**     **Modification**.  No provision hereof may be waived, modified or amended except by a written agreement signed by  the party to be charged.

**W.**     **Entire Agreement**.  Together with the Term Sheet signed on July 17, 2025, which is attached as Exhibit C and incorporated herein by reference, this Agreement constitutes the final, complete, and exclusive statement of the terms of the agreement between the Parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings or agreements of the Parties. All Parties had full opportunity to investigate the facts and law related to this matter and no Party has been induced to enter into this Agreement by, nor is any Party relying on, any representation or warranty except those expressly set forth herein.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first set forth above.

_____
Mark F. Buckman

_____
Mark F. Buckman,
Trustee of the Mark F. Buckman
Trust dated August 9, 2022

_____
Jennifer Buckman

_____
Tamara Buchwald or Natalie Pitre,
Successor Trustee of the Patricia W. Buckman Revocable
Trust dated July 25, 2019, as amended

_____
Tamara Buchwald or Natalie Pitre,
Personal Representative under Patricia W. Buckman's
Will

_____
Natalie Pitre

_____
Carl Pitre

APPROVED AS TO FORM

_____
Louise Ing,
DENTONS US LLP
Attorney for Mark
Buckman and Jennifer
Buckman

_____
Richard Wilson,
Law Office of Richard E. Wilson,
LLC
Attorney for Tamara Buchwald or
Natalie Pitre, not individually, but
as Successor Trustee of the Patricia
W. Buckman Revocable Trust and
as Personal Representative of
Patricia W. Buckman's Will

_____
Thomas Bush,
Thomas Bush Law Office, LLC
Attorney for Natalie Pitre and
Carl Pitre

*Settlement Agreement, Case 1:24-cv-00129-MWJS-KJM, Page 8 of 9 (February 24, 2026)*



**STATE OF HAWAII
BUREAU OF CONVEYANCES
RECORDED**
August 11, 2023 3:25 PM
Doc No(s) A - 86230897

/s/ LESLIE T KOBATA
REGISTRAR

Pkg 12245697  ICL

**LAND COURT SYSTEM**

Conveyance Tax: $0.00

AFTER RECORDATION, RETURN BY MAIL [  ] PICKUP [  ]:
Mark F. Buckman, Esq.
7100 Bandy Road
Sacramento, CA 95829

This Document Contains 7 Pages:

Tax Map Key No. (1) 3-1-024-043 CPR 0002

COTTAGES AT DIAMOND HEAD
Unit Ewa

## WARRANTY DEED

THIS WARRANTY DEED, made this /O day of August, 2023, by PATRICIA W. BUCKMAN, Trustee of the Patricia W. Buckman Revocable Trust dated July 25, 2019, as amended, having all powers under said trust agreement, including full powers to sell, convey, exchange, mortgage, lease, assign or otherwise deal with and dispose of all lands of the trust estate and interests therein, of 3010 Kaunaoa Street, Honolulu, Hawaii 96815 ("Grantor"), in favor of MARK F. BUCKMAN, Trustee of the Mark F. Buckman Trust dated August 9, 2022, having all powers under said trust agreement, including full powers to sell, convey, exchange, mortgage, lease, assign or otherwise deal with and dispose of all lands of the  trust estate and interests therein, whose residence and post office address is 7100 Bandy Road, Sacramento CA 95829 ("Grantee");

### WITNESSETH:

The Grantor, in consideration of the sum of TEN AND N0/100 DOLLARS ($10.00) and other valuable consideration paid by the Grantee, the receipt of which is hereby acknowledged by the Grantor, does hereby grant, bargain, sell and convey unto the Grantee, his successors in trust and assigns, in fee simple, forever, the real property commonly known as 3010 A Kaunaoa Street, Honolulu, HI 96815, and more particularly described as follows:

1

Settlement Agreement, Exhibit A

MFB00001

That certain Unit Ewa of the "COTTAGES AT DIAMOND HEAD" Condominium Project, together with the undivided percentage interest in the common elements appurtenant thereto, being the property more particularly described in Exhibit "A" attached hereto and made a part hereof, subject to the encumbrances, exceptions, reservations, restrictions and other matters noted herein.

AND the reversions, remainders, rents, issues and profits thereof and all of the estate, right, title and interest of the Grantor, both at law and in equity, therein and thereto;

TO HAVE AND TO HOLD the same, together with all buildings, improvements, rights, easements, privileges and appurtenances thereon and thereto belonging or appertaining or held and enjoyed therewith, unto the Grantee according to the tenancy set forth herein, forever.

TOGETHER WITH the benefits of, but SUBJECT, ALSO, to the burdens of the restrictions on use and the other restrictions and all covenants, agreements, obligations, conditions and other provisions, and any and all easements appurtenant to or encumbrances on the Unit or said common elements described in Exhibit "A", as created by, referred to or set forth in the original Unit Deed, Declaration of Horizontal Property Regime or Declaration of Condominium Property Regime (whichever is applicable}, By-Laws attached or applicable thereto, condominium Map or File Plan (whichever is applicable), and other condominium documents, referred to in Exhibit "A", as the same have been or may be lawfully amended or restated from time to time, and in all rules and regulations which from time to time may be duly promulgated pursuant to the foregoing, which provisions are and shall constitute covenants running with the land and equitable servitudes to the extent provided by law and set forth in said instruments.

