

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

PATRICIA W. BUCKMAN,        :   CIVIL NUMBER

PATRICIA W. BUCKMAN         :   24-00129 MWJS-KJM

REVOCABLE TRUST,            :

            Plaintiffs,       :

          Vs.                :

MARK F. BUCKMAN, MARK       :

F. BUCKMAN TRUST,           :

JENNIFER BUCKMAN, JOHN      :

DOES 1-10; JANE DOES 1-10;  :

DOE CORPORATIONS 1-10;      :

DOE PARTNERSHIPS 1-10;      :

DOE GOVERNMENTAL            :

AGENCIES 1-10,              :

         Defendants.         :

_____ :

 

      CONTINUED DEPOSITION OF NATALIE PITRE
taken by the Defendants at the Law Offices of Dentons
US LLP, 1001 Bishop Street, Suite 1800, Honolulu,
Hawaii 96813 on June 19, 2025, commencing at
10:12 a.m. pursuant to Notice.

 

REPORTED BY:  Kathryn Plizga, RPR, CSR No. 497

RALPH ROSENBERG COURT REPORTERS, INC.

**EXHIBIT 3**

APPEARANCES:

      For Plaintiffs Patricia W. Buckman, et al.

       RICHARD E. WILSON, ESQ.

         735 Bishop Street, Suite 306

         Honolulu, HI   96813

     For Defendants Mark F. Buckman, et al.

      LOUISE K.Y. INC, ESQ.

        Dentons US LLP

        1001 Bishop Street, Suite 1800

        Honolulu, HI   96813

      MARK F. BUCKMAN, ESQ.

        (Individually and as Trustee of the

        Mark F. Buckman Trust)

    For the Deponent:

       THOMAS E. BUSH, ESQ.

         1001 Bishop Street, Suite 1560.

         Honolulu, HI   96813


ALSO PRESENT:

Keoni Sallas, Videographer, Certified Legal and Video

Services

A.   I'm sorry, I don't remember.

Q.   Would you say for more than half of the interrogatories she needed her memory refreshed?

MR. BUSH:  Objection, vague.

A.   No, I don't think so.

Q.   What percentage would you say of the interrogatories she needed her recollection refreshed?

A.   About 10 percent.

Q.   How would you refresh her recollection?

A.   I would ask her questions.

Q.   Such as?  What do you mean?

MR. WILSON:  Objection, it goes into attorney-client communication.  Instruct you not to answer.

Q.   You would ask her questions or do you give her facts?

MR. WILSON:  Same objection, instruct you not to answer.

MR. BUCKMAN:  I'm not asking for --

MR. WILSON:  Yes, you are.

MR. BUCKMAN:  Please don't interrupt me.

Q.   I'm not asking you for what was said or what the facts are.  I'm asking you, do you give Mom facts to help her respond to the interrogatories?

RALPH ROSENBERG COURT REPORTERS, INC.

A.    I refuse to answer.

MR. BUSH:  So at this point whatever the instructions I think may have been given previously, I don't recall.  But what should have been given to you is that you let Mr. Buckman finish his question.

THE WITNESS: Okay.

MR. BUSH:  But then before you answer, let Mr. Wilson state what he needs to state.

THE WITNESS: Okay.

MR. BUSH:  And then you respond, just so we have it sequentially.

MR. BUCKMAN:  For clarification, because Mr. Wilson is not your attorney here, he can't instruct you not to answer.

MR. BUSH:  Oh, yes, he can.  I think he can.

MR. BUCKMAN:  Unless it's an instruction not to answer by your attorney, Mr. Bush, then you have to answer.

MR. BUSH:  Actually that's not correct.  I don't think that's correct.

THE WITNESS: I'm not listening to him.

MR. BUCKMAN:  Why do you think that's not correct?

MR. BUSH:  Because the holder of the privilege is Rich's client.

RALPH ROSENBERG COURT REPORTERS, INC.

Q. So, as you sit here today you don't have any idea of what facts in any of the complaints that were provided by you; correct?

A. That is correct.

Q. Do you know what facts in the complaint have been provided by Mom?

A. I equally don't know.

Q. Do you know what facts in the complaint have been provided by Tamara Buchwald?

A. I don't know.

Q. Do you know what facts in the complaint or the allegations in the complaint were provided by Kimberly Buckman?

A. I don't know.

Q. Is it correct that you communicated with Tamara Buchwald about providing more facts in the complaints in this matter?

A. Yes.

Q. And how many times did you communicate with Tamara about getting more facts for the complaints?

A. A couple.

Q. So is that two?

A. Yeah, maybe two, maybe three.

Q. No more than three times?

RALPH ROSENBERG COURT REPORTERS, INC.