The Grantor does hereby covenant with the Grantee that the Grantor is seized of the property described herein in fee simple; that said property is free and clear of and from all liens and encumbrances except for the lien of real property taxes not yet by law required to be paid, and except as may be specifically set forth herein; that the Grantor has good right to sell and convey said property as aforesaid; and, that the Grantor will WARRANT AND DEFEND the same unto the Grantee against the lawful claims and demands of all persons, except as aforesaid.

The Grantee does hereby covenant and agree, for the benefit of the owners from time to time of all other units in the condominium property regime described in Exhibit "A", to observe and perform at all times all of the terms, covenants, conditions and restrictions set forth in the Declaration and By- laws referred to in Exhibit "A", as the same may from time to time be amended, on the Grantee's part to be observed and performed, and when required to do so to indemnify and hold and save harmless the Granter from any failure so to observe and perform any of such terms, covenants, conditions and restrictions.

The rights and obligations of the Grantor and the Grantee shall be binding upon and inure to the benefit of their respective heirs, devisees, personal representatives, successors and assigns.

2

MFB00002

This conveyance and the warranties of the Granter are expressly declared to be in favor of the Grantee, and the Grantee's heirs, devisees, personal representatives, successors and assigns.

The terms "Granter" and "Grantee", as and when used herein, or any pronouns used in place of those terms, shall mean and include the masculine, feminine or neuter, the singular or plural number, individuals, partnerships, trustees or corporations and their and each of their respective successors, heirs, personal representatives, and assigns, according to the context thereof. All covenants and obligations undertaken by two or more persons shall be deemed to be joint and several unless a contrary intention is clearly expressed elsewhere herein.

Each of the parties to this document may execute different and separate copies of this document ("counterparts"), each of which when so executed shall be deemed to be an original, and all of which taken together will constitute one and the same document. The document assembled in this manner will be binding upon all of the parties, even though all of them have not signed the same original or counterparts. For all purposes, including, without limitation, recordation, filing and delivery of this document, duplicate unexecuted and unacknowledged pages of the counterparts may be discarded and the remaining pages assembled as one document.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

3

MFB00003

IN WITNESS WHEREOF, the undersigned has executed these presents as of the day and year first above written.

_Patricia W. Buckman_

PATRICIA W. BUCKMAN,

Trustee of the Patricia W. Buckman

Revocable Trust dated July 25, 2019, as amended

"Grantor"

MARK F. BUCKMAN,

Trustee of the Mark F. Buckman

Trust dated August 9, 2022

"Grantee"

4

MFB00004

STATE OF HAWAII                         )

                                        ) SS.

CITY AND COUNTY OF HONOLULU    )


On this this *10* day of August, 2023, before me personally appeared PATRICIA W. BUCKMAN and MARK F. BUCKMAN, to me personally known or adequately proven to be the person(s) described in and who executed the foregoing instrument, who, being by me duly sworn or affirmed, did say that such person(s) executed the same as the free act and deed of such person(s), and if applicable, in the capacity shown, having been duly authorized to execute such instrument in such capacity.

Notary Public, State of Hawaii

*Mihail Gilevich*

(Printed name)         MIHAIL GILEVICH #16-241
                       My commission expires July 10, 2024

My commission expires: *July 10, 2024*

| | |
|---|---|
| Doc. Date: **08-10-2023** | # Pages: **7** |
| Name: *Mihail Gilevich* | First Circuit |
| Doc. Description: *Warranty Deed* | |

Notary Signature          Date          MIHAIL GILEVICH #16-241
                                        My commission expires July 10, 2024

NOTARY CERTIFICATION

5

MFB00005

**EXHIBIT "A"**

**FIRST**

Unit Ewa of that certain Condominium Project known as "COTI AGES AT DIAMOND HEAD", as shown on Condominium Map No. 5725 and described in the Declaration of Condominium Property Regime dated January 25, 2018, recorded in the Bureau of Conveyances of the State of Hawaii as Document No. A-65990763, as may be amended from time to time.

Together with appurtenant easements as follows:

(A)    An exclusive easement to use the Dwelling Area having the same number as the Unit as designated on said Condominium Map.

(B)    An exclusive easement to use the parking spaces, if any, designated on said Condominium Map.

(C)    Non-exclusive easements in the common elements designed for such purposes for ingress to, egress from, utility services for and support of said Unit; in the other common elements for use according to their respective purposes.

(D)    Exclusive easements to use other limited common elements appurtenant thereto designated by the Declaration.

**SECOND**

An undivided fifty percent (50%) interest in all common elements of the Project as established for said Unit by said Declaration, or such other percentage interest as hereinafter established for said Unit by an amendment of said Declaration, as tenant in common with the other Unit owners and tenants thereof.