A.   I don't recall more than three times.

Q.   So what facts did --

A.   Tammi wasn't there.

Q.   What facts did Tamara provide?

MR. BUSH:  Objection, asked and answered.

A.   None.  Tammi wasn't there.  Gee, I wasn't even there, it was between you and Mom.

Q.   Say again?

A.   It seems like it was between you and Mom.

Q.   What do you mean by that?

A.   This whole thing.

Q.   You mean like when Mom and I met and discussed things you weren't there; correct?

A.   Yeah.

Q.   Were you present or overheard anything that Mom and I discussed about signing any of the documents that are at issue in this case?

A.   You made sure that I wasn't there.

Q.   So the answer is yes, you have no personal knowledge of what was said or done when Mom signed any of the disputed documents in this case; correct?

A.   I was not present so I don't know.

Q.   Do you know if anybody else was present besides Mom and myself?

RALPH ROSENBERG COURT REPORTERS, INC.

A.   Well, I believe that you did the same thing to Matt too, because Matt got drunk, had him sign some stuff.

Q.   Can you read the question back, please?

(Whereupon, the question referred to was read back by the reporter.)

A.   I'm not omnipotent.  I was not there, I don't know.

Q.   There are some allegations in the complaint that Jennifer was there at some of the document signing.  Do you have any personal knowledge of that?

A.   I know that Jenny showed up with you and took Mom to the Outrigger for drinks and had her out all day and that Jenny was part of all of this.

Q.   I was asking you, do you have personal knowledge that Jennifer was there when any of the documents were discussed or signed?

A.   I have no more personal knowledge of her being there than I do of Mom or you being there.

Q.   Do you know if Kimi was ever present when documents were signed between Mom and I?

A.   I don't know.

Q.   So, would it be fair to say as far as you know, being your mom's facilitator in this case, that the facts about the meetings between Mom and I

RALPH ROSENBERG COURT REPORTERS, INC.

could only come from Mom?

MR. BUSH: Objection. Objection to the extent that it calls for speculation. Go ahead and answer.

MR. WILSON: And also beyond anything we've talked about.

MR. BUSH: That's right.

MS. BUCKMAN: Is that an attorney-client privilege objection?

MR. WILSON: I'm sorry, are you counsel of record?

MR. BUSH: Actually, you need to be quiet. You're just a party, right? That doesn't give you the right to talk during the deposition, a right to go on record. If you need to communicate something you have two attorneys here, you can talk to them and communicate with them, okay.

MR. BUCKMAN: Are you claiming attorney-client privilege with Natalie, Rich?

MR. WILSON: I'm just -- you asked the question if there were any facts outside of any facts she's done for me.

MR. BUSH: Let me clarify then the objection, okay? So Rich has made an attorney-client objection.

RALPH ROSENBERG COURT REPORTERS, INC.

So to the extent that you were a representative or facilitator for your mom and to the extent that you learned from Rich facts concerning meetings between Mr. Buckman and your mother, don't disclose that information.  So setting that information apart, if you can respond to his question.

THE WITNESS:  Okay.  Thank you.

A.    Yeah, the information would have come from either you or Mom.

Q.    Did you help Mom recall any of these facts that are alleged in the complaint?

A.    What do you mean by help her recall?

Q.    However you understand the phrase, ma'am.

MR. BUSH:  Objection, objection.

Q.    Do you understand help?  Do you understand that part?

A.    You're asking me to speculate again.

Q.    Do you understand what the definition of help is, ma'am?

A.    Why don't you define it for me.

Q.    So you don't know what help means, is that correct?

A.    In this context, help recall?

Q.    Did you talk with Mom about the allegations

Natalie -- so I need facts.  When did she come to Hawaii the last time prior to August 2023?  What did she do differently with Pat?  We need to tell the story.  Let's get on this sooner rather than later.  Rich."

Q.   Did you check with your mom to provide these facts to Mr. Wilson?

A.   Uh-huh.

Q.   And did she, without telling me the facts, did she provide you some facts?

A.   Yes.

Q.   Did you convey those facts to Mr. Wilson?

A.   Yes.

Q.   Did you also provide your own facts to Mr. Wilson?

MR. BUSH:  Objection, vague as to own facts.

Q.   Did you provide some facts that Mom had not provided?

A.   Yes.

Q.   So you added some other facts in addition to Mom's; correct?

A.   Yes.

Q.   And did Tamara add some extra facts as well?

A.   No.

Q.   Did you talk to Tamara about this e-mail?

RALPH ROSENBERG COURT REPORTERS, INC.

A.    No.

Q.    Did you talk to her about the subject matter, about getting more facts to tie in Jennifer as part of the conspiracy?