Being a portion of the land conveyed to Grantor herein by UNIT DEED, dated August 11, 2022 recorded as aforesaid as Document No. A-82590335.

The land upon which said Condominium Project is located is described in said Declaration, which description is hereby expressly incorporated by reference.

SUBJECT, HOWEVER, to the following:

1.    The terms and provisions contained in said Declaration, as the same may be amended from time to time. (Project covered by Condominium Map No. 5725 and any amendments thereto.)

2.    Bylaws of the Association of Unit Owners for "COTTAGES AT DIAMOND HEAD", dated January 25, 2018, recorded in the Bureau of Conveyances of the State of Hawaii as Document No. A-65990764, as the same may be amended from time to time

6

MFB00006

3.      Any and all easements encumbering the Unit herein mentioned, and/or the common interest appurtenant thereto, as created by or mentioned in said Declaration, as the same may be amended from time to time, and/or in said Unit Deed, and/or as delineated on said Condominium Map.

TOGETHER WITH all built-in furniture, attached existing fixtures, built-in appliances, water heater, electrical and/or gas and plumbing fixtures, and attached carpeting, all of the foregoing being situate in or used in connection with the above-described real property.

**END OF EXHIBIT "A"**

MFB00007

## Agreement Regarding Note and Mortgage

Mark invested in, acted as the on site general contractor of, and obtained the mortgage for 714 16th Avenue, Honolulu, HI. Pat also invested in 714 16th Avenue, lived there, paid the mortgage, and was responsible for upkeep. Pat and Mark agreed that Mark owned Forty Percent (40%) of the property for his investment, construction, and financing, and that Pat owned the balance of the property.

The amount of the promissory note signed today ($235,695.00) was determined by taking the closing statement for 714 16th Avenue:

| | |
|---|---|
| Closing Date: | January 4, 2017 |
| Net proceeds: | $559,239.84 |
| Plus commission paid to Island Properties: | $30,000.00 |
| Total Adjusted Proceeds: | $589,239.84 |
| Mark's 40% | $235,695.93 |

So, the ~$235,000 was due to Mark in January 2017, but was not paid at that time. This number above is a compromise and discount. Mark held title alone from 1991 until 1998, at which time he added Jeni and mom (stated as 90% Mark & Jeni, and 10% mom). This was done so that Pat could more clearly claim the mortgage interest deduction. In 2006, Pat added the property to her newly-formed trust, listing Mark as receiving 40% of the property, as had been previously agreed. In 2008, Mark & Jeni deeded the property to Pat's trust. Before that deed, the face value of mortgages against the property was ~$450,000 (the balances were less). Then, when Pat acquired the property, she obtained new mortgages, the face value of which increased to $620,000.00. So, Pat already received $170,000 of equity value out of the property (the increased mortgage amount) and Mark did not receive 40% of those proceeds. However, Mark has agreed to waive the claim to that money, as well as mortgage paydown, to resolve this matter.

Pat is signing the promissory note so that Mark receives his Forty Percent (40%) equity share of the proceeds of the sale of the Property (714 16th Avenue). But, this is also done so that Pat does not have to pay this money during her lifetime, unless she moves out of 3010 Kaunaoa Street, Honolulu.

ACKNOWLEDGED AND AGREED:


_Patricia W. Buckman_

Patricia W. Buckman


_Mark F. Buckman_ (signature)

Mark F. Buckman


Settlement Agreement, Exhibit B                    MFB00019

## PROMISSORY NOTE

US $235,695.00                                          HONOLULU, HAWAII


Date:  September 18, 2023


FOR VALUE RECEIVED, the undersigned Patricia W. Buckman, individually and as Trustee of the Patricia W. Buckman Revocable Trust ("**Borrower**") promise(s) to pay MARK F. BUCKMAN, a married man as his sole and separate property ("**Lender**"), or order, the principal sum of TWO HUNDRED THIRTY-FIVE THOUSAND, SIX HUNDRED NINETY-FIVE AND NO/100 DOLLARS ($235,695.00), with interest on the unpaid principal balance from January 4, 2017 until paid, at the rate of Five Percent (5.00%) per year.

1.      Payments.

a.      There are no monthly payments due on this Note, rather, the Note shall be repaid upon the Maturity Date, as described below.

b.      The entire principal balance and accrued interest shall be due and payable upon the earliest to occur of any of the following (the "**Maturity Date**"): (a) the passing of Patricia W. Buckman, (b) sale, further mortgaging, or other transfer (including by way of Agreement of Sale or otherwise) of 3010 Kaunaoa Street, Honolulu, HI 96815, or (c) Patricia W. Buckman permanently moving out of 3010 Kaunaoa Street.

c.      Payment in lawful money of the United States shall be made to Mark F. Buckman at 7100 Bandy Road, Sacramento, CA 95829. or such other place as the Note holder may designate.

2.      Prepayments.  Borrower may prepay the principal amount outstanding in whole or in part at any time, but such prepayment must be in equal one thousand dollar increments to facilitate accounting.  Any partial prepayment shall be applied against the principal amount outstanding and shall not in any event extend the Maturity Date for the remaining amount due.

3.      Notices.      Any notice to Borrower provided for in this Note shall be given by mailing such notice by certified mail addressed to Borrower at the Property address stated in paragraph 4 of this Note, or to such other address as Borrower may designate by notice to the Note holder. Any notice to the Note holder shall be given by mailing such notice by certified mail, return receipt requested, to the Note holder at the address stated in the paragraph 1(C) of this Note, or at such other address as may have been designated by notice to Borrower.

4.      Mortgage as Security. The indebtedness evidenced by this Note is secured by a Mortgage of even date herewith against 3010 Kaunaoa Street, Honolulu, HI 96815 (aka the front

MFB00022

house or Unit Diamond, the house in which Pat lives), and reference is made to the Mortgage for rights as to acceleration of the indebtedness evidenced by this Note.

5.    Waivers / Miscellaneous.    Presentment, notice of dishonor, and protest are hereby waived by all makers, sureties, guarantors and endorsers hereof. This Note shall be the joint and several obligation of all makers, sureties, guarantors and endorsers, and shall be binding upon them and their successors and assigns. If suit is brought to collect this Note, the Note holder shall be entitled to collect all reasonable costs and expenses of suit, including, but not limited to, reasonable attorney's fees. The interest on this Note shall be compounded monthly but in no case shall it exceed that maximum rate permitted by law.

BORROWER

*Patricia W. Buckman*
Patricia W. Buckman,
Individually

*Patricia W. Buckman*
Patricia W. Buckman,
Trustee of the Patricia W. Buckman
Revocable Trust dated July 25, 2019, as amended

State of Hawaii
City & County of Honolulu } ss
Subscribed and signed this
before me on 09 24-2023
Mihail Gilevich
Notary Public

MIHAIL GILEVICH #16-241
My commission expires July 10, 2024

Page **2** of **2**

MFB00023

|  |  |
|---|---|
| LAND COURT SYSTEM | REGULAR SYSTEM |

AFTER RECORDATION, RETURN BY MAIL [ ] PICKUP [ ]:
Mark F. Buckman, Esq.
7100 Bandy Road
Sacramento, CA 95829

This Document Contains 12 Pages

Tax Map Key No. (1) 3-1-024-043 CPR 0001
COTTAGES AT DIAMOND HEAD
Unit Diamond Head

### MORTGAGE

THIS MORTGAGE is made this **24** day of September, 2023, between and among PATRICIA W. BUCKMAN, individually and as Trustee of the Patricia W. Buckman Revocable Trust dated July 25, 2019, as amended, having all powers under said trust agreement, including full powers to sell, convey, exchange, mortgage, lease, assign or otherwise deal with and dispose of all lands of the trust estate and interests therein, whose address is 3010 Kaunaoa Street, Honolulu, Hawaii 96815 (herein **"Borrower"**) and MARK F. BUCKMAN, a married man as his sole and separate property, whose address is 7100 Bandy Road, Sacramento, CA 95829 (herein **"Lender"**).

WHEREAS, Borrower is indebted to Lender in the principal sum of TWO HUNDRED THIRTY-FIVE THOUSAND, SIX HUNDRED NINETY-FIVE AND NO/100 DOLLARS ($235,695.00), which indebtedness is evidenced by Borrower's note of approximate even date herewith (herein **"Note"**);

TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon, the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage, and the performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant, convey and assign to Lender, a married man as his sole and separate property, all of the property described in Exhibit "A" attached hereto.

Page 1 of 12

MFB00024

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rents, rights, appurtenances, and all fixtures now or hereafter attached to the property, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property are herein referred to as the "Property".

TO HAVE AND TO HOLD the same with all improvements now or hereafter erected thereon, and all rights, privileges and appurtenances thereto belonging, and the rents, issues and profits thereof and all of the estate, rights, easements, title and interest of the Borrower both at law and in equity, therein and thereto, or appertaining or held and enjoyed therewith, unto the said Lender, and its successors and assigns forever.

Borrower covenants that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, that the Property is unencumbered except by a first mortgage to Bank of Hawaii, and that Borrower will warrant and defend title to the Property against all claims and demands, subject to any declarations, easements or restrictions or encumbrances mentioned in Exhibit "A" attached hereto.

Borrower and Lender covenant and agree as follows:

1.      Payment of Principal and Interest. Borrower shall promptly pay when due the principal of and interest on the indebtedness evidenced by the Note, and any prepayment and late charges as provided in the Note.

2.      Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraph 1 hereof shall be applied first to any prepayment charges and late charges, then to any advances by or other costs of Lender, then to interest payable on the Note, and last to the principal due under the Note.

3.      Charges; Liens. Borrower shall pay all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any, when due, directly to the payee thereof, unless otherwise directed by Lender. Borrower shall promptly furnish to Lender all notices of amounts due under this paragraph, and Borrower shall promptly furnish to Lender receipts evidencing such payments. Borrower shall promptly discharge any lien which has priority over this Mortgage; provided, that Borrower shall not be required to discharge any such lien so long as Borrower shall agree in writing to the payment of the obligation secured by such lien in a manner acceptable to Lender, or shall in good faith contest such lien by, or defend enforcement of such lien in, legal proceedings which operate to prevent the enforcement of the lien or forfeiture of the Property or any part thereof.

4.      Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, and other hazards included within the term "extended peril coverage" (with inflation guard) in amounts at least equal to the full replacement cost of the insurable improvements on the Property. Borrower shall also obtain comprehensive public liability insurance as customarily provided in Hawaii for homeowner's insurance, and

MFB00025

flood insurance if the Property is within the flood zones eligible for federally subsidized flood insurance.

The insurance carrier providing the insurance shall be chosen by Borrower from insurance companies authorized to do business in the State of Hawaii. NOTICE IS HEREBY GIVEN BY LENDER TO BORROWER THAT BORROWER IS FREE TO PROCURE ANY INSURANCE POLICY REQUIRED BY THIS INSTRUMENT FROM ANY INSURANCE COMPANY AUTHORIZED TO DO BUSINESS IN THE STATE OF HAWAII. All premiums on insurance policies shall be paid by Borrower making payment, when due, directly to the insurance carrier, unless otherwise directed by Lender.

All insurance policies and renewals thereof shall be in form acceptable to Lender and shall include a standard mortgage clause in favor of and in form acceptable to Lender. If the Borrower shall procure any other insurance on the improvements on the property, all such insurance shall likewise include such standard mortgage clause in favor of the Lender and will be claimable by the Lender for application in accordance with this paragraph, and, whether or not so made payable, may be recovered by the Lender by any appropriate proceeding and be similarly applied. Lender shall have the right to hold the policies and renewals thereof, and Borrower shall promptly furnish to Lender all renewal notices and all receipts of paid premiums. In the event of loss, Borrower shall give promptly notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is damaged or destroyed, then the proceeds of the insurance insuring against such damage or destruction will he applied, at Borrower's option, to repair, restore or rebuild the Property, or to reduce the amount Borrower owes to Lender under the Note and under this Mortgage. Any such proceeds not used to repair, restore or rebuild the property shall be applied to the sums secured by this Mortgage. If the insurance proceeds are to be applied to the sums secured by this Mortgage, then the excess proceeds, if any, shall he paid to Borrower. If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance henefits, Lender is authorized to collect and apply the insurance proceeds to restoration or repair of the Property.

Unless Lender and Borrower otherwise agree in writing, any such application of proceeds to principal shall not extend or postpone the due date of any installment called for under the Note or change the amount of any such installments. If under paragraph 15 hereof the Property is acquired by Lender, all right, title and interest of Borrower in and to any insurance policies and in and to the proceeds thereof resulting from damage to the Property prior to the sale or acquisition shall pass to Lender to the extent of the sums secured by this Mortgage immediately prior to such sale or acquisition.

5.    <u>Preservation and Maintenance of Property</u>. Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of

MFB00026

Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

6. Protection of Lender's Security. If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, including, but not limited to, eminent domain, insolvency, code enforcement, or arrangements or proceedings involving a bankrupt or decedent, then Lender at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums and take such action as is necessary to protect Lender's interest, including, but not limited to, disbursement of reasonable attorney's fees and entry upon the Property to make repairs.

Any amounts disbursed by Lender pursuant to this paragraph 6, with interest thereon, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof, and shall bear interest from the date of disbursement at the rate payable from time to time on outstanding principal under the Note unless payment of interest at such rate would be contrary to applicable law, in which event such amounts shall bear interest at the highest rate permissible under applicable law. Nothing contained in this paragraph 6 shall require Lender to incur any expense or take any action hereunder.

7. Inspection. Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

8. Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Mortgage, with the excess, if any, paid to Borrower. In the event of a partial taking of the Property, unless Borrower and Lender otherwise agree in writing, there shall be applied to the sums secured by this Mortgage such proportion of the proceeds as is equal to that proportion which the amount of the sums secured by this Mortgage immediately prior to the date of taking bears to the fair market value of the Property immediately prior to the date of taking, with the balance of the proceeds paid to Borrower.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date such notice is mailed, Lender is authorized to collect and apply the proceeds, at Lender's option, either to restoration or repair of the Property or to the sums secured by this Mortgage.

MFB00027

Unless Lender and Borrower otherwise agree in writing, any such application of proceeds to principal shall not extend or postpone the due date of any installment called for under the Note or change the amount of any such installments.

9.    Continuing Liability of Borrower. Unless Lender agrees in writing to release the original Borrower or any of Borrower's successors in interest, any extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest.

10.    Forbearance by Lender Not a Waiver. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of any of Lender's rights, including, without limitation, to accelerate the maturity of the indebtedness secured by this Mortgage.

11.    Remedies Cumulative. All remedies provided in this Mortgage are distinct and cumulative to any other right or remedy under this Mortgage or afforded by law or equity, and may be exercised concurrently, independently or successively.

12.    Successors and Assigns Bound; Joint and Several Liability; Captions. The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 14 hereof. All covenants and agreements of Borrower shall be joint and several. The captions and headings of the paragraphs of this Mortgage are for convenience only and are not to be used to interpret or define the provisions hereof.

13.    Notice. Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by mailing such notice by certified mail, return receipt requested, addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail, return receipt requested, to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

14.    Transfer of the Property. If Borrower shall sell, dispose of, transfer (including by way of Agreement of Sale), or further encumber, or agree to sell, dispose of, transfer (including by way of Agreement of Sale), or further encumber, all or any portion of the Property, excluding (a) the creation of purchase money security interest for household appliances, (b) a transfer by devise, descent or by operation of law upon the death of a joint tenant, or (c) the grant of any leasehold interest of three years or less not containing an option to purchase, then except as otherwise prohibited by federal or state law, Lender may, at Lender's option, declare all the sums secured by this Mortgage to be immediately due and payable pursuant to Paragraph 15 hereof.

Page 5 of 12

MFB00028

15.    Default. In the event of default, that is to say, if any one or more of the following events shall happen:

(1)    Borrower fails to make any payment of principal or interest on the Note secured hereby on or before the date such payment is due;

(2)    Borrower fails to make payment of any advance or expense with interest thereon secured hereby, or repay any disbursement with interest thereon authorized by the terms of this Mortgage and actually made by Lender;

(3)    Borrower fails to perform or observe any other covenant, condition, or agreement contained herein or in any other instrument or obligation secured hereby;

then in each such event and after providing the notice as hereinafter set forth, at Lender's option, the whole amount of all indebtedness owing by or chargeable to the Borrower under any provision of this Mortgage or intended to be secured hereby shall become at once due and payable, and any delay or failure on the part of Lender to demand such payment shall not prejudice the right of Lender to do so. Prior to acceleration by Lender as aforesaid, Lender shall mail notice to Borrower as provided in paragraph 13 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than thirty (30) days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage and sale of the Property.

In each such event of default, with or without foreclosure, the Borrower, upon demand of Lender, shall forthwith surrender to Lender the actual possession of the Property and, to the extent permitted by law, Lender (i) may enter and take possession of the mortgaged property, together with the books, papers, and accounts of the Borrower relating thereto, (ii) may exclude the Borrower, its agents, and servants therefrom, (iii) may hold, operate, and manage the same and from time to time make all needful repairs and such alterations, additions, advances, and improvements as Lender shall deem wise, (iv) may receive and collect all rents, income, and profits from the Property whether then due or accrued or to become due, and said rents, income, and profits are hereby assigned to Lender, and Lender is hereby irrevocably appointed the attorney-in-fact of the Borrower in the name of the Borrower, or in the name of Lender, to demand, sue for, collect, recover, and receive all such rents, income, and profits, to compromise and settle claims for rents, income, or profits upon such terms and conditions as the Lender may deem proper, and out of the same, may pay all proper costs and expenses in connection therewith, including reasonable compensation to Lender's agents, attorneys, counsel, and accountants, and any taxes and assessments and other charges, including rents, prior to the lien of this mortgage, which Lender shall deem it wise to pay, and all expenses of such repairs, alterations, additions, and improvements, and other disbursements made by Lender pursuant to the terms hereof, and may apply the remainder of the moneys so received by Lender to the payment of the unpaid principal of, and interest on, the or any other obligation secured hereby, and (v) may enter into, renew, or terminate leases or tenancies.

Page 6 of 12

MFB00029

In each such event of default, Lender may, in its sole discretion, foreclose this Mortgage: (a) by civil action, with the immediate right to appointment of a receiver with the aforesaid powers upon ex parte motion or order and without bond pending foreclosure; (b) by entry and possession; (c) with or without entry and possession, by advertisement and sale under Section 667-5, Hawaii Revised Statutes, as amended or otherwise, of all or any portion or portions of the Property, either as a whole or in parcels or units, and on such terms as to payment and credit, partial credit, and security for payment as Lender may approve, having first given notice as required by law, at public auction in Honolulu, Hawaii, unless at the time of such sale the law requires, notwithstanding this provision, that the sale be held elsewhere, in which event such sale shall be held wherever required by such law, and may either in the name of Lender or as the attorney-in-fact of the Borrower for such purpose hereby irrevocably appointed, give valid receipts for the purchase money and effectually assign, transfer, and convey the Property so sold to the purchaser or purchasers absolutely and forever; or (d) by any other remedy then provided by law.

Any foreclosure shall forever bar the Borrower and all persons claiming under the Borrower from all right, title, and interest in the Property at law and in equity, notwithstanding any provision of law to the contrary now existing or hereafter enacted, the Borrower expressly waiving the benefits thereof, and no foreclosure sale shall impair or affect the lien of this Mortgage on any portion of the Property remaining or any other remedy of Lender for the recovery of any indebtedness remaining after application of said moneys. Out of the proceeds of any foreclosure sale, Lender may deduct all costs and expenses of any remedy pursued, including attorneys' fees, may pay and discharge any lien, either prior or junior to this Mortgage, on said property, and retain or be awarded all sums necessary to repay advances authorized hereunder and to satisfy all indebtedness of the Borrower to Lender whether or not then due, rendering the surplus, if any, to the Borrower. IF SUCH PROCEEDS SHALL BE INSUFFICIENT TO DISCHARGE THE SAME IN FULL, THEN EXCEPT AS OTHERWISE PROVIDED BY LAW, LENDER MAY HAVE ANY OTHER LEGAL RECOURSE AGAINST THE BORROWER FOR THE DEFICIENCY.

This Mortgage shall not prevent nor be deemed to prevent Lender, in the event of default, from pursuing any other remedy whatsoever against Borrower for the collection of the indebtedness hereby secured and interest thereon and Lender may, at the option of Lender, pursue any other course to collect said indebtedness and interest thereon and resort to any assets of Borrower whatsoever without first resorting to, and without prejudice to the right to later resort to, the Property pursuant hereto.

Neither the Borrower nor anyone claiming by, through, or under Borrower, to the extent Borrower may lawfully so agree, shall or will set up, claim, or seek to take advantage of any appraisement, valuation, stay, extension, or redemption laws now or hereafter in force in any locality where any of the Property is situated, in order to prevent or hinder the enforcement or foreclosure of this Mortgage, or the absolute sale of the Property, or the final and absolute putting into possession thereof, immediately after such sale, of the purchasers thereat; and Borrower, for themselves and all who may claim under them, hereby waive, to the full extent that

MFB00030

they may lawfully do so, the benefit of all such laws, and any and all right to have the estates comprised in the security intended to be created hereby marshalled upon any foreclosure of the lien hereof and agrees that Lender or any court having jurisdiction to foreclose such lien may sell the Property as an entirety.

16.    Governing Law; Severability. This Mortgage shall be governed by the law of the State of Hawaii. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Mortgage and the Note are declared to be severable.

17.    Assignment of Rents; Appointment of Receiver. As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 15 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 15 hereof or abandonment of the Property, Lender shall be entitled to have a receiver appointed by a court to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorney's fees, then to the sums secured by this Mortgage. The receiver shall be liable to account only for those rents actually received.

18.    Defaults on Prior Mortgages. A default under any mortgage prior to this Mortgage that continues for 30 days or more, or the commencement of any action to foreclose any such prior mortgage, shall constitute a default under this Mortgage and all amounts secured hereby shall immediately become due and payable without notice at the option of the Lender, notwithstanding the provisions of paragraph 15 to the contrary.

If the Borrower defaults under any prior mortgage, the Lender shall have the right but not the obligation to cure any such default, and all amounts paid or advanced by Lender to cure such default, including all costs and expenses incident thereto, together with interest from the time of such payments shall be added to the indebtedness secured by this Mortgage and may be collected hereunder at any time thereafter.

19,    Release. Upon payment of all sums secured by this Mortgage and payment by Borrower for the cost of a release, Lender shall release this Mortgage. Borrower shall pay all costs of recordation, if any.

20.    Usury. If the loan secured by this Mortgage is subject to a law which sets maximum loan charges and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the

Page 8 of 12

MFB00031

principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

21.    <u>Alterations and Improvements</u>. Borrower is not permitted to make additions or major improvements to the Property without Lender's written consent. Lender may inspect plans and specifications and may condition Lender's consent on Borrower's obtaining required building permit and evidence of Borrower's adequate financing or bonding to pay for the improvements; provided, however, that if after ten calendar days from the Borrower submitting such plans to Lender, Borrower has not received any advice from the Lender, then Lender's silence shall be deemed to be approval and Borrower may proceed with improvements or alterations.

IN WITNESS WHEREOF, the Borrower has executed this Mortgage on the day and year first above written.

_Patricia W. Buckman_

PATRICIA W. BUCKMAN,
Individually

_Patricia W. Buckman_

PATRICIA W. BUCKMAN,
Trustee of the Patricia W. Buckman
Revocable Trust dated July 25, 2019, as amended
"Borrower"

MFB00032

STATE OF HAWAII                    )

                                  ) SS.

CITY AND COUNTY OF HONOLULU       )


On this this 24 day of September, 2023, before me personally appeared PATRICIA W. BUCKMAN, to me personally known or adequately proven to be the person(s) described in and who executed the foregoing instrument, who, being by me duly sworn or affirmed, did say that such person(s) executed the same as the free act and deed of such person(s), and if applicable, in the capacity shown, having been duly authorized to execute such instrument in such capacity.

_____
Notary Public, State of Hawaii

Mihail Gilevich
_____
(Printed name)          MIHAIL GILEVICH #16-241
                        My commission expires July 10, 2024

My commission expires: July 10, 2024

Doc. Date: 09-24-2023          # Pages: 12

Name: Mihail Gilevich   First Circuit

Doc. Description: Mortgage

_____

Mihail Gilevich 09-24-23
Notary Signature              Date

NOTARY CERTIFICATION
MIHAIL GILEVICH #16-241
My commission expires July 10, 2024


Page 10 of 12

MFB00033

## EXHIBIT "A"

### FIRST

Unit Diamond Head of that certain Condominium Project known as "COTI AGES AT DIAMOND HEAD", as shown on Condominium Map No. 5725 and described in the Declaration of Condominium Property Regime dated January 25, 2018, recorded in the Bureau of Conveyances of the State of Hawaii as Document No. A-65990763, as may be amended from time to time.

Together with appurtenant easements as follows:

(A)     An exclusive easement to use the Dwelling Area having the same number as the Unit as designated on said Condominium Map.

(B)     An exclusive easement to use the parking spaces, if any, designated on said Condominium Map.

(C)     Non-exclusive easements in the common elements designed for such purposes for ingress to, egress from, utility services for and support of said Unit; in the other common elements for use according to their respective purposes.

(D)     Exclusive easements to use other limited common elements appurtenant thereto designated by the Declaration.

### SECOND

An undivided fifty percent (50%) interest in all common elements of the Project as established for said Unit by said Declaration, or such other percentage interest as hereinafter established for said Unit by an amendment of said Declaration, as tenant in common with the other Unit owners and tenants thereof.

Being a portion of the land conveyed to Grantor herein by UNIT DEED to Unit Diamond Head, dated August 11, 2022 recorded as aforesaid as Document No. A-82590334.

The land upon which said Condominium Project is located is described in said Declaration, which description is hereby expressly incorporated by reference.

SUBJECT, HOWEVER, to the following:

1.     The terms and provisions contained in said Declaration, as the same may be amended from time to time. (Project covered by Condominium Map No. 5725 and any amendments thereto.)

2.     Bylaws of the Association of Unit Owners for "COTTAGES AT DIAMOND HEAD", dated January 25, 2018, recorded in the Bureau of Conveyances of the State of Hawaii as Document No. A-65990764, as the same may be amended from time to time

Page **11** of **12**

MFB00034

3.      Any and all easements encumbering the Unit herein mentioned, and/or the common interest appurtenant thereto, as created by or mentioned in said Declaration, as the same may be amended from time to time, and/or in said Unit Deed, and/or as delineated on said Condominium Map.

TOGETHER WITH all built-in furniture, attached existing fixtures, built-in appliances, water heater, electrical and/or gas and plumbing fixtures, and attached carpeting, all of the foregoing being situate in or used in connection with the above-described real property.

**END OF EXHIBIT "A"**

Page 12 of 12

MFB00035

P. 1

<u>Front House</u>
  ⊠ Note & Mtg stay, but
reduced by 1/3.

<u>Back House</u>  — Mark's Trust on title
     Matt to have option to live
there for life, but has to sign
rental agreement. Matt pays
carrying costs, limited to $500/mo
for 1st year, $750/mo second year,
$1,000/mo third year, & then
carrying costs + $350 mo for maintenance (fund)
(estimated @ $1,200 month).

~~Back House sold~~:
If Matt doesn't pay monthly
costs, then he has to move out —
evicted if not out w/i 2 months.
Mark will then pay Matt the
net rental income (minus $350/mo
reserve fund). — About $1,500+ per month
          for housing expenses.
House sold upon Matt's passing —
Manoa to receive $200,000.
Only $10,000 paid to him in cash,
the balance to be for real estate

Settlement Agreement, Exhibit C

p. 2

Life Insurance as-is.
$40k Natalie
$80k Mark - holding $40k
for Matt, only $10k in cash,
the rest over time. Monica to
receive any unused balance.

$10,000 each to Gabby & Ellie,
for college costs from Back House
$10,000 to Monica upon Pat's passing.
Mark & Jeni to pay all own fees
& costs from Back House,
Natalie & Mom to pay all own fees
& costs from Front House.
                                    Patricia
                                    Mark, Jeni
Full releases of everyone⟶ Natalie, Carl

Matt & Monica beneficiaries. but Not
signatories.                  - but Not to
                                be changed.
Option to deed Back House to
New trust, if so, of PWB. If
so, then move another 10% of mortgage
off of Front House - b/c of reduced
tax burden.

        more detailed settlement agreement to be drafted.

• Mark agrees to pay Natalie ~~$1000/month~~ for the duration of Pat's life as long as Pat is living with Natalie.

p. 3

Mark has option, @ his expense, to hire professional property mgr.

Mark can give Pat $20,000 so Pat can leave $10,000 each to Emma & Brian

The undersigned have full authority to enter into this settlement and to do so with the intent to fully and finally resolve any and all disputes among them from the beginning of time & until today, July 17, 2025.

Patricia W. Buckman
Patricia Buckman

Mark Buckman

Jennifer Buckman

Natalie Pitre
Natalie Pitre

Carl Pitre