A.    No.

Q.    Did you talk to Kimi about trying to get more facts to allege against Jennifer?

A.    Yes.

Q.    And you wanted Jennifer to be in the case because she couldn't afford to be disbarred; correct?

A.    Yes.

Q.    And you did that because you wanted to get leverage over me; correct?

A.    Yes.

Q.    And you thought it would be better for settlement if you had Jenny in the case; correct?

A.    I don't know if I was thinking settlement. I don't know what we were thinking.

Q.    Was it to apply more pressure to me?

A.    Yeah, it was to apply pressure.

Q.    On me?

A.    Yeah.

Q.    Because I wouldn't want my wife to be sued; correct?

A.    Well, I mean, anybody who wasn't a

narcissist and cared about their wife would be worried about that.

Q.   So that's a yes?

A.   Yes.

Q.   And as to the facts you provided to Mr. Wilson, without telling me what they were, what was the mix of facts between Mom and you?  Was it 50/50 that you provided, was it more you providing facts or was it more Mom?

MR. WILSON:  Objection, speculation.

A.   Yeah, I just don't know.  I think it was mostly Mom.

Q.   Would it be fair to say you were the sole conduit of the facts sought in this e-mail from Mom to Rich?

A.   Sole conduit?

Q.   Sole person that transmitted the information to Rich?

A.   Yes.

MR. BUSH:  Objection, speculation.  That's speculation.

A.   Yes.

Q.   Did Mom ever tell you she picked up the phone and called Rich and talked about these matters?

A.   No, she didn't as far as I know.

Q.    So when was the last time that Jenny came to Hawaii prior to August 2023?

A.    I don't know.

Q.    Was it 2022?

A.    I don't know.

Q.    Did we visit with you guys in 2018?

A.    I don't know.

Q.    Did Matt and Manoa come up to our house in 2018?

A.    I don't know.

Q.    Did you come up to California with Mom and stay at our house when Emma graduated from high school in 2018?

A.    I don't know.

Q.    Did we come to Hawaii in 2020, right before COVID in March 2020 --

A.    I don't know.

Q.    -- and visit with Mom?

A.    Describe visit with Mom.  I mean, you're making it sound like --

Q.    Come and spend time with Mom.

A.    Yeah.

Q.    In 2020?

A.    You might have went and talked to her.

Q.    In 2019 we also came to Hawaii, Emma and I

RALPH ROSENBERG COURT REPORTERS, INC.

came to Hawaii at Christmastime; correct?

A.    Yeah, at some point you guys made these cut-out chain-things, pictures.

Q.    For Christmas ornaments?

A.    Uh-huh.

Q.    And in 2021 we came to Hawaii in like April, Emma and I; correct?

A.    You mean when you stayed at the Surf Jack and you had Emma distract me so you could go and talk to Mom?

Q.    In 2021 did Emma and I come to Hawaii, and you say I visited with Mom; correct?

A.    If that was the time, I don't know.

Q.    You say I went and visited with Mom because Emma distracted you?

A.    There was a point at which right after you received the trust documents, then you showed up in Hawaii with Emma.

Q.    We're talking in 2021, the trust documents are in 2023.

A.    Oh, okay, yeah.  I don't know about 2021.

Q.    Then in 2021 we came to Hawaii to celebrate Brian's graduation from high school and his 18th birthday and we visited with you and Mom and you and Matt; right?

RALPH ROSENBERG COURT REPORTERS, INC.

A.    Was that when Brian, he had that cool kid, that young boy who was Brian's friend?

Q.    We also visited with Gabriel on that trip; yes.

A.    Yes.

Q.    Do you remember Gabriel was also on the trip with us in March of 2020 right as COVID was starting?

A.    I don't remember that.

Q.    Do you remember Emma and I visiting in 2022 around Christmastime and visiting with you and Mom and Matt?

A.    Is that the time that we made the ornament things?

Q.    I don't know.  You remember that?

A.    Yeah.  I don't know.

Q.    So, let's look at the next exhibit, Exhibit 19.

You see Exhibit 19?  It's an e-mail from Richard Wilson to you and Tamara dated October 30, 2024, and the subject is "Haha, Jen is still in full play."

And it says, "Enjoy the read."  Have you seen this e-mail before?

A.    Yes.

Q.    And what does, "Haha, Jen is still in full

STATE OF HAWAII        )

COUNTY OF HONOLULU )     SS.

I, KATHRYN PLIZGA, RPR, Hawaii CSR, Notary Public, State of Hawaii, hereby certify:

That on June 19, 2025 at 10:12 a.m. appeared before me NATALIE PITRE, the witness whose deposition is contained herein; that prior to being examined, the witness was by me duly sworn;

That pursuant to Rule 30 (e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to the transcript was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

That the foregoing represents, to the best of my ability, a full, true and correct transcript of said deposition.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

_____

KATHRYN PLIZGA, RPR, Hawaii CSR 497

RALPH ROSENBERG COURT REPORTERS, INC